**Jason K. Singleton**, State Bar #166170
jason@singletonlawgroup.com
**Richard E. Grabowski**, State Bar #236207
rgrabowski@mckinleyville.net
**SINGLETON LAW GROUP**
611 "L" Street, Suite A
Eureka, CA 95501
(707) 441-1177
FAX  441-1533

**Attorneys for Plaintiff, ASIS INTERNET SERVICES and JOEL HOUSEHOLTER**

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASIS INTERNET SERVICES, a California corporation, and JOEL HOUSEHOLTER, dba KNEELAND ENGINEERING, dba FOGGY.NET<br><br>Plaintiffs,<br>vs.<br><br>ACTIVE RESPONSE GROUP, INC., a Delaware corporation, et al.<br><br>Defendants. | Case No. C-07-6211 TEH<br><br>PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF IMPOSITION OF A PROTECTIVE ORDER |

This brief is in response to the Court's Order of April 7, 2008, requesting information concerning why a protective order should be issued in this matter.  Plaintiffs assert a protective order is proper to allow Plaintiffs to disclose confidential materials in a limited manner in order to further the litigation process, while protecting Plaintiffs and their customers from harm. **FRCP** Rule 26(c)(1)(G) authorizes a protective order to protect trade secrets or other confidential information.  Plaintiffs posit there are three reasons Plaintiffs' customers' email addresses should be protected from public disclosure.  1) Plaintiffs, each an Internet Access Provider, are required by statute to protect their customers information; 2) Plaintiffs, and their customers could suffer denial of service attacks if the account information is publicly disclosed; and 3)  Defendant's reasons for public disclosure of Plaintiffs' customers email addresses are without merit.

Internet access providers are required by statute to protect their customers private

information, including identity.  15 **USC** §6501-6506 requires an internet service operator to protect any information relating to or that can be used to identify a child (anyone under the age of 13) from disclosure.  Since most of Plaintiffs' email accounts are let to families, in their service areas, disclosure of customer identity information would violate 15 **USC** §6501 et seq. 47 **USC** §222 requires a common carrier providing wire communications access to protect the confidentiality of customer proprietary network information.  Email and Internet access are wire communications.   The carrier must protect aggregate information including customer proprietary network information.  It is likely that a list of email accounts fits within the definition of aggregate information that a carrier is required to protect.  Moreover, The **California Constitution**, Article 1, Section 1, provides a right to privacy that protects the private information of individuals in California.  The California Supreme Court has ruled that there is a legally recognized right to:  "precluding the dissemination *or misuse* of sensitive and confidential information ("informational privacy")." **Hill v. National Collegiate Athletic Assn.**, 7 Cal.4th 1 at 35 (Cal.,1994).  As is set forth in more detail below, publicly disclosing thousands of email addresses to hundreds or thousands internet marketers could lead to the misuse of normally confidential information.

     Public disclosure of Plaintiffs' customers' email addresses could lead to serious harm to Plaintiffs and Plaintiffs' customers.  Plaintiffs are experienced Internet and Email service providers.  As such they have experienced denial of service attacks perpetrated by malicious parties.  Public disclosure of Plaintiffs' email lists potentially provides those malicious persons with the information necessary to perpetrate a denial of service attack on Plaintiffs.  A denial of service attack can be perpetrated by various methods.  One of the simplest methods is to use a botnet[1] to flood the Internet Access Provider's (hereafter "IAP') servers with emails until the servers can no longer operate.  See FTC Report: *Spam Summit:  The Next Generation of Threats and Solutions*, November 2007, P. 2–19, describing botnets and their use in denial of

---

[1] A network of hijacked computers that enables spammers to send large volumes of spam anonymously and remotely. Botnets often are credited with increasing the volume of spam hitting the filters of email and Internet service providers ("ISPs").  FTC Report: *Spam Summit:  The Next Generation of Threats and Solutions*, November 2007, P. 2–3.

service attacks. Courtesy copy attached. Alternatively Plaintiffs' email lists could simply be sold and resold on spammer networks and used to send an ever increasing level of spam.

