THOMAS R. BURKE (CA State Bar No. 141930)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111
Telephone:    (415) 276-6500
Facsimile:    (415) 276-6599
Email:         thomasburke@dwt.com
Attorneys for Defendant Active Response Group, Inc.

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ASIS INTERNET SERVICES, a California corporation, and JOEL HOUSEHOLTER, d/b/a KNEELAND ENGINEERING, d/b/a FOGGY.NET,

    Plaintiffs,

v.

ACTIVE RESPONSE GROUP, INC. et al.

    Defendants.

Case No. CV 07-6211 TEH

DEFENDANT ACTIVE RESPONSE GROUP, INC'S SUPPLEMENTAL BRIEF ON PROTECTIVE ORDER

Defendant Active Response Group, Inc. ("ARG") submits this brief pursuant to the Court's April 28, 2008 order requiring supplemental briefing on the parties' dispute concerning Plaintiffs' request that the addresses of the unassigned or inactive accounts at the heart of this dispute be marked "Highly Confidential" and unavailable for review by knowledgeable ARG representatives or its affiliates.

## I. ARGUMENT

On April 28, 2008, the Court ordered the parties to submit a proposed order as well as explicitly state (1) the precise disclosures Plaintiffs seek to have protected; (2) what portions of the proposed Protective Order are in dispute; (3) whether Defendant consents to any degree of protection for the disclosures; and (4) responses to the arguments set forth in the parties' April 21, 2008 briefs. ARG proposes the Court enter the standard order issued in the Northern District of California, as modified and attached herewith.[1]

---

[1] It is for this reason, not that suggested by Plaintiffs' counsel, Pl. MPA at 6, Ex. A, that ARG did

### A. The Precise Disclosures Plaintiffs Seek to Have Protected.

Plaintiffs allege ARG unlawfully sent emails to them. ARG contends it did not send any emails to Plaintiffs, as it does not send email to any entities. *See* Declaration of Brady Brown, ¶ 1. Plaintiffs seek to preclude ARG from learning for itself, who sent the emails at issue by having an employee examine the email addresses to which emails were allegedly sent. *See Id.*, ¶¶ 6-8. Plaintiffs seek to shield these email addresses, which Plaintiffs alleged are either for email accounts that are no longer active or are unassigned to any individuals, by designating them "Highly Confidential—Attorney's Eyes Only," the highest level of protection available for documents that is reserved for extremely sensitive kinds of information not at issue here.

### B. The Portions of the Protective Order in Dispute.

The standard protective order in the Northern District of California provides two tiers of protection for information. *See* Proposed Order at 2. It defines "'Confidential' Information or Items" as "information… or tangible things that qualify for protection under standards developed under F.R.Civ.P. 26(c)." *Id.* at 2, ¶ 2.3. It defines "'Highly Confidential—Attorneys' Eyes Only' Information or Items" as "extremely sensitive 'Confidential Information or Items' whose disclosure to another Party or non-party would create a substantial risk of serious injury that could not be avoided by less restrictive means.'" *Id.* at 2, ¶ 2.4. "Confidential" information may only be divulged to the party's outside counsel and employees to whom disclosure is "reasonably necessary" and who must sign an agreement to be bound by the Protective Order. *Id.* at 7, ¶ 7.2(b). "Highly Confidential" information, however, may be disclosed only to the party's outside counsel and in certain circumstances, to its in-house counsel. *See id.* at 8, ¶ 7.3(a)(b).

The order requires parties to exercise restraint and care in designating material for protection, so that materials "for which protection is not warranted are not swept unjustifiably within the ambit of this Order." *Id.* at 3, ¶ 5.1. "Designations that are shown to be <u>clearly unjustified</u> or that <u>have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process, or to impose unnecessary expenses and burdens on other parties</u>), expose the Designating Party to sanctions." *Id.* (emphasis added).

---

not directly provide its initial disclosures to Plaintiffs, and elected to describe them by category.

2

The parties dispute whether the email addresses to which ARG allegedly sent unlawful emails should be designated as "Confidential," with limited additional disclosure, or "Highly Confidential." Plaintiffs contend that the email addresses should be designated as "Highly Confidential." *See* Pl. MPA. ARG contends such a designation would be both unjustified and made for an improper purpose, and that the "Confidential" designation should instead apply to the email addresses, with limited additional disclosure as identified in the Proposed Order.