Plaintiffs also fear that directory harvests[2] of their email address lists could occur. The FTC reports that Northeast Netforce Investigators placed 250 new undercover email addresses on 175 locations on the Web (blogs, message boards, etc.) within eight minutes one of the emails started receiving SPAM. FTC Report: *Federal, State, and Local Law Enforcers Tackle Deceptive Spam and Internet Scams*, November 13, 2002. Courtesy copy attached. More recently in 2007 the FTC repeated the experiment and found that spammers continue to harvest email accounts and use them to send increasing levels of SPAM. See FTC Report: *Spam Summit: The Next Generation of Threats and Solutions*, November 2007, P. A-3.

Defendant's proffered basis to seek <u>public disclosure</u> of Plaintiffs' customers' email addresses is without merit. Defendant asserts that "*it may only determine the origination of the subject emails by examining the email addresses to which the subject emails were sent.*" Defendant's Joint CMC Statement (Docket 16), p.4, lines 9-10. Defendant <u>has not</u> explained the mechanics of how the "*sent to*" email addresses will reveal *who sent* the spam. Defendant has stated it did not send the emails and that it did not hire a contractor to send them. Consequently, Plaintiffs cannot logically, or technically, deduce how the "sent to" addresses will reveal the party that "sent."

---

[2] A Directory Harvest Attack or DHA is a technique used by spammers in an attempt to find valid/existent e-mail addresses at a domain by using brute force. The attack is usually carried out by way of a standard dictionary attack, where valid e-mail addresses are found by brute force guessing valid e-mail addresses at a domain using different permutations of common usernames. These attacks are more effective for finding e-mail addresses of companies since they are likely to have a standard format for official e-mail aliases (i.e. jdoe@example.domain, johnd@example.domain, or johndoe@example.domain).

There are two main techniques for generating the addresses that a DHA will target. In the first, the spammer creates a list of all possible combinations of letters and numbers up to a maximum length (15, for example) and then appends the domain name. This would be described as a standard brute force attack.

The other, more targeted technique, is to create a list that combines common first name and surnames and initials (as in the example above). This would be considered a standard dictionary attack when guessing usernames for e-mail addresses. The success of a directory harvest attack relies on the recipient e-mail server rejecting e-mail sent to invalid recipient e-mail addresses during the Simple Mail Transport Protocol (SMTP) session. Any addresses to which email is accepted are considered valid and are added to the spammer's list (which is commonly sold between spammers). Although the attack could also rely on Delivery Status Notifications (DSNs) to be sent to the sender address to notify of delivery failures, directory harvest attacks likely don't use a valid sender e-mail address. *Wikipedia* at http://en.wikipedia.org/wiki/Directory_Harvest_Attack.

1     Moreover, it is not true that Defendant is without tools to determine who sent the subject
2  emails.  The subject emails contain in the body of the email, a creative.  An advertisement.
3  That advertisement is a link to a web site maintained by Defendant.  When a consumer clicks
4  on that ad, the consumer is instantly brought to Defendant's web page.  Now, Defendant
5  presumably has (like all internet marketers) software known as "link tracking" or "click through
6  tracking."  Such software tells Defendant which of its contractors generated which internet
7  traffic.  This software is the basis on which Defendant knows how much money to pay each of
8  its affiliates.  Consequently, the web link within the creative contains an "affiliate ID."  That
9  affiliate ID is recorded with Defendant for each "click through" to Defendant's web site.
10  Defendant need only look at the affiliate ID within the body of the subject emails, and thus
11  determine which of Defendant's affiliates was going to get paid for traffic generated by such
12  emails.  Defendant has not yet contended that the links within the body of the subject emails
13  does not direct to Defendant's web sites.
14     Equally pertinent, is that the proposed protective order provides that each party's
15  "retained expert" may view any materials designated under the protective order.  Whatever
16  analysis that needs to be done on the undredacted subject emails, can and should be done by
17  Defendant's expert.  If there is any information that needs to be provided to Defendant's
18  expert, by Defendant, so that such expert can compare that data to the subject emails, same is
19  not only possible, but likely what will occur in any event to prepare for expert disclosure.
20  Defendant is not prejudiced by designation under the proposed protective order, and Plaintiffs
21  are clearly protected from possible harm.
22     Plaintiffs suspect that Defendant, like most all internet marketers, maintains an "opt-in"
23  list.  This is a list of consumers who have entered their email address on a web site, indicating
24  assent to receive marketing material via email.  Defendant would probably wish to know
25  whether any of the recipient addresses on the subject emails appear in Defendant's "opt-in"
26  list.  Disclosure of private email addresses to an alleged spammer need not occur for this
27  comparison to be done.  Defendant does not need the complete email addresses to search its
28  "opt-in" list.  All of the subject email addresses, contain the "ASIS", or "FOGGY" domain.  For