### C. Whether Defendant Consents to Any Protection for the Disclosures at Issue.

ARG consents to the designation of the email addresses as "Confidential" under the Proposed Order, with the exception that ARG's employees be able to share the email addresses with its Affiliates to the extent necessary to determine the identity of the emails' senders.

### D. Response to the arguments set forth in Plaintiffs' April 21, 2008 Brief.

#### 1. Plaintiffs' Privacy Concerns are Insubstantial.

Disclosure of the email addresses would not create a "substantial risk of serious injury that could not be avoided by less restrictive means," as required by the "Highly Confidential" designation. If ARG were responsible for sending emails to these addresses—as the Complaint alleges—presumably ARG already knows these addresses, and this information is not confidential at all, and certainly should not be designated "Attorneys Eyes Only." This is particularly salient in light of the fact that the emails in dispute were sent to "unassigned or inactive email accounts owned by ASIS and Foggy." Compl. ¶ 17; *see also id.* ¶ 25, 36 ("Note that all receiving email accounts have been redacted, while these email all represent inactive email accounts they are still the property of ASIS and FOGGY and are protected by Plaintiffs' corporate privileges."). If the email addresses are unassigned or inactive,[2] the addresses are unlikely to involve any individual privacy or confidentiality concerns at all.[3]

---

[2] Plaintiffs have not disclosed how many of the email accounts in dispute are inactive versus unassigned.

[3] Indeed, it is Plaintiffs' practices of reviewing the content of emails within their own customers' email accounts that raises legitimate privacy concerns. Even keeping these accounts open, according to AsIs's own expert in a prior case, could be a privacy violation. *See AsIs Internet Servs. v. Optin Global, Inc. et. al.*, C-05-4401, Dkt. 361 at 4, Point 30.

Nonetheless, in numerous CAN-SPAM cases,[4] Plaintiffs' counsel, on behalf of different plaintiffs, has consistently fought to keep the email addresses at issue out of the hands of their opponents' employees—and at least one court has seen through their act. In *Phillips v. Netblue*, No. C05-4401 SC (EDL), Magistrate Judge Laporte properly recognized that there was no consumer privacy to be protected in unassigned or inactive email accounts, stating:

> [t]he purported "highly confidential" or even "confidential" nature of this list of email addresses is not evident on its face. <u>Plaintiff states that the accounts are inactive or have never been active. Accordingly, there is no consumer privacy or commercial value to protect here</u>. Plaintiff has not offered any support to show how "disclosure to another Party or nonparty would create a substantial risk of serious injury that could not be avoided by less restrictive means." Stipulated Protective Order at 2.4 (defining "Highly Confidential").

*Phillips*, 2006 WL 3545002, at *2 (Dec. 8, 2006 N.D. Cal.) (emphasis added).

Plaintiffs' attempts to distinguish this order from the instant case are futile. They assert they did not explain to Judge Laporte why it was necessary to protect closed and administrative accounts. Pl. MPA at 5. In fact, this issue appears to have been fully briefed, with Plaintiffs' counsel devoting an entire section of their opposition brief to a motion to compel on this very issue. *See Phillips*, Dkt. 86 at 17 ("C: Plaintiff's response to Defendants' request to modify its designation of the emails it produced to Netblue's request for production No. 1 as 'Highly Confidential'…"). Plaintiffs also assert that Judge LaPorte's order "only dealt with email accounts that were closed or inactive," and that "live accounts" are at issue here. Pl. MPA at 5. Plaintiffs here have pled only that inactive accounts received email, and should they wish to allege otherwise, must seek leave to amend. Moreover, just three paragraphs later, Plaintiffs claim ARG will be "hard pressed to explain why it might have 'opt-in' consent" for "internal administrative addresses, and email addresses which have been <u>inactive since prior to the adoption of the CAN-SPAM Act</u>."