example, "johndoe@asis.com."  Defendant can very easily run a search for all email addresses within its "opt-in" list, to find any email addresses which contain the "ASIS" domain.  Then, since Defendant's counsel, or expert, will be privy to the unredacted email list, (designated AEO), counsel or expert can themselves compare the "ASIS" "opt-in" list from Defendant, with the subject email addresses.  The same process can be used by Defendant to search its affiliates "opt-in" list, without disclosing to hundreds, or even thousands, of internet marketers Plaintiffs' customers' email addresses.  Plaintiffs are concerned that Defendant seeks *public disclosure* of Plaintiffs' customers email addresses, not due to any paramount need, but rather as leverage in the overall litigation.

Defendant cited the decision of Judge Laporte in the **Phillips v Netblue** case.  **Phillips v. Netblue**, 2006 WL 3545002 (N.D. Cal. Dec. 8, 2006).  Defendant argues that there is no need for a protective order based on the language from Judge Laporte's order as Defendant cited in the Joint Report, Pg. 4, L. 17–20.  However, this order only dealt with email accounts that were closed or inactive.  It did not apply to live consumer owned email accounts.  Plaintiff there had simply relied on the prior Order of the Court granting AEO designation, and had not explained to Judge Laporte why it was necessary to protect closed and administrative accounts.  At issue in the present case are both live accounts, and closed and administrative accounts.

Administrative email accounts are used by internet access providers for testing, configuring, and maintenance of email computer servers.  As discussed above, Plaintiffs have good reason to be concerned with a denial of service attacks or increased level of spamming by exposure of their email accounts to the public.  This threat is just as big a problem if the attack is directed to administrative and closed accounts as it is for live accounts.  The spam still hits Plaintiffs' servers.  Further, it is likely that at some point certain email accounts which are presently inactive, might be requested by a new client of Plaintiffs'.  A hypothetical mary@asis.com may be inactive now, but likely requested by a client in the future.

Moreover, Defendant will be hard pressed to explain why it might have "opt-in" consent to send commercial emails to internal administrative addresses, and email addresses which

1  have been inactive since prior to the adoption of the **CAN SPAM Act**.

2  Ultimately, there is no substantive basis underlying Defendant's request to *publicly*
3  *disclose* Plaintiffs' customers' and administrative email addresses, yet there is a real threat of
4  harm to Plaintiffs and Plaintiffs customers if public disclosure occurs.

5  Finally, Defendant is now refusing to produce documents with its **FRCP** 26 Initial
6  Disclosures, waiting to see if the Court will effect a protective order, so that Defendant can
7  designate its documents thereunder.  (Exhibit "A" hereto)  It seems odd that Defendant
8  opposes the imposition of a protective order, yet is refusing to produce documents on the basis
9  such documents fall within the gambit of protection.

**SINGLETON LAW GROUP**

Dated:      April 21, 2008          /s/ Jason K. Singleton
                                     Jason K. Singleton
                                     Richard E. Grabowski, Attorneys for Plaintiffs,
                                     **ASIS INTERNET SERVICES and JOEL**
                                     **HOUSEHOLTER, dba FOGGY.NET**