---

[4] Plaintiff AsIs Internet Services, Inc. ("AsIs"), as well as Plaintiffs' counsel, are notorious for filing lawsuits uder the CAN SPAM Act of 2003, with AsIs having instituted at least seven other actions in the Northern District of California alone. *See* Ltr. From Burke to Judge Henderson (Apr. 8, 2008), Dkt. 20. Judge Spero granted summary judgment against AsIs last week in a case raising identical issues as this litigation. *See AsIs Internet Servs. v. OptIn Global, Inc. et al.*, No. C 05 05124 JCS, Dkt. 401 (Apr. 29, 2008).

### 2. The Privacy Statutes Relied on by Plaintiff are Inapplicable.

In a futile attempt to find a privacy statute Plaintiffs would violate by disclosing the emails, they cite three inapplicable laws, 15 U.S.C. § 6501 *et seq.*, 47 U.S.C. § 222, and the California Constitution. Pl. MPA at 2. These statutes do not prohibit disclosure of email addresses at all. Even so, ARG is willing to subject them to the "Confidential" designation under the Proposed Order, with limited additional disclosure—meaning that the addresses would be disclosed only to those who reasonably need to know them.

#### a. The Children's Online Privacy Protection Act is inapplicable.

The Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*, Pl. MPA at 2, generally requires internet operators targeting children to require permission from parents before acquiring and disclosing personal information. *See generally* 15 U.S.C. § 6501 *et seq.* The statute defines an "operator," in relevant part, as "any person who operates a website located on the Internet or an online service and who collects or maintains personal information from or about the users of or visitors to such website or online service, or on whose behalf such information is collected or maintained." *Id.* § 6501(2). The Federal Trade Commission, in implementing the governing regulations, made clear that "entities that merely provide access to the Internet, without providing content or collecting information from children, [are not] considered operators." FTC Children's Online Privacy Protection Final Rule, 16 CFR 312 (Nov. 3, 1999).

Plaintiffs, by their own admission, are internet service providers. Compl. ¶¶ 11-12. They do not purport to provide content or collect information directly from children. Nor do their websites reflect such activity. *See* http://www.asis.com/asis/home.html; http://www.foggy.net. As such, COPPA is wholly inapplicable to them.

Even if COPPA were applicable, several additional hurdles exist. COPPA's statutory prohibitions apply only to "operator[s] of a website or online service <u>directed to</u> children, or any operator that has <u>actual knowledge</u> that it is collecting or maintaining personal information from a child." 16 CFR 312.3 (emphasis added); *see also* 15 U.S.C. §(b)(1)(A). Such operators must provide notice on their websites of what information they collect from children, how the operator uses the information, and the operator's disclosure practices for such information. *Id.* §

6502(b)(1)(A)(i). They must also obtain "verifiable parental consent" to disclose personal information from children. *Id.* § 6502(b)(1)(A)(ii).

Plaintiffs do not allege they operate a website directed to children, or that they have actual knowledge they have collected any information from a child. Rather, they merely assert that most of their email accounts are "let to families." Pl. MPA at 3. Their websites do not provide notice of what information they collect from children and how they use it, so they are either violating the statute, or are not subject to it. *See* http://www.asis.com/asis/home.html; http://www.foggy.net. Merely renting email addresses to "families" is not <u>actual knowledge</u>, as defined by the Federal Trade Commission. The FTC made quite clear that "operators of a general audience" are only liable if they "have actual knowledge that postings are being made by a child under 13." Final Rule, 16 CFR Part 312. So long as Plaintiffs did not know that a child submitted information to it, it may not hide behind the veil of COPPA. And, if Plaintiffs can show that they provide children's content online, <u>and</u> knew that it collected information from children under age 13—presumably by obtaining the required parental consent—for particular email accounts, ARG would not object to the designation of <u>these</u> email accounts as "Highly Confidential."

        **b.**    **The Telecommunications Act of 1996 is Equally Inapplicable.**

Plaintiffs' citation to 47 U.S.C. § 222, Pl. MPA at 2, the Telecommunications Act of 1996, is unavailing. That law defines "telecommunications" as the "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43). When someone offers telecommunications "for a fee directly to the public," such services are "telecommunications services." 47 U.S.C. § 153(46). An "information service," by contrast, is "the offering" of a capability "for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." 47 U.S.C. § 153(20).

The Federal Communications Commission has found that a dial-up Internet service is an information service, not a telecommunications service. *In re Federal-State Joint Board on Universal Service, Report to Congress*, 13 FCC Rcd. 11501, 11539-11540 ¶¶ 73, 80-81 (1998). It also found provision of email is an information service. *Id.* at 11538 ¶ 78, and that the definitions

of "telecommunications service" and "information service" are mutually exclusive: One cannot be both an information service and a telecommunications carrier. *Id.* at 11516-517 ¶ 33.

Plaintiffs are clearly "information services," not telecommunications carriers. As such, the Telecommunications Act of 1996, including 47 U.S.C. § 222, imposes no obligations on them. *See, e.g.*, 47 U.S.C. § 222 (requiring telecommunications carriers to protect consumer proprietary network information). Even if plaintiffs were "telecommunications carriers," email addresses are not consumer proprietary network information ("CPNI"). *See id.* § 222(h)(1)(A) (CPNI is "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship.").

### (1) The California Constitution Does Not Prohibit Disclosure of the Email Addresses.

"The party claiming a violation of the constitutional right of privacy established in article I, section 1 of the California Constitution must establish (1) a legally protected privacy interest, (2) a reasonable expectation of privacy under the circumstances, and (3) a serious invasion of the privacy interest." *Int'l Fed. of Prof'l and Tech. Engineers v. Sup. Court of Alameda County*, 42 Cal.4th 319, 338 (2007). "Just as the right to privacy is not absolute, privacy interests do not encompass all conceivable assertions of individual rights." *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal.4th 1, 35 (1994).

In deciding the existence of a legally protected privacy interest, courts look to whether "well-established social norms recognize the need to maximize individual control over its dissemination and use to prevent unjustified embarrassment or indignity." *Id.* at 35. "Even when a legally cognizable privacy interest is present… advance notice of an impending action may serve to limit an intrusion upon personal dignity and security." *Id.* at 36 (internal quotation marks and citations omitted). The intrusion must be "sufficiently serious in… nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." *Id.* at 35. "Invasion of a privacy interest is not a violation of the state constitutional right to privacy if the invasion is justified by a competing interest," and "if intrusion is limited and

7

confidential information is carefully shielded from disclosure except to those who have a legitimate need to know, privacy concerns are assuaged." *Id.* at 38.

ARG has located no reported California cases deciding whether an email address is a protected privacy interest. Moreover, Plaintiff fail to explain how the email addresses of inactive email accounts could possibly reflect such an interest. *Hill* provides guidance. "Well-established social norms" do <u>not</u> "recognize the need to maximize individual control over [an <u>inactive</u> email address's] dissemination and use to prevent unjustified embarrassment or indignity." Email addresses are everywhere—on websites, resumes, in directories, and on these very pleadings. No one has a "reasonable" expectation of privacy in his email address and certainly not an email address that is either unassigned or inactive.

### 3. ARG has Ample Reason to Suggest a "Confidential" Designation of the Email Addresses.

On the rare occasion when ARG learns someone has received unwanted emails containing its content, ARG actively seeks to learn the identity of any third party who has allegedly sent the email. Brown Decl., ¶ 3. To do so, ARG first, as Plaintiffs suggest, Pl. MPA at 3, examines the links contained within the body of the email. *Id.*, ¶ 4. This information may tell ARG which Affiliate either sent, or allowed a sub-affiliate to send, the email. *See id.* However, the links in the email do not point directly to ARG's websites; they are links specific to the Affiliate that eventually redirect the user to an ARG website. *Id.* Typically, links related to unauthorized advertising are disabled a few days after they are sent, i.e., they are no longer functional and cannot be used to trace to the Affiliate who may have sent or would know who sent the emails. *See id.* An examination of the sample emails provided along with the Complaint indicates that most, if not all, of the links have been disabled, and ARG can no longer identify from them any information relating to who sent the email. *Id.*, ¶ 5.

Once the links have been disabled, ARG has no recourse but to examine the email addresses to which the emails were allegedly sent. *Id.*, ¶ 6. Plaintiffs suggest that if ARG did not send the emails or hire someone to do so, the recipient address cannot possibly lead ARG to the sender. Pl. MPA at 3. Plaintiffs' sweeping assertion is simply incorrect. Individuals may sign up, or "opt in," to receive emails in a variety of manners, from a variety of vendors. *Id.*, ¶ 7.

DEFENDANT'S SUPPLEMENTAL BRIEF
Case No. CV 07-6211 TEH

DWT 11032777v1 0080512-000010

Affiliates may send emails, and may contract with other third parties, who may in turn contract with additional third parties to send emails. *Id.* These entities generally maintain permission or "opt-in" lists that include these email addresses. *Id.* Alternatively, individuals may request that particular vendors not send them emails, and these addresses would be included on that vendor's suppression list. *Id.* Upon notification that unwanted email has been sent, ARG notifies its Affiliates, and checks with them to determine whether the email addresses at issue appear on their, or their vendors' suppression or opt-in lists. *Id.*, ¶ 8. If the addresses are on a permission list, ARG may be able to identify the origin of the emails. *Id.*

Plaintiffs may have signed up to receive emails from an Affiliate or an affiliate of an affiliate, and so on, or they may have requested emails not be sent to them. If they did, their email addresses would appear not on the opt-in or suppression lists maintained by ARG, but on the lists for such third parties. Because anyone can sign up to have email sent to a particular email address—by merely inputting an address on a given website—it is irrelevant that the email addresses at issue are "administrative addresses" and email addresses inactive since CAN-SPAM was enacted. *See* Pl. MPA at 5-6.

Plaintiffs' suggestion that ARG may simply search its own lists, or the lists of its affiliates, Pl. MPA at 5, like their suggestion that an expert can examine the lists, *id.* at 4, would impose an undue financial burden on ARG. Trolling through lists for any email address with the domain names "asis.com" or "foggy.net" would take considerable resources, as would hiring an expert, educating the expert as to ARG's business, and asking the expert to spend time finding the origin of the emails. The expert would be unable to take advantage of ARG's relationship with its Affiliates, who have every interest in providing the requisite information to ARG.

    **4.    Plaintiffs' Fear of "Denial of Service Attacks" and "Directory Harvests" are Completely Unfounded.**

A "denial of service" attack occurs when a third party bombards a website with repeated requests for website pages. Brown Decl., ¶ 9. This overloads the web server, rendering the website inoperable. Plaintiffs' fears of such an attack, Pl. MPA at 2-3, are unfounded. Plaintiffs have provided only rote speculation to support these contentions.

Indeed, anyone who wanted to carry out such an attack on plaintiffs could do so merely by knowing their domain name, which identifies their websites. *Id.*, ¶ 9. The suggestion that ARG would carry out an attack by sending large volumes of spam to plaintiffs is absurd. ARG does not engage in such activity, *id.* ¶ 9, and as a party now appearing before this Court, such actions would have adverse consequences.

A "directory harvest" is a technique used by spammers to find email addresses listed within the content of a domain name's website. *Id.*, ¶ 10. For example, such a harvest would include searching for common names, i.e., jsmith@foggy.net, to determine whether valid email addresses exist. Plaintiffs' fears that limited disclosure of the email addresses would subject them to such an attack, Pl. MPA at 3, are also unfounded. Someone can already carry out a directory harvest by knowing Plaintiffs' domain names exist. Access to email addresses would make it no more likely that someone could guess other email addresses. This scenario too, is unfounded.

## II.    CONCLUSION

Plaintiffs assert no valid privacy interests in the email addresses at issue—the requested designation is not only unjustified, but appears to have been made for an improper purpose: to slow the progress of the case and impose an unnecessary expenses on ARG, in express violation of a standard protective order. ARG respectfully requests this Court adopt its Proposed Order and find that the email addresses are not entitled to a designation of "Highly Confidential—Attorneys' Eyes Only," but rather to one of "Confidential," with a limited exception for disclosure to entities to whom it is reasonably necessary.

DATED: May 5, 2008

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

/s/ Thomas R. Burke
Thomas R. Burke
Attorneys for Defendant Active Response Group, Inc.

10
DEFENDANT'S SUPPLEMENTAL BRIEF
Case No. CV 07-6211 TEH
DWT 11032777v1 0080512-000010