# EXHIBIT H

1   Jason K. Singleton, State Bar #166170
    jason@singletonlawgroup.com
2   Richard E. Grabowski, State Bar #236207
    rgrabowski@mckinleyville.net
3   SINGLETON LAW GROUP
    611 "L" Street, Suite A
4   Eureka, CA 95501
    (707) 441-1177
5   FAX  441-1533

6   Attorneys for Plaintiff, ASIS Internet Services

7

8                   UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10  ASIS INTERNET SERVICES, a California        )   Case No.  C-05-5124 JCS
    corporation,                                )
11                                              )
                                                )   OPPOSITION TO MOTION FOR SUMMARY
12          Plaintiff,                          )   JUDGMENT OR IN THE ALTERNATIVE
    vs.                                         )   SUMMARY ADJUDICATION OF ISSUES
13                                              )
    OPTIN GLOBAL, INC., a Delaware              )
14  Corporation, also dba Vision Media Limited  )   DATE:  March 14. 2008
    Corp., USA Lenders Network, USA Lenders,    )   TIME:  1:30 p.m.
15  and USA Debt Consolidation Service;         )   CTRM: 15, 18TH FLOOR
    Azoogleads.com, et al.,                     )
16                                              )
                                                )
17          Defendants.                         )
                                                )
18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2    I.    INTRODUCTION... .......... .......... .......... ......... .......... .......... .......... .......... .......... ........ 1

3    II.    MEMORANDUM OF POINTS AND AUTHORITIES .. .......... .......... .......... ......... 1

4            1.    Standard for Summary Judgment. .......... .......... .......... .......... .......... .......... 1

            2.    Plaintiff has standing to bring actions under the *CAN SPAM Act* ........ .......... ........ 2

5                 a.    Plaintiff is an IAP under the *CAN SPAM Act* ...... .......... .......... .......... 2

6                 b.    Plaintiff was adversely affected by the subject emails..... .......... .......... ........3

7            3.    Azoogle procured (induced) the subject emails while consciously avoiding knowing
                 that SPAM emails would be sent. .. .......... .......... .......... .......... .......... .......... ........ 9

8                 a.    Azoogle has misstated the law....... .......... .......... .......... .......... ........ 9

9                 b.    There is significant evidence that Azoogle procured the SPAM emails. ....... 11

10                c.    Defendant Azoogle consciously avoids knowing that its contractors
                      are spamming........... .......... .......... .......... .......... .......... .......... 15

11                d.    The same entity sent all of the emails. .......... .......... .......... .......... 22

12                e.    Plaintiff has demonstrated that Defendant Azoogle induced the sending
13                     of the emails and consciously avoided knowing they would be sent in
                      violation of the *CAN SPAM Act*...... .......... .......... .......... .......... .......... 24

14           4.    ASIS' *California Business & Professions Code* §17529.5 claim does not fail
15                on any basis.. .......... .......... .......... .......... .......... .......... .......... .......... .......24

16                a.    Plaintiff is an Email Service Provider and has standing under *California
                      Business & Professions Code* § 17529.5..... .......... .......... .......... ....... 24

17                b.    Azoogle is clearly the advertiser who procure the sending of the emails,
18                     and is therefore in violation of *California Business & Professions Code*
                      §17529.5....... .......... .......... .......... .......... .......... .......... .......... 25

19                c.    The CAN SPAM Act does not pre-empt the *California Business &
20                     Professions Code* § 17529.5. .......... .......... .......... .......... .......... ....... 26

21           5.    Plaintiff has neither consented to receive the subject emails nor has it shown
                 bad faith (unclean hands) in bringing this action against a known SPAMMER. ...... 28

22                a.    Plaintiff did not consent to receive the emails from Defendant or anyone
                      else..... .......... .......... .......... .......... .......... .......... .......... .......... 28

23                b.    Plaintiff does not have unclean hands. ....... .......... .......... .......... ....... 29

24   III.   CONCLUSION........ .......... .......... .......... .......... .......... .......... .......... .......... 30

25

26

27

28

1

## TABLE OF AUTHORITIES

2

### CASES

3

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ...................................................... 2

4

*Dollar Systems, Inc., v Avcar Leasing Systems, Inc.*, 890 F.2nd 165, 173 (9th Cir. 1989) .. 30
*Gordon v. Virtumundo, Inc.*, Slip Copy, 2007 WL 1459395 (W.D.Wash., 2007).......... 2, 4, 5, 7

5

*Hypertouch, Inc. v. Kennedy-Western Univ.*, No. C04-5203-SI, 2006 WL 648688
    (N.D.Cal. Mar. 8, 2006) ........................................................................................ 4, 5, 6

6

*Kleffman v. Vonage Holdings Corp.*, Not Reported in F.Supp.2d, 2007 WL 1518650
    at FN1 (C.D.Cal.,2007) ........................................................................................ 26, 27

7

*Lamie v. U.S. Trustee*, 540 U.S. 526 at 533 (2004) ...................................................... 4

8

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099 at 1102
    (9th Cir., 2000).................................................................................................... 1, 2

9

*Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348 (4th Cir., 2006) ........ 26, 27
*People v. McKean*, (1925) 76 Cal.App. 114 at 131 [243 P. 898] ................................ 25

10

*Rains v. Superior Court*, (1984) 150 Cal.App.3d 933, 938 [198 Cal.Rptr. 249] .............. 29
*Rose v. A.C. & S., Inc.*, 796 F.2d 294 at 298 (9th Cir.,1986); also see *Fontenot v. Upjohn*

11

    *Co.*, 780 F.2d 1190 at 1194 (5th Cir. 1986)........................................................ 28

12

*United States v. Curtis-Nev. Mines, Inc.*, 611 F.2d 1277, 1280 n. 1 (9th Cir.1980) ......... 4

13

### STATUTES

14

15 *USC* 7702(11) ...................................................................................................... 2
15 *USC* 7702(12) .................................................................................................... 10

15

15 *USC* 7706(6) ...................................................................................................... 10
15 *USC* 7706(g)(1) ................................................................................................ 2, 3

16

15 *USC* 7706(g)(2) .................................................................................................. 10
15 *USC* 7706(g)(3).................................................................................................... 3

17

15 *USC* 7706(g)(3)(A) ............................................................................................... 4
15 *USC* 7707(c) .................................................................................................... 3, 30

18

18 *USC* § 2511(2)(a)(i) .............................................................................................. 29
47 *USC* 231(e)(4) ...................................................................................................... 2

19

*California Business & Professions Code* §17529(j).................................................. 25

20

*California Business & Professions Code* §17529(k)................................................... 25
*California Business & Professions Code* §17529.1(a)................................................ 25

21

*California Business & Professions Code* §17529.1(c)................................................ 25
*California Business & Professions Code* §17529.1(h)................................................ 25

22

*California Business & Professions Code* §17529.5 ............................................ passim

23

*California Business & Professions Code* §17529.5(a)(2) ........................................ 27
*California Business & Professions Code* §17529.5(a)(3) ........................................ 27

24

*California Business & Professions Code* §17529.5(b)(1)(A)(ii)................................ 25
*CAN SPAM Act* ............................................................................................ passim

25

*Electronic Communications Privacy Act*................................................................ 29

26

### OTHER AUTHORITIES

27

150 Cong. Rec. E72-02, 2004 WL 170208 (Cong.Rec.)............................................ 11

28

*IronPort Internet Security Trends for 2007 – a Report on SPAM, Viruses and Spyware*,
    by Tom Gillis .................................................................................................... 9

*Judicial Council Of California Civil Jury Instruction* 1302 ................................................... 29

SEN. REP. NO. 108-102, at 7 and 8 (2003) .................................................................... 3

## RULES

*FRCP* **Rule 56** ............................................................................................................. 1

# I. INTRODUCTION

Plaintiff, ASIS Internet Services (hereafter "ASIS") responds to Defendant's, Azoogleads.com, Inc. (hereafter "Azoogle"), Motion for Summary Judgment or in the Alternative Summary Adjudication of Issues.

Plaintiff will present a separate Response to Defendant's Separate Statement of Undisputed Facts. Plaintiff objects to almost all of Defendant's separate undisputed facts as they represent: irrelevant and immaterial statements; misstatements of witness's testimony; statements taken out of context; opinions of expert witnesses; and facts disputed by evidence provided by Defendant. Further, Plaintiff was not provided an un-redacted version of Defendant's Motion and sealed documents until January 23, 2008, five days after the electronic filing of the Motion.

Defendant presents four basis for its motion in its Memorandum of Points and Authorities. Defendant's basis are:

       1.      ASIS cannot demonstrate standing under *CAN SPAM Act*;

       2.      Neither the law or the facts support that Azoogle procured the emails;

       3.      ASIS' *California Business & Professions Code* §17529.5 claim fails on multiple insurmountable grounds;

       4.      ASIS' claims are barred by the doctrines of consent and unclean hands.

Plaintiff will respond to each of these issues and arguments. Because of the excessive length of Defendant's motion and separate statement of facts, Plaintiff will not respond to issues not raised by Defendant.

## II. MEMORANDUM OF POINTS AND AUTHORITIES

**1.    Standard for Summary Judgment.**

*FRCP* Rule 56 allows for summary judgment where the moving party can demonstrate that there is no "genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

The Court has ruled that the moving party has the "initial burden and the ultimate burden" of producing evidence for summary judgment. ***Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.***, 210 F.3d 1099 at 1102 (9th Cir., 2000). If the moving party does not carry its burden, then the non-moving party has no obligation to produce anything even if it would have the initial burden at trial.

1    *Id.* at 1102 and 1103; citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

2        The moving party must produce evidence negating an essential element of the non-moving

3  party's case or present evidence sufficient to show that the non-moving party cannot produce evidence

4  at trial to meets its burden of proof. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210

5  F.3d 1099 at 1102 (9th Cir., 2000).  Plaintiff need only show at summary judgment that there is a

6  genuine issue of disputed fact as to the issues in Defendant's motion.

7    **2.**    **Plaintiff has standing to bring actions under the *CAN SPAM Act***

8        Defendant argues that Plaintiff was not acting as a provider of Internet Access Services or a

9  Provider of email services when conducting its business and preparing to pursue the abuse of its

10  facilities by spammers.  Defendant is wrong both in its presentation of the facts and its interpretation of

11  the law.

12        **a.**    **Plaintiff is an IAP under the *CAN SPAM Act***

13        Plaintiff is an IAP under the *CAN SPAM Act of 2003* and was adversely affected by the subject

14  SPAM.

15        Defendant relies heavily upon a recent decision in the Washington Federal District: *Gordon v.*

16  *Virtumundo, Inc.*, Slip Copy, 2007 WL 1459395 (W.D.Wash., 2007).  (Courtesy copy attached.)  The

17  *Gordon* Court, citing 15 USC 7706(g)(1), held that a Plaintiff must be: (1) a provider of Internet Access

18  Services (hereafter "IAP") and (2) must have been adversely affected by the subject emails.  *Gordon v.*

19  *Virtumundo, Inc.*, Slip Copy, 2007 WL 1459395 at 2, 3, and 7 (W.D.Wash., 2007).

20        The *Gordon* Court further defines an Internet Access Service according to the language of 47

21  *USC* 231(e)(4), as directed by 15 *USC* 7702(11), as:

22        The term "Internet access service" means a service that enables users to access content,
      information, electronic mail, or other services offered over the Internet, and may also

23        include access to proprietary content, information, and other services as part of a package

24        of services offered to consumers.  Such term does not include telecommunications
      services.

25        47 *USC* 231(e)(4); *Gordon v. Virtumundo, Inc.*, Slip Copy, 2007 WL 1459395 at 3

26        (W.D.Wash., 2007).

27        Defendant has stipulated that Plaintiff is a provider of Internet Access Service within the meaning

28  of 15 *USC* 7706(g)(1), 15 *USC* 7702(11); and 47 *USC* 231(e)(4).  Joint Statement of Undisputed Facts

1    Item 1 Pg. 1 (Docket 329, courtesy copy attached).

2    Defendant argues that Plaintiff was not acting as an IAP when it gathered the evidence of this

3    case and took actions to file litigation. Even using the Defendant's descriptions of the events leading up

4    to litigation, those facts only demonstrate that Plaintiff was doing exactly what an IAP would be doing

5    to enforce the rights provided by the *CAN SPAM Act*. How else can an IAP stop spammers from

6    abusing its resources other than by gathering and preserving evidence?

7    The legislature has made it perfectly clear the purpose of the *CAN SPAM Act* is to deter the

8    sending of unsolicited commercial email in violation of the act so as to reduce the damages done. **SEN.**

9    **REP. NO.** 108-102, at 7 and 8 (2003). (Courtesy copy attached.) Therefore, it is within the authority of

10    a party specifically authorized, such as an IAP, to take actions necessary to bring litigation. Those

11    actions obviously include gathering and preserving evidence, engaging a law firm, creating a place to

12    store evidence, investigating the senders and procurers of the emails, etc. To argue that Plaintiff

13    somehow violated the authority granted by the statute by taking actions to make a case for litigation is

14    ludicrous on its face.

15    In fact, the *CAN SPAM Act* specifically prohibits the interpretation of the Act in the manner that

16    Defendant suggests:

17    (c) No effect on policies of providers of Internet access service.

18    Nothing in this chapter shall be construed to have any effect on the lawfulness or
      unlawfulness, under any other provision of law, of the adoption, implementation, or

19    enforcement by a provider of Internet access service of a policy of declining to transmit,
      route, relay, handle, or store certain types of electronic mail messages. 15 *USC* 7707(c).

20

21    There is no possible defense based on Plaintiff's motives in bringing a CAN SPAM case. If the

22    legislature did not intend for IAPs to bring an action and for spammers to pay penalties for each email

23    they would not have written standing and statutory penalties into the Act. 15 *USC* 7706(g)(1) (Action

24    Authorized) and 15 *USC* 7706(g)(3) (Statutory Damages).

25    **b.    Plaintiff was adversely affected by the subject emails.**

26    Next Defendant argues that based on the *Gordon* case Plaintiff was not adversely affected by the

27    subject spam. In *Gordon* the court found that adverse affect was defined as: "the 'adverse effect' to that

28    entity must be both real and of the type uniquely experienced by IASs for standing to exist." ***Gordon v.***

1    *Virtumundo, Inc.*, Slip Copy, 2007 WL 1459395 at 7 (W.D.Wash., 2007).  The *Gordon* Court reaches

2    this definition after reviewing the outcome of *Hypertouch, Inc. v. Kennedy-Western Univ.*, No. C04-

3    5203-SI, 2006 WL 648688 (N.D.Cal. Mar. 8, 2006) (Courtesy copy attached) and legislative comment

4    contained in **S. REP. NO.** 108-102, at 3 and 6 (2003).

5        The *Gordon* Court argues that it is appropriate to use the legislative document when the

6    language of the act has been determined to be ambiguous. *Gordon v. Virtumundo, Inc.*, Slip Copy, 2007

7    WL 1459395 at 7 (W.D.Wash., 2007); citing *United States v. Curtis-Nev. Mines, Inc.*, 611 F.2d 1277,

8    1280 n. 1 (9th Cir.1980).  While this approach is reasonable when the statute is ambiguous on its face, it

9    is not reasonable where the plain language of the statute is not ambiguous.  "[W]hen the statute's

10    language is plain, the sole function of the courts-at least where the disposition required by the text is not

11    absurd-is to enforce it according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526 at 533 (2004).

12        It is likely, based on the actual language of the *CAN SPAM Act* that both the *Hypertouch* and

13    *Gordon* courts are wrong in their interpretation of the *CAN SPAM Act*.  The language of the *CAN*

14    *SPAM Act* clearly does not support the complex version of adverse affect espoused by the two Courts.

15    15 *USC* 7706(g)(3)(A) states:

16        For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is the
        amount calculated by multiplying the number of violations (with each separately
17        addressed unlawful message that is transmitted or <u>attempted</u> to be transmitted over the
        facilities of the provider of Internet access service, or that is transmitted or <u>attempted</u> to
18        be transmitted to an electronic mail address obtained from the provider of Internet access
        service in violation of section 7704(b)(1)(A)(i) of this title, treated as a separate
19        violation)...(*emphasis added*).

20        The language of the statute clearly applies penalties for even "attempting" to transmit an email in

21    violation of the Act. *Ibid.*  If penalties apply for "attempting" to transmit an email, then the complicated

22    definition of adverse affect devised by the Courts cannot be correct, since there is no requirement that

23    the emails actually be received by the IAP.  If this interpretation of the statute is correct then the only

24    proof of adverse affect required is the actual emails and a showing of attempted transmission.  Plaintiff

25    has provided the emails and demonstrated that they were received by Plaintiff at its facilities.  Plaintiff

26    will not duplicate this information here, it was provided in detail in Plaintiff's Motion for Summary

27    Adjudication of Issues P7, L.6-25.  Therefore, based on the plain language of the statute Plaintiff has

28    established adverse affect.  At most, the adverse effect required of an IAP is the adverse effect that a

bona fide IAP suffers from the onslaught of spam generally. Dr. Cohen said it best himself:

> "*I believe that in the overall, plaintiff and everybody I know that uses the internet suffers adverse effects from getting large volumes of emails that they don't wish to receive.*" Cohen Depo, P76 L3-6, Exhibit T to Declaration of Jason Singleton in Support of Opposition (hereafter "JS")

However, if the Court does not find this argument convincing, then an analysis of the facts and decisions in both *Hypertouch* and *Gordon* can easily distinguish those cases from *ASIS v. Optin Global*.

In *Hypertouch*, the Court found:

> As for adverse affect, Hypertouch has submitted a declaration indicating that high spam loads have caused decreased server response and crashes, led to higher bandwidth utilization, and forced expensive hardware and software upgrades. Given the thousands of spam messages that plaintiff has shown were received by its servers, this is a reasonable statement creating an issue of material fact. Wagner Decl. ¶ 18. Finally, the argument on the alleged lack of spam filtering software on Hypertouch's servers is better characterized as an argument on a failure to mitigate damages, not that there is no adverse affect.
> *Hypertouch, Inc. v. Kennedy-Western Univ.*, No. C04-5203-SI, 2006 WL 648688 at 4 (N.D.Cal. Mar. 8, 2006).

Plaintiff has provided a similar statement in this case. Plaintiff has described the adverse affect it suffered from SPAM including the 12,756 emails at issue. (See Docket 318-4, ¶9 and Exhibit E to Dec. Nella White. Ms. White, President of ASIS, estimates that a third of her employees' time is spent on spam complaints and technical issues dealing with spam. (Nella White Depo. P92, L.4-7, Exhibit A to JS. ASIS's customers with older computers now have to buy newer computers to use the service because of the changes ASIS has had to make to reduce SPAM. Nella Depo P97, L. 21–P98, L. 2, Exhibit A to JS. Ms. White estimated that the prevention of SPAM costs about $3000 per month in Spam filtering costs and employee time. Nella Depo P223, L. 8–18, Exhibit A to JS. Ms. White personally spent weeks working on the spam emails in this case. Nella Depo P225, L. 4–12, Exhibit A to JS. Plaintiff increased its computer server capacity as a result of the spam emails at issue and the other spam it was receiving. Nella Depo P246, L. 23–P247, L. 16, Exhibit A to JS.

Defendant's arguments regarding statements made by Falcon Knight, Plaintiff's system administrator, are taken out of context and not representative of the facts. Falcon Knight is an outside contractor working for ASIS, it therefore is not privy to the efforts or expenditures made by ASIS with

1    other vendors, such as Postini, AT&T, and others. Falcon Knight is not privy to the efforts of ASIS's

2    internal employees, or with equipment not co-located with Falcon Knight. In direct contrast to the self

3    serving statements presented by Defendant, is the statement by Falcon Knight that ASIS added three

4    servers, two leased from Falcon Knight and one owned by ASIS, in 2005 when ASIS started with

5    Falcon Knight. O'Conner Depo. P18, L.3–8, P30, L.10–18, Exhibit B to JS. Falcon Knight also stated

6    that the reason that ASIS came to Falcon Knight was because they were exceeding the bandwidth of

7    their T1 (telecommunications line) and that she needed more capacity for spikes she was experiencing.

8    O'Conner Depo. P20, L. 16-P21, L. 6, Exhibit B to JS.

9        As the Court in *Hypertouch* stated, the fact that Plaintiff has altered its spam filtering software in

10   order to collect the spam emails has nothing to do with adverse affect. *Hypertouch, Inc. v. Kennedy-*

11   *Western Univ.*, No. C04-5203-SI, 2006 WL 648688 at 4 (N.D.Cal. Mar. 8, 2006). Moreover, the

12   adverse affect is the same whether the subject emails were filtered by Postini or not. Postini is not just a

13   filtering service. All customer's SPAM is stored at Postini, so that false positive emails can be plucked

14   out of the SPAM folders by the customers. Nella Depo P230, L. 14–P231, L. 7, Exhibit A to JS.

15   Plaintiff pays for this service on a per user basis. Nella Depo P218, L. 20–P219, L. 14, Exhibit A to JS.

16   Increases in costs for capacity are passed on to Postini's customers over time on a per message center

17   (individual customer email account) basis. Indeed, Postini is integrated, (an extension) of ASIS. Each

18   ASIS client has a message center at Postini, which they can log into, to set spam filtering, add senders to

19   block or do not block list, and retrieve false postive filtered emails. Depo Sally Then P47-48, Exhibit C

20   to JS.

21        Plaintiff aliased her closed accounts to a separate account so that those emails would be saved in

22   the same manner, thus preserving evidence for litigation. Even prior to making this change, all of the

23   emails, whether directed to open or closed accounts, were received by the service and had to be

24   processed.

25        This evidence, at the very least creates a disputed issue of fact that should be sent to a trier of

26   fact to consider.

27        The Court's decision in *Gordon* can easily be distinguished. The plaintiff in *Gordon* did not

28   argue that he had suffered any adverse affect beyond the receipt of the emails. This led the Court to

1   determine that the plaintiff was suffering no affect other than that of an average consumer.  If the affect

2   was no greater than that felt by a consumer then plaintiff was not among those intended by the

3   legislature to bring an action, otherwise the legislature would have given standing to consumers.

4   *Gordon v. Virtumundo, Inc.*, Slip Copy, 2007 WL 1459395 at 8 and 9 (W.D.Wash., 2007).  In addition,

5   the plaintiff in *Gordon* had only six customers, most of them were family members.  *Id.* at 3.  The

6   plaintiff in *Gordon* did not own his own equipment, bandwidth or have employees.  The plaintiff in

7   *Gordon* did not charge for his services and all of his revenue came from SPAM "settlements and

8   disputes." *id.* at 3 and 4.  This led the Court to believe that the plaintiff was really in the business of

9   conducting spam suits.

10       In the case before the Court, Plaintiff ASIS has provided both a declaration of adverse affect well

11   beyond what any consumer can experience, and further provided evidence of the damages.  Plaintiff had

12   almost a thousand, paying, internet and email clients in 2005, the time of the incident.  See Nella Depo

13   P74, L.20–P75, L.2, Exhibit A to JS.  These customers paid for this service and Plaintiff has provided

14   samples of the invoices for its customers.  Plaintiff, in response to Defendant Quicken's Request for

15   Production No. 2, provided to all parties the following documents: Articles of Incorporation of ASIS

16   INTERNET SERVICES; ASIS's Business License; various vendor invoices related to providing

17   Internet and email services; and sample Customer Invoices (redacted) for both Internet and email

18   services.  See 318-4, Dec. NW ¶6 and Ex. B.  Plaintiff both owns and leases hardware and network

19   bandwidth in providing its services.  Defendant's supposedly undisputed fact that Plaintiff does not own

20   its equipment is not supported by the facts.  O'Connor Deposition P30, L. 10-18, Exhibit B to JS.

21       Plaintiff is clearly running an Internet Access service in the isolated community of Garberville,

22   California, providing internet and email service to most of the population of Garberville.  Plaintiff is a

23   going concern based on profits from its internet and email services.  The ASIS business has been in

24   operation since 1995 and by 2000 had 800 paying customers.  See Nella Depo P74, L.7-21, Ex. A to JS.

25       Defendant has argued that Plaintiff's motives are solely to profit from settlements and

26   judgments[1].  Plaintiff has stated that its motives in bringing this and other *CAN SPAM Act* cases is to

---

27   [1] Defendant has noted the six CAN SPAM lawsuits Plaintiff has filed.  Plaintiff objects to Defendant's characterization of
28   Plaintiff as a professional litigant, without an analysis of the merits of each suit.  Moreover, it is self-evident that ASIS gets
     inundated with spam, and the responsibility for that lies with the spammers.  ASIS is doing nothing more than Congress
     intended, which is to act as in the nature of a private attorney general, and enforce the *CAN SPAM Act.*

1   "get rid of spam." See Nella Depo P18, L.20–21, Exhibit A to JS. The legislature created a private right

2   of action for the IAPs, with statutory penalties available as a remedy. There is an obvious intent in the

3   statute and the statutory penalties to induce IAPs to take up the burden of a private attorney general in

4   order to reduce and deter the sending of spam. The fact that Plaintiff has taken up the burden does not

5   impute bad faith intent to Plaintiff or provide Defendant with a defense[2].

6        Therefore, Plaintiff is both an IAP within the definitions of the statutes and has suffered adverse

7   affect, within the language of the statute and available case law. Therefore, Plaintiff has standing to

8   bring an action under the ***CAN SPAM Act***.

9        Def Brief notes that ASIS has aliased 1507 email address accounts to the "ng" account, "despite

10  its user base is less than 1000." Def Brief, P2 fn2, and P6L26   It is the nature of a small IAP selling dial

11  up service, such there is a constant stream of clients leaving and new clients signing up. ASIS has been in

12  business since 1995. White Depo P74 L7-12  It is not surprising there are more inactive email addresses

13  than active. Further, each client, is entitled to have multiple email addresses, (family members etc).

14  When an account closes, it often leaves multiple email addresses inactive. Dec Nella White, Para 3

15        Finally, if the Court accepts Defendant's arguments regarding standing then it is clear that no

16  IAP will ever have standing to bring a suit under the ***CAN SPAM Act***. It is impossible for any IAP to

17  associate their costs of running business to the receipt of specific emails. Even a small IAP receives a

18  hundred thousand emails a day. These businesses purchase assets such as server capacity, storage,

19  network bandwidth months or years in advance of using the assets. This is good business. If they

20  waited for their systems to collapse they would lose all of their customers, because of repeated service

21  outages.

22        When a company is receiving such large volumes of spam every day, trying to calculate a cost of

---

Def Brief P6-7 argues ASIS litigation is "a separate business".   ASIS is a bona fide IAP, a fact which is not in dispute. Spam is for ASIS, and for IAP's generally, one of its largest expenses.  It is hoped the litigation will have its intended effect, the reduction of spam sent to ASIS customers. Indeed, as a result of the within suit, Azoogle agreed to add the entire ASIS domain to Azoogle's global suppression list. JS in Oppo, ¶24, and Okin P163 and 170, Ex. J to JS.

[2] Defendant's arguments to the effect that Plaintiff could not have suffered adverse effect on the grounds ASIS altered its spam filtering, aliased accounts, etc. is really just an attempt to recast the "failure to mitigate" defense, (rejected by Judge Conti in the Netblue case, see Plaintiff's Motion for Summary Adjudication), as an issue of adverse effect. Defendant's arguments, under either concept, impermissibly shift the responsibility for spam from the spammer to the victim, contrary to Judge Conti's instruction. Defendant has not, and cannot, state what procedures *would be* acceptable to a Plaintiff IAP to gather evidence to enforce the ***CAN SPAM Act***.

1    loss for each individual email is not possible, especially for a small business. The accounting resources

2    are simply not in the small business in order to do this analysis. Given the huge number of emails

3    received by larger firms (in the hundreds of millions per day) it is unlikely that even large firms could

4    calculate a cost per spam email. See *IronPort Internet Security Trends for 2007 – a Report on SPAM,*

5    *Viruses and Spyware,* by Tom Gillis, reporting that in 2005 the volume of SPAM increased by 200

6    percent and changes in the type of SPAM required a 300 percent increase in email gateway capacity in

7    2006 (Courtesy copy attached). Therefore, requiring a plaintiff to demonstrate the detailed level of loss

8    for 10,000 emails out of millions of spam emails received would present an impossible task. Since it is

9    unlikely a business can calculate a cost it is even more unlikely they can show a direct relationship for

10    resource purchases and specific SPAM emails received.

11       The requirement of demonstrating a specific resource purchase to specific SPAM emails would

12    make enforcement of the *CAN SPAM Act,* by IAPs, impossible. The only real result would be that the

13    SPAMMERS will win, and the will of the legislature to deter SPAM by giving IAPs standing would be

14    defeated.

15
16    **3.    Azoogle procured (induced) the subject emails while consciously avoiding knowing that SPAM emails would be sent.**

17       Defendant argues at length that it is Plaintiff's burden to prove that Azoogle knew, or avoided

18    knowing, that the actual sender of the subject emails would do so, and, that since the sender of the

19    emails was several contractors downstream from Azoogle, that Azoogle could not have avoided

20    knowing that its subcontractor(s) (etc.) would violate CAN SPAM[3]. Defendant's Motion, P12-13.

21    Defendant has misstated both the facts and the law.

22       **a.    Azoogle has misstated the law.**

23       The *CAN SPAM Act* states that it is unlawful for "any person to initiate the transmission" of

24    emails in violation of the Act. 15 *USC* 7704(a)(1).

25       The term "initiate the transmission" is defined in 15 *USC* 7702(9) as: "means to originate or

26

27
28    [3] Azoogle was quite aware that its third party vendors themselves had affiliate networks that were used to drive traffic to generate the leads Azoogle would purchase. McVey P60, P62, Ex. E; Speiser P25 L20, Ex. L; Zhardanovsky P146-147, Ex. M; Okin P56 L7, P62, Ex. J; and Hernandez P107, Ex. K to JS. It would seem however, that if Azoogle contends it did not educate itself that its vendors were contracting out the advertising Azoogle hired the vendor to perform, same would be an admission of "consciously avoids knowing".

1  transmit such message or to procure the origination or transmission of such message... For purposes of

2  this paragraph, more than one person may be considered to have initiated a message."

3      The term "procure" means: "intentionally to pay or provide other consideration to, or _induce_,

4  another person to initiate such a message on one's behalf." 15 *USC* 7702(12). (emphasis added)

5      Therefore anyone who induces another to send commercial electronic mail messages is

6  potentially liable for the penalties assessed by the Act.  There is no requirement that defendant control

7  the third party in order for liability to be incurred, only that the third party was induced by the defendant.

8      This argument is further supported by the special definition of _procure_ allowed to plaintiff IAPs:

9  "*with actual knowledge, or by consciously avoiding knowing, whether such person is engaging, or*

10  *will engage, in a pattern or practice that violates this chapter.*"  15 *USC* 7706(g)(2).

11      The *CAN SPAM Act* makes an advertiser liable for procuring the sending of spam with

12  knowledge, or consciously avoiding knowing that the statute was being violated.  15 *USC* 7706(g)(2).

13      Defendant attempts to quote the language of the statute in 15 *USC* 7706(g)(2) and then alters the

14  quotation by the insertion of "[the sender of the emails]" and then argues that this language makes the

15  intent of the statute unambiguous in favor of Defendant[4].  Defendant's Motion P10, L.25.  The language

16  of the statute is actually:

17      In any action brought under paragraph (1), this chapter shall be applied as if the definition
       of the term "procure" in section 7702(12) of this title contained, after "behalf" the words
18      "with actual knowledge, or by consciously avoiding knowing, whether such person is
       engaging, or will engage, in a pattern or practice that violates this chapter."
19      15 *USC* 7706(g)(2)

20      This language clearly provides no guidance in whether the inducer must know that the person

21  hired would send the emails themselves or hire a sub-affiliate to actually send the emails.  The language

22  only requires that the inducer know or avoid knowing whether the person hired uses a pattern or practice

23  that violates this chapter.  Clearly a contractor that regularly hired spammers to send commercial emails

24  would fit within "a pattern or practice that violates this chapter."  15 *USC* 7706(g)(2).

25      The language also does not create a requirement that the procurer have actual knowledge of the

26  ultimate sender, as Defendant tries to argue in his Motion.  Defendant's Motion P11, L.1.

27      The legislature also foresaw that advertisers would create agreements that would, on paper,

28

---

[4] Def's Brief, at P 18, L 22, also quotes 15 *USC* 7706(6) as "sent of delivered."  The actual text is "sent or delivered."

1   shield them from liability.

2   "Subsection (g)(2) contains a special definition of "procure" for purposes of ISP
    enforcement actions that includes a scienter requirement with regard to whether a person
3   who initiates commercial email on their behalf is engaging or will engage in a pattern or
    practice that violates this Act. It is the intent, with regard to the falsification violations of
4   Section 5(a)(1), that "conscious avoidance of actual knowledge" *be construed broadly in
    a manner consistent with a fundamental purpose of this Act* to prohibit and deter
5   falsification techniques in commercial e-mail. Therefore if the procurer has an indication
    that the initiator is or has engaged in any falsified spamming technique prohibited by
6   Section 5(a)(1) or 18 U.S.C. 1037, the Act is intended to be read so that such a procurer
    meets the standard of "conscious avoidance of actual knowledge" of violations of the Act
7   by an initiator unless the procurer and takes reasonable steps *to prevent* such violations
    by the initiator."
8
9   "Actual knowledge or conscious avoidance of actual knowledge could be evidenced, for
    example, by information obtained by the procurer directly from an initiator, or via a
10  complaint, warning or cease and desist communication received from a recipient, Internet
    access service, or law enforcement alerting the procurer that an initiator to whom the
11  procurer is providing consideration is violating the law. Conscious avoidance of actual
    knowledge could also be evidenced, for example, by: (1) *Doing little or nothing to*
12  *determine whether suspect initiators who are marketing partners, resellers, affiliates,*
    *agents or contractors of the procurer are violating or have violated Federal or State law*;
13  (2) failing to follow the procurer's stated policies or procedures prohibiting illegal e-mail
    advertising methods by initiators who are marketing partners, resellers, affiliates, agents
14  or contractors; (3) repeatedly allowing initiators who are engaged in illegal e-mail
    advertising methods to provide false information or to fail to identify themselves when
15  they sign up to conduct e-mail advertising for the procurer's products or services; (4)
    repeatedly paying initiators whom the procurer has terminated for violating the procurer's
16  e-mail policies prohibiting illegal spamming methods; or (5) allowing initiators who have
    been terminated for violating the procurer's policies prohibiting illegal e-mail activities
17  repeatedly to sign up for new accounts. The above is not an exhaustive list of ways in
    which the requisite state of mind can be evidenced." (emphasis added)
18
19  **150 Cong. Rec. E72-02**, 2004 WL 170208 (Cong.Rec.), SPEECH OF HON. JOHN D.
20  DINGELL OF MICHIGAN, Wednesday, January 28, 2004 (Courtesy copy attached).

21      **b.    There is significant evidence that Azoogle procured the SPAM emails.**

22      The contract between Seamless and Azoogle specifically contemplated and authorized Seamless

23  to use email (See Mossanen Depo. P 41-42, Exhibit D to Dec. of JS) marketing to generate the leads that

24  Azoogle was to purchase exclusively.  (See McVey Depo. P197, Exhibit E to JS, also see Exhibit F,

25  submitted under seal, AZ 05-09, the Advertising Insertion Order, ¶3 and 12).

26      Azoogle did not simply purchase leads from Seamless media.  Azoogle was engaged in joint

27  internet marketing, via email, with Seamless.  Azoogle *pre-paid* Seamless Media for leads that did not

28  yet exist.   Joint Statement of Undisputed facts Item number 8.  Moreover, the Seamless-Azoogle

1    contract also provided that Azoogle and Seamless would share the database of email addresses generated

2    as a result of Seamless' email marketing, for marketing purposes. Exhibit F to JS, AZ 05-09, ¶3 and 12.

3            Azoogle's brief argues at length they had no idea who John Stothers was, or that he was engaged

4    in generating leads for Azoogle prior to this litigation. Defendant's Motion P12, L8–17. The evidence

5    is quite the contrary. In correspondence between Azoogle and Quicken Loans regarding the "Bruce

6    Wolf" lead, Azoogle represented to Quicken: "[t]he affiliate that provided Azoogle the lead: John

7    Strothers." QL-084-085, Exhibit G to JS, under seal. This email dated November 8, 2005, was sent by

8    Ragi Mahil, the manager for the Quicken account. Azoogle did not say it was its affiliate's affiliate's

9    affiliate, but represented it was *Azoogle's affiliate*. Note that this email directly contradicts the assertion

10    by Azoogle that it knew nothing about the other parties involved until the start of litigation on December

11    12, 2005, when the original Complaint was filed. See Declaration of David Graf (Docket 321) ¶11.

12            That Azoogle had set up in advance to obtain leads from the wumort.com site, (where the Bruce

13    Wolf lead was inputed) is established by the actual electronic transfer of the lead to Azoogle, and the use

14    of Azoogle's proprietary lowrateadvisors.com site by the lead generator.

15            The "Bruce Wolf" lead was received by Quicken Loans from Azoogle as coming from

16    "*LowRateAdvisors.com*" Exhibit G to JS, QL-0116. Indeed, Quicken Loans sent an email to the

17    fictitious Bruce Wolf stating that Quicken Loans "*has received your mortgage inquiry from

18    LowRateAdvisors.com, one of our lending partners*." See  Docket 318-4, Dec of NW, Exhibit F.

19    (Bruce's email address was given in the process of filling out the wumort mortgage web page). Now,

20    Quicken's twice referencing Bruce's inquiry as coming from the lowrateadvisors.com web page is

21    particularly telling. Azoogle operated its own web property[5], "lowrateadvisors.com," (Docket 318-3,

---

[5]    Azoogle' site: http://www.lowrateadvisors.com/long/ index.php?affil=1828#, is a web page that is virtually the same as the web page Nella White saw in October 2005. This web page contains the following: "©AzoogleAds.com Inc., All Rights Reserved." See Docket 318-3, Exhibit H-Carl 2 Ex. C. Domain name "Lowrateadvisors.com" is owned by Azoogle. http://www.lowrateadvisors.com/long/ index.php?affil=1828#, is located at IP address 209.47.46.154, which is in the range of IP addresses owned exclusively by Azoogle per Azoogle's disclosure of June 22, 2007. See Docket 318-3, Exhibit I (under seal) AZ-0125.
        Images of each element of the page Nella White saw on October 27, 2005, appearing in the wumort.net web page, also appear on the Azoogle server at:
            www.lowrateadvisors.com/long/images/ln_1.jpg;; www.lowrateadvisors.com/long/images/ln_2.gif;
            www.lowrateadvisors.com/long/images/ln_5.gif; www.lowrateadvisors.com/long/images/ln_6.jpg
            www.lowrateadvisors.com/long/images/graph.gif; www.lowrateadvisors.com/long/images/ln_right.gif
            www.lowrateadvisors.com/long/images/spacer.gif; www.lowrateadvisors.com/long/images/ln_left.gif.
See Docket 318-3, Exhibit H-Carl 2 Exhibit E. The source code for the wumort.net, and the Azoogle web pages all use the exact same file names for the images. That is the file name for the image of the house is "ln_6.jpg." The file name for the

1   Exhibit G) and that web page, in one incarnation, was nearly identical in content to the wumort web

2   page filled out by Nella White. See Docket 50, Dec. of Nella White, (hereafter Dec NW 50), Exhibit C.

3   The only way Quicken could have referenced the Bruce Wolf lead as coming from

4   "lowrateadvisors.com" is if *Azoogle so told Quicken.*

5       In fact, Azoogle told Quicken Loans that its leads were generated by its web sites:

6       **"Mortgage leads are generated by our own web properties allowing greater quality
        control, submitted by nationwide consumers, who are ready to buy – leaving you**

7       **with the invaluable opportunity to close!"** Exhibit G to JS, QL-023 (emphasis added)

8       Azoogle provided Quicken Loans with documentation of its web sites, including the site

9   LowRateAdvisors.com. Exhibit G to JS, QL-017-022. The site for LowRateAdvisors.com, QL-017,

10  contains an image of a house that is exactly the same as the house image seen by Nella White on the

11  wumort.net site on October 27, 2005. This image has been verified to be an image that originated from

12  Azoogle's server and can be found at: http://www.lowrateadvisors.com/long/images/ln_6.jpg. The

13  domain lowrateadvisors.com is owned by Defendant Azoogle. (See AZ-0128, Exhibit F to Dec of JS).

14      Azoogle operated a variety of other mortgage lead pages, such as ChristianMortgageUSA,

15  Bluecollarmortgage, etc, but those were not the pages Azoogle referenced to Quicken as generating the

16  "Bruce Wolf" lead. The inference is, that Azoogle knew the "Bruce Wolf" lead came from a web page

17  that was nearly identical to its own "lowrateadvisors.com" page, given Azoogle's identification of the

18  lead to Quicken as coming from "lowrateadvisors.com."

19      The assertion that the leads were generated by Azoogle's web site is further supported by similar

20  claims made by Azoogle to Aegis lending. Exhibit H to JS, AEG-032–033, submitted under seal. At

21  the top of AEG-033 Azoogle provided the following description of its services to Aegis:

22      Our web properties and affiliate marketing make it easy for the consumer to engage with
        us in the way they want. If interested, the consumer populates the required fields for a

23      free mortgage quote. Once the consumer clicks "submitted", an instant message appears
        to advise them that one of our partners will be contacting them. We then import the lead

24      to your database.

25      There is further support in the record that shows Azoogle was aware it was receiving mortgage

26  leads from the wumort web page. Azoogle received its mortgage leads electronically in real time, via

27

28  Freddie Mac graph image is "graph.gif." As discussed above these are the same file names used on the Azoogle
    lowrateadvisors.com image server. See Docket 318-3, Exhibit H-Carl 2  Exhibits B, C and D for printouts of the source code
    for the wumort.net and other landing pages.

1    custom Azoogle software known as "Lead Agents." See Exhibit E to JS, McVey Depo P34, L.16-P35,

2    L. 23 and Exhibit D, Mossanen Depo P24, L.20-P25, L.10. This was true as to the leads coming from

3    Seamless Media, the company Azoogle identified as producing the "Bruce Wolf" lead for Azoogle.

4    Exhibit E to JS, McVey Depo P201, L16 and Exhibit D to JS, Mossanen Depo P55, L16-23). Lead

5    Agents, was an electronic connection between the third party vendors mortgage landing page, and

6    Azoogle. Azoogle's third party vendor's landing page had to be specially configured in advance, (an

7    HTML post, it is called), to submit the leads generated on that page, to Azoogle's Lead Agents software.

8    See Exhibit I, under seal, Depo Don Mathis, P169, L9-18; Exhibit J, under seal, Depo Rick Okin P46,

9    L16-23 and P52, L20-24. When Azoogle's Lead Agents software communicated with a third party

10   vendor's mortgage page, receiving a mortgage lead, *Lead Agents recorded the URL, or landing page,*

11   *from which the lead was generated.* See Exhibit K, Marvin Hernandez Depo P153 and 155, and Exhibit

12   J, Rick Okin Depo P23, L15 to P24, L2.

13       Azoogle was quite aware that it was obtaining leads from the wumort copy of Azoogle's

14   "lowrateadvisors.com" web page. Moreover, Azoogle engaged in a standard practice of allowing its

15   third party vendors to copy (and re-host) Azoogle's mortgage web pages, for use by the third party

16   vendor, so as to allow the third party vendor to generate leads that would be sold to Azoogle. Exhibit D

17   to JS, Mossanen Depo P111, L20, P112, P118, L23-P119, L8. In such a process, Azoogle would not be

18   identified on the page copied and used by the third party vendor. Mossanen P112, P119, P120 (Exhibit

19   D). It appears as the same as what occurred with the wumort page visited by Nella White.

20       Azoogle received the lead at "10/28/05 12:50 PM PST," within an hour or so of when Nella

21   White entered the information on the wumort.net site. Exhibit F to JS, AZ-022. This is consistent with

22   Lead Agents receiving the lead in "real time" as testified to by Ryan McVey and described to AEGIS.

23       There is another telltale sign that indicates Azoogle was electronically connected to the wumort

24   page where Ms. White input the "Bruce Wolf" mortgage request. Azoogle passed each of the leads it

25   received, from any source, through an electronic filtering system within Lead Agents, which precluded

26   the submission of duplicate leads. Leads which had the same phone number, for example, were rejected.

27   (Hernandez P44, L16, Exhibit K and McVey P80, Exhibit E to JS)

28       Nella White attempted to submit another fictitious lead into another of the web pages that was

1    advertised via the subject spam. The URL was slightly different, but the look of the page was the same,

2    as was the look of the spam. Ms. White entered all new fictitious information into the page, except used

3    the same phone number as the Bruce Wolf lead. The page rejected the submission and would not accept

4    it. (Dec Nella White ¶2)  Standing alone, the similarity of Azoogle's lead filtering software, to the

5    operation of the mortgage pages as experience by Nella White, would not be particularly probative.

6         However, when taking all the facts together, the similarity of the wumort page to Azoogle's, the

7    fact the lead was received in real time via Lead Agents, (which had to be configured in advance)

8    Quicken's identifying the lead as coming from Azoogle's "lowrateadvisors.com" site, Azoogle's

9    standard practice of "white labeling," that is allowing its vendors to copy Azoogle's pages, rehost them,

10   drive traffic to the copied pages, then sell the leads to Azoogle, and the undisputed fact that Azoogle did

11   in fact purchase the Bruce Wolf lead generated by the wumort page, clearly create a contested issue of

12   fact as to whether Azoogle "knew" or consciously avoided knowing that leads generated by the wumort

13   page would be via traffic generated by spam.

14        Finally, the facts relied upon by Azoogle to establish that it knew nothing of John Stothers, (See

15   Declarations: Graff-Docket 321, Williams-Docket 322, Ex. M) simply do not match the evidence adduced

16   in the matter.

17        Defendant also posits that Plaintiff's claims lack veracity since Plaintiff seeks a default judgment

18   of Leads Ltd. Def Brief P14 L1-3. Azoogle sold the "Bruce Wolf" lead to another lead aggregator,

19   Eleadz. (McVey P197, Exhibit E to JS) Eleadz may have sold the lead to Leads Ltd. Moreover, the

20   CAN SPAM Act expressly states that more than one entity may be considered the "originator" of the

21   spam. 15 *USC* 7702(9). There is nothing in the SAC or the Declaration for default which remotely states

22   that Leads Ltd, and not Azoogle, is the initiator of the subject emails.

23        **c.    Defendant Azoogle consciously avoids knowing that its contractors are spamming.**

24        Defendant argues that Plaintiff cannot show that Defendant consciously avoided knowing that it

25   was inducing SPAM emails in violation of the Act. The record is clear that Azoogle did nothing to

26   determine whether its third party contractors would, or were, violating the *CAN SPAM Act*.

27        Julian Mossanen was the Azoogle employee responsible for finding, negotiating, contracting and

28   communicating with candidate and actual third party vendors of Azoogle. Mossanen Depo P12, 13, 22,

1  | Exhibit D to JS.  Julian had the authority to decide whether a contract would be executed with a vendor.

2  | Exhibit D to JS, P69, L20.  Julian was the primary contact with vendors.  Exhibit D to JS, P127, L21-

3  | P128, L5.  Julian was not provided any training at Azoogle.  Exhibit D to JS, P160, L5.  Julian found

4  | candidate vendors by doing an internet searches for them, then sending them form emails.  Exhibit D to

5  | JS, P62.

6  |      The only document Mr. Mossanen obtained from candidate third party vendors, was the Insertion

7  | Order itself.  Exhibit D to JS, P35, L21-22.  Indeed, the *only information* Mr. Mossanen obtained from

8  | the candidate third party vendor, was the insertion order.  Exhibit D to JS, P36, L6.  Sometimes basic

9  | contact data for the vendor, such as name, address, phone, email, would be obtained, and sometimes it

10 | was not.  Exhibit D to JS, P86, L23-P87, L6.  There was no set procedure for obtaining that information.

11 | Exhibit D to JS, P88, L16-25.  When such information was obtained, Julian was not instructed to give it

12 | to anyone else at Azoogle.  Exhibit D to JS, P157, L13-L17.

13 |      Julian did not ask for the URL or landing page from which the vendors leads would be

14 | generated, Exhibit D to JS, P36, L21-P37, L3 and P48, L17-P49, L6.  Nor was Julian's standard practice

15 | to ask for that information,  Exhibit D to JS, P89.  Julian did not ask for business references from

16 | candidate vendors, Exhibit D to JS, P37, L10.  Julian testified there was no written policy as to what

17 | steps he was required to take before contracting with a third party vendors, Exhibit D to JS, P49, L16.

18 | Mr. Speiser, Azoogle's co-founder, testified he did not know what standards were used to determine

19 | whether a candidate third party vendor would be contracted with. Speiser Depo, P73, L7, Exhibit L to

20 | JS.  Neither did Alex Zhardanovsky.  Zhardanovsky Depo P141, L20-25, Exhibit M to JS, submitted

21 | under seal.

22 |      When Julian was questioned as to what inquiry he made, to determine whether or not candidate

23 | third party vendors were reputable such that he would sign a contract on behalf of Azoogle, with them,

24 | Julian's response was, "*We typically didn't do a lot of investigation*." P50, L22-P51, L5, Exhibit D to JS,

25 | under seal.  Julian also testified he could not recall any steps that *Azoogle* took to determine whether

26 | third party vendors were reputable.  Exhibit D to JS, P53.  Nor did Julian audit third party vendors email

27 | address suppression lists.  Exhibit D to JS, P54, L15-23.  Nor did anyone else at Azoogle, Exhibit D to

28 | JS, P55, L10.

1      In fact, Julian testified he never received any instruction, verbal or otherwise, from anyone at

2  Azoogle, as to what steps he was to take prior to contracting with third party vendors.  Mossanen Depo

3  P58, L19, P59, L22, Exhibit D to JS.   Nor did Julian run candidate third party vendors through

4  Spamhaus prior to contracting with them.  Exhibit D to JS, P61, L18.  In fact, there was no method to do

5  so at Azoogle.  Depo Richard Okin, P107, L16, Exhibit J to JS.  Nor was Mr. Mossanen provided any

6  "black list" of vendors\affiliates he was not to contract with. Mossanen Depo, Exhibit D to JS, P159,

7  L20-P160, L2.

8      Azoogle's third party vendor, Seamless media, confirmed what Julian Mossenan testified to, that

9  no background check *whatsoever* was required for Azoogle vendors.  See First Declaration of Jay

10  Williams P1, L.28- P2, L. 8, Exhibit N to JS.

11      When Julian was advised of a spam complaint regarding a third party vendor, his only action was

12  to communicate the complaint to the vendor.  Mossanen Depo P73 to 74 L7, Exhibit D to JS, and he did

13  not recall ever transmitting that complaint to anyone else at Azoogle.  Exhibit D to JS, P80.  Julian

14  testified Azoogle used no method to track complaints regarding vendors, Exhibit D to JS, P90, L24.

15      It is also unclear if Defendant could or intended to actually enforce the terms of its contracts.

16  Defendant could only produce one actual signed contract by any third party vendor.    Declaration of

17  Azoogleads General Counsel, David Graf (Docket 258).  Note that the second contract with Seamless

18  Media is not signed.  Defendant did no vetting of its contractors as testified by Mr. Mossanen.

19  Defendant acquired only basic information about their contractors: name, address, phone, and email.

20  Defendant claimed they could not even find Seamless Media until they suddenly needed to produce

21  evidence for summary judgment.  It is hard to fathom how a company could expect to enforce a contract

22  when they could not even find their contractor for almost two years.

23      Joe Speiser and Alex Zhardanovsky were Julian's only supervisors. Mossanen P126, L4- P127,

24  L15, Exhibit D to JS.  Julian never had any conversation with Mr. Zhardanovsky, Mr. Speiser, Mr.

25  Baydin, Mr. Mathis, Mr. Okin, or Mr. Baxter regarding spam policy. Exhibit D to JS, P135, L25-P137,

26  L22.  In fact, Mr. Mossanen could not recall having any conversation with anyone at Azoogle regarding

27  spam policy. Exhibit D to JS, P137, L23-P138, L4.  Richard Okin, Azoogle's Chief Information Officer,

28  also never had any conversation *with anyone* at Azoogle regarding spam policies or procedures. Okin

1  Depo P140, L13, Exhibit J to JS.

2      Joe Speiser, Azoogle's co-founder, could not ever recall having _any_ conversation regarding

3  Azoogle's spam policing policy with Alex Baydin (VP and General Manager of Verticals) Ryan McVey

4  (Director of Mortgage Vertical), Julian Mossanen, Ben Baxter (Compliance Manager), Rick Okin, Jen

5  Evans (Director of Affiliate Management) or Don Mathis (chief operating officer). Speiser Depo P51-

6  52, Exhibit L to JS.

7      Julian testified:

8          Q. What, if anything, did you do to police the
           third-party vendors to make sure they were not
9          spamming to generate traffic to generate the leads
           they were selling to Azoogle?
10         (Objections Omitted)
           THE DEPONENT:  Aside from
11         having them sign the insertion
           order?
12         BY MR. SINGLETON:
13         Q.    Correct.
           A.    Nothing.
14         Mossanen Depo P129, L.6–19, Exhibit D to JS.

15     Julian summed it up best, when he testified he never even inquired of candidate vendors, whether

16  there were any known spammers in their network. Exhibit D to JS, P161, L25-P162, L4.

17     Matt Schaub operates "reallygreatrate.com." In 2005, for a period of one week, Matt purchased

18  mortgage leads from Azoogle. Matt stopped buying leads from Azoogle, because over 50% of the leads

19  received were bogus. Matt concluded the reason Azoogle's leads were bogus was because of "internal

20  quality control" Schaub Depo P28, 29, 30, Exhibit O to JS, particularly the lack of Azoogle vetting its

21  lead vendors. P73, L7, Exhibit O to JS.

22     Azoogle argues that it met its duty to police its third party vendors, because its contract with

23  vendors prevented violations of the **_CAN SPAM Act_**. That is hardly sufficient, where Azoogle did not

24  even bother to consistently collect vendor contact data, (brief ante at P16), where Azoogle can only

25  produce one contract with any vendor out of 63, (Exhibit F to JS, AZ 0131–132 (under seal) where that

26  contract is not even signed by Azoogle's representative.

27     Azoogle's general attitude toward CAN SPAM compliance is also clearly demonstrated by the

28  total failure to provide any third party vendor an email address suppression list. Quicken's contract with

OPPOSITION to Motion For Summary Judgment            18                C-05-5124 JCS

1    Azoogle, required that Quicken's own suppression list be used for all email marketing. See Quicken

2    Loans/Azoogle Marketing Agreement QL-029-41, specifically P36, ¶*Suppression*, Exhibit G to JS.

3    Indeed, Azoogle operated its own proprietary mortgage loan lead generation cites, to which traffic was

4    driven by its affiliate network, in part, via email. Okin Depo P141, L14-P142 L17, Exhibit J to JS.

5    Presumably, many thousands of people "opted out" of such emails, as Azoogle stated it maintained a

6    suppression list for each of its web page offers. Okin Depo P153-P155, Exhibit J to JS and Speiser Depo

7    P56, Exhibit L to JS. Yet, neither the mortgage bank(s) suppression list, nor Azoogle's own suppression

8    list was *ever* provided to *any* Azoogle third party vendors. Mossanen Depo P29, L21-P30, L20, P156,

9    L14-22, P161, L19, Exhibit D to JS; Okin Depo P91-93, Exhibit J to JS; Speiser Depo. P56, Exhibit L to

10    JS; and Hernandez Depo P43, L14, P155, L21-P156, L8, Exhibit K to JS.

11        The Suppression list was not provided even though Azoogle knew that its vendors would be

12    copying Azoogle's mortgage web pages, (Mossanen Depo P110-111, Exhibit D to JS, Speiser Depo

13    P12, L10-16, and P16, L12, Exhibit L to JS) driving traffic to those pages via email marketing,

14    (Mossanen Depo P47, L19, P105, L13, Exhibit D to JS) then selling the leads exclusively (McVey Depo

15    P40, L4-9, Exhibit F to JS) to Azoogle.

16        Interestingly, if a consumer opts in to receive *any* Azoogle offer, such consumer will receive

17    emails regarding *any* Azoogle or Azoogle partner's offers. However, if the consumer "opts-out" of an

18    Azoogle offer, the consumer is only removed from mailings from that *specific* offer, and will still

19    receive emails regarding all other offers. Okin Depo P154-155, Exhibit J to JS.

20        "Consciously avoids knowing", in plain language, means: what did the internet email marketer

21    do to look. There were some very simple, and very effective, things Azoogle could have done to "look"

22    that were not done.  Azoogle's Lead Agents software recorded the URL of the landing page that

23    generated leads.  All Azoogle had to do, was look at the landing page visited by Nella White, and it

24    would have been clear that the page was hosted on a server in South Korea, by a non-existent person

25    named "John Dillinger," whose domain name registration address was an empty oil field in Texas.

26    Whois Report for wumort.net from October 28, 2005, Exhibit P to JS,.  Azoogle took no such action.

27    Mossanen Depo P89 L18, Exhibit D to JS.

28        Richard Okin testified that a lot of fraudulent traffic came from overseas, but there was no

1  feature of Lead Agents that flagged mortgage leads sent in from overseas. Okin Depo P106, Exhibit J to

2  JS.

3       Next, Azoogle had some 60 employees during the period in question. Each had an email address

4  used for work. Several Azoogle employees testified they received spam, and particularly mortgage

5  spam in their email. Okin Depo P132, Exhibit J to JS; Zhardanovsky Depo P87, Exhibit M to JS;

6  McVey Depo P130, L11, Exhibit E to JS. Azoogle could have done exactly what Plaintiff did, which is

7  to gather all such spam into a single location, then search it for its affiliates and third party vendors

8  violations of the **CAN SPAM Act**. This was not done. Richard Okin testified such a method could have

9  been set up in less than 100 man hours. Okin Depo P136, L9, P138, and P139, Exhibit J to JS.

10       Finally, there is no technical reason why mortgage loan lead generation landing pages, while

11  gathering up a dozen fields of data, could not simply request the consumer forward with their

12  information, the email that drove them to the site. This was not done at Azoogle. Okin Depo. P204,

13  L12-16, Exhibit J to JS.

14       The affiliate side was not much better.

15       Mathis testified, on the affiliate side, spam detection was "*primarily*" via technology algorithm.

16  Mathis Depo P24, L10–18, Exhibit I to JS. Mr. Olkin, testified such algorithm was *no value* for spam

17  policing. Okin Depo P43, L3-17, Exhibit J to JS. Joe Speiser concurred with this opinion. Speiser

18  Depo P81, L11-12, Exhibit L to JS.

19       Mr. Zhardanovsky (Azoogle's co founder) stated Azoogle would terminate affiliates who had

20  three spam complaints, (and sometimes on two complaints, depending on the circumstances).

21  Zhardanovsky Depo P21, Exhibit M to JS. However, Mr. Hernandez, who handled spam complaints on

22  the ground level, testified some affiliates had as many *as ten spam* complaints, and many more than five.

23  Hernandez Depo P66-68, Exhibit K to JS. Indeed, Mr. Hernandez testified he was never required to

24  share this information with anyone at Azoogle, until he handed his job duties to Lee Herrera. Hernandez

25  Depo. P68, L22-P69 L1, Exhibit K to JS.

26       Richard Okin is Azoogle's Chief Information Officer. He is the head of information technology

27  at Azoogle. Okin Depo P4, L20, Exhibit J to JS. Mr. Okin never made any suggestions to anyone at

28  Azoogle on how to police affiliates for spam violations. Okin Depo P79, L11, Exhibit J. Nor did

1  anyone at Azoogle ever ask him to brainstorm to come up with ideas to police affiliates and\or third

2  party vendors for CAN SPAM violations. Okin Depo P80, Exhibit J. Nor has Mr. Okin ever received

3  or provided any training on CAN SPAM. Okin Depo P81, Exhibit J. Mr. Okin did not know of anyone

4  at Azoogle who provided any such training. Okin Depo P81, L18, Exhibit J.

5          Azoogle's customer service representative, Marvin Hernandez, among other duties, took care of

6  spam complaints. Hernandez Depo P8 L8, Exhibit K to JS. Marvin was not provided any training

7  regarding spam complaints. Hernandez Depo P11, 12, and 39, Exhibit K to JS. Nor was he provided

8  any written instructions whatsoever, nor any Azoogle spam policy or procedures. Hernandez Depo P73,

9  Exhibit K to JS. When a spam complaint came in, Mr. Hernandez sole action on that complaint was to

10  add the complainant to the suppression list. Hernandez Depo P29, 30 and 34, Exhibit K to JS. Marvin

11  was hired in July 2004, and there was no compliance department at Azoogle when he was hired.

12  Hernandez Depo P61, L18, Exhibit K to JS. Mr. Hernandez never had any conversation regarding

13  spam, spam policy or spamming, with any of the following individuals; Ben Baxter, Alex

14  Zhardanovsky, Joe Speiser, Rick Okin, Don Mathis, Mr. Nowaczek (VP of operations, head of

15  compliance), or Chris Lafaro (Director of Compliance Dept). Hernandez Depo P55-56, Exhibit K to JS.

16          Azoogle does not care if its affiliates and third party vendors are spammers. Alex Zhardanovsky

17  testified that SPAMHAUS listings, or having been sued by the FTC for spamming, was not a basis to

18  terminate an affiliate. Zhardanovsky Depo P112, 113, Exhibit M to JS. In September of 2004

19  Azoogle's Internet Service Provider, SAVVIS, canceled service to Azoogle for repeated violations of

20  their policies regarding SPAM. See Letter of cancellation from SAVVIS and log of incidents, Bate

21  0852-0856, Exhibit Q to JS. One complaint was routed from SpamCop and concerned Azoogle's

22  "Spamvertised web site: http//www.lowrateadvisors.com...." SAVVIS P 0864, Exhibit Q to JS. In

23  October of 2005 (the incident period of this case), Azoogle was still on the SPAMHAUS Register of

24  Known Spam Operations (ROKSO). AZ-SP0022, Exhibit R to JS, under seal. SPAMHAUS provided

25  Azoogle with instructions as to how to get out of the SPAM business. AZ-SP023–025, Exhibit R to JS.

26  Mr. Zhardanovsky testified Azoogle made no changes to its spam policing policy even after Savvis

27  terminated Azoogle's internet access due to spam complaints. Zhardanovsky Depo P109, L24-P110, L5,

28  Exhibit M to JS.

1     **d.    The same entity sent all of the emails**

2     Plaintiff has conducted a study of the emails and the URL links contained in the emails. This

3 study was conducted by tracing the history of the IP addresses used to hold the actual images on the

4 landing pages of the URL links.

5     Some 1578 emails of the 12,756 plus emails pointed to the wumort.net or wumort.com websites.

6 Another 3,397 of the emails pointed to web pages containing the exact same images in the wumort.net

7 web page. Another 1,352 emails pointed to web pages containing at least six of the same images as the

8 wumort.net web page. That is they contained the same house image, graph image, etc. Therefore, 6,327

9 emails of the 12,756 pointed to web pages with the exact same, or almost the same, images as the web

10 page viewed by Nella White on October 27, 2005. See Docket 318-3, Exhibit W, Posluns, ¶IV-E. The

11 actual source of those pages, which can be recovered using the Internet Wayback machine, is the same

12 or very similar.

13     In addition, the whois information for some of the domains that the URL's contained in the

14 emails sent the recipient to were registered to similar persons. For example, the whois for wumort.net

15 indicates that the owner of the domain is "John Dillinger" with email id of "bestleadz@gmail.com."

16 While the name changes, the email id "bestleadz@gmail.com" remains the same. 1747 emails sent the

17 recipient to landing sites where the domain name owner used the email id of "bestleadz@gmail.com."

18 Many of the sites were registered, at the incident time, under proxy and protection services and

19 unfortunately not discovered.

20     This means that a direct connection can be shown between those 6,327 emails and the email that

21 was used to generate the Bruce Wolf lead.

22     In addition, by tracking the IP address history of the web pages pointed to by the remaining

23 emails, an additional 5,091 emails can be shown to have been on the same IP Address as those web

24 pages containing the images viewed by Nella White. Unfortunately the web images for these pages

25 were not archived in the Internet Wayback machine and cannot be recovered. However, their coincident

26 appearance on the same servers (IP Addresses) at the same time is excellent circumstantial proof that

27 they were related. The chances of two unrelated emails received during a short time frame pointing to

28 exactly the same IP Address is incredibly remote, given that there are over 4 trillion possible IP

1   Addresses in the Internet system.  See Docket 318-3, Exhibit W, Posluns, ¶IV-E.

2        Therefore, 11,418 of the emails can be shown to point to the web pages with the same images

3   viewed by Nella White when she entered the Bruce Wolf Lead.

4        The subject emails can be shown to have come from identical sources during the entire period.

5   Plaintiff has discovered evidence that a botnet was used to transmit the emails.  By comparing the time

6   the email was sent, the domain name advertised in the domain, the list of recipients, and the similarities

7   in both the headers and the message body, as discussed above, it can be determined that identical

8   messages were being sent using a botnet.  See Docket 318-3, Exhibit W, Posluns ¶IV-G.

9        Further, Plaintiff conducted a study of the email characteristics and discovered that over 93% of

10  the emails in the ASIS originals can be grouped into three distinct message body types:

11       6,393 emails contained the unique phrase "Keine";

12       4,099 emails contained the unique phrase "Or maybe"; and

13       1,498 emails contained the unique phrase "to be remov(ed".

14       Each group of emails contains identical patterns that can be compared to a form letter or

15  template.  In both the "Keine" and the "or maybe not" emails, the advertised domain is inserted into the

16  email template, along with a set of random nonsense words.

17       In the case of the "to be remov(ed" group of emails, the advertised domain is inserted into the

18  email template, and a random name is added.  See Exhibit S to JS, Declaration of Mohland, for detailed

19  data regarding the emails, Exhibit A ¶7 and 8 and Exhibits D, E, F, and G; also see Docket 318-3,

20  Exhibit W, Posluns, ¶IV-E.

21       Almost all of the emails contained links to a series of IP addresses containing the

22  LowRateAdvisor images.  The emails were sent via a bot-net in an alphabetical and time sequence.  All

23  of the emails contain similar characteristics.

24       Taken together the following characteristics show that all of the emails are linked together, and

25  that they were sent by the same person or persons during the incident period: the similarity of the text

26  within the emails; the registration of the URLs within the emails to one entity; the overlap of the URL's,

27  and IP history; the fact that the emails were sent in alphabetical order over short bursts from 1100

28  different "senders"; the overlap of the images within the URL's to one another.  Docket 318-3, Exhibit

1  W, Posluns ¶IV-E.

2      e.      **Plaintiff has demonstrated that Defendant Azoogle induced the sending of
3              the emails and consciously avoided knowing they would be sent in violation
               of the CAN SPAM Act.**

4      Plaintiff has now produced overwhelming evidence that:

5          1.    All of the emails were directly connected and sent by the same entity;

6          2.    Azoogle did procure the sending of the emails based on their advertising
                 insertion order with Seamless Media;

7
8          3.    Azoogle asserted to its customers that the leads were generated by their
                 web sites;

9          4.    Azoogle asserted to Quicken loans that the Bruce Wolf lead came from
                 Azoogle's LowRateAdvisors.com web site;

10         5.    The spammers used a LowRateAdvisors.com look alike web page to get
                 the lead and submit it to Azoogle;

11
12         6.    Azoogle made the LowRateAdvisors.com web page available to anyone
                 who wanted it;

13         7.    Azoogle promoted the use of "white Labeling" by their affiliates and
                 contractors in their advertising programs;

14
15         8.    Azoogle did nothing to find out if their contractors and affiliates were
                 using SPAM to generate leads;

16         9.    Azoogle was told by outside parties and their ISP that Azoogle's actions
                 related to their lowrateadvisors.com site were causing SPAM to be sent;

17         10.   Azoogle did nothing about their SPAM problem even after being
18               cancelled by their ISP and ending up on the SPAMHAUS ROKSO list.

19         Taken together this provides a preponderance of evidence that Azoogle procured the emails and

20  did so consciously avoiding knowledge that the emails were being sent in violation of the *CAN SPAM*

21  *Act*.

22  **4.    ASIS' *California Business & Professions Code* §17529.5 claim does not fail on any basis.**

23      a.      **Plaintiff is an email service provider and has standing under California
                Business & Professions Code §17529.5**

24      Defendant claims, in their Motion P22, ¶A, that Plaintiff does not have standing under

25  *California Business & Professions Code* §17529.5 because ASIS is not an "electronic mail services

26  provider." Defendant is incorrect based on Defendant's own stipulations.

27      Defendant has already stipulated in the Joint Statement of Undisputed Facts, Item 2, that "ASIS

28  is an Electronic Mail Service Provider within the definition of *California Business & Professions Code*

OPPOSITION to Motion For Summary Judgment          24          C-05-5124 JCS

1    §17529.5 and *California Business & Professions Code* §17529.1(h)."

2        *California Business & Professions Code* §17529.5(b)(1)(A)(ii) provides standing to bring an

3    action to "(ii) An electronic mail service provider" against an entity that violates any part of the section.

4    Plaintiff has alleged and provided exhaustive evidence that Defendant violated this section.

5        Therefore, there is no dispute that Plaintiff has standing to bring an action under *California*

6    *Business & Professions Code* §17529.5.

7        b.    **Azoogle is clearly the advertiser who procured the sending of the emails, and
               is therefore in violation of *California Business & Professions Code* §17529.5.**

8        Defendant argues that Plaintiff cannot demonstrate that Azoogle advertised in the subject emails.

9    Defendant is incorrect.

10       California has adopted a broad definition of the term advertise: "any means of exploitation

11   through the conveyance of information is advertising." *People v. McKean*, (1925) 76 Cal.App. 114 at

12   131 [243 P. 898]. "'Advertiser' means a person or entity that advertises through the use of commercial

13   e-mail advertisements." *California Business & Professions Code* §17529.1(a).    The California

14   Legislator decided:

15       There is a need to regulate the advertisers who use spam, as well as the actual spammers,
         because the actual spammers can be difficult to track down due to some return addresses
16       that show up on the display as "unknown" and many others being obvious fakes and they
         are often located offshore. *California Business & Professions Code* §17529(j)
17

18       The California Legislator also found that: "The true beneficiaries of spam are the advertisers who

19   benefit from the marketing derived from the advertisements." *California Business & Professions Code*

20   §17529(k). *California Business & Professions Code* §17529.1(c) makes the following definition:

21       "Commercial e-mail advertisement" means any electronic mail message initiated for the
         purpose of advertising or promoting the lease, sale, rental, gift offer, or other disposition
22       of any property, goods, services, or <u>extension of credit</u>." (emphasis added.)

23       Defendant issued an "AzoogleAds Insertion Order for Mortgage Lead Test" to Seamless Media,

24   (Exhibit F to JS, AZ-05–09) which has resulted in the sending of SPAM emails in violation of the *CAN*

25   *SPAM Act* (emails containing false headers and misleading subject lines) as discussed above and in

26   detail in Plaintiff's Motion for Summary Adjudication P22-24.  This insertion order purports to prepay

27   Seamless Media for the generation of mortgage refinance leads and the media to be used includes

28   "Email".

1    In addition, documents provided to AEGIS indicate the exact technique of how the advertisement

2    will be used to acquire the mortgage refinance lead.    Exhibit H to JS, AEG-0032–0033.    Similar

3    documents provided to Quicken Loans make the same claims.

4    In fact, exactly what was described to Aegis is what apparently occurred with Bruce Wolf lead.

5    The email recipient filled out a form, that apparently was taken directly from an Azoogle property

6    (lowrateadvisors.com), and the refinance request was sent to Azoogle where it was then resold to

7    various Mortgage Brokers.

8    Since this sequence of events is obviously an exploitation (acquiring the lead information)

9    through the conveyance of information (the email and web site), Azoogle was advertising in the emails.

10   The advertising insertion order indicates that Azoogle was advertising through the use of emails.  This

11   sequence also meets the intent of the California legislature to regulate the advertiser (Azoogle) who

12   benefits from the advertisement.  In this case by re-selling the lead generated by their contractor.

13       **c.**    **The *CAN SPAM Act* does not pre-empt the *California Business & Professions***

14   ***Code* §17529.5.**

15   Defendant claims the ***CAN SPAM Act*** preempts ***California Business & Professions Code***

16   §17529.5 because it does not sound in fraud.  Defendant over relies on the cases cited and attempts to

17   extend those cases beyond any reasonable argument.

18   The ***Mummagraphics*** case cited by Defendant, refers only to the Oklahoma and Email Statute,

19   and therefore provides only limited guidance. ***Omega World Travel, Inc. v. Mummagraphics, Inc.***, 469

20   F.3d 348 (4th Cir., 2006).  In addition, the Court in ***Mummagraphics*** avoids the difficult legal issue of

21   preemption of the Oklahoma Statute by finding that neither that statute nor the ***CAN SPAM Act*** were

22   violated, as the header information clearly identified the Defendant, Omega World Travel.  ***Id.*** at 356,

23   357 and FN2.  The ***Mummargraphics*** case stands for the principles that: "(1) the CAN-SPAM

24   preemption clause does not allow states to create strict liability for inaccuracies in commercial email;

25   and (2) CAN-SPAM's federal right of action for misleading headers does not lie if the message text

26   contains ways to identify the sender." ***Kleffman v. Vonage Holdings Corp.***, Not Reported in F.Supp.2d,

27   2007 WL 1518650 at FN1 (C.D.Cal.,2007).

28   There is no argument put forth by Defendant that the California Statute creates strict liability for

1   inaccuracies in the emails.  In fact Defendant admits that the *California Business & Professions Code*

2   §17529.5 does not *"per se,* run afoul of the CAN-SPAM's preemption clause."  Defendant's Motion

3   P23, L.16–17.  In addition, the California statute does not even apply to the sender, it applies to the

4   advertiser in the email.  Therefore, neither of the principles discussed by the *Mummargraphics* Court

5   apply in this case.

6          The Court in *Kleffman v. Vonage Holdings Corp.*, Not Reported in F.Supp.2d, 2007 WL

7   1518650 (C.D.Cal., 2007) found that the plaintiff's specific claims in that case were preempted and did

8   not go so far as to declare the California statutes pre-empted.  The Court in *Kleffman* found that the

9   nature of the plaintiff's harm did not meet the type envisioned in the saving statute of the *CAN SPAM*

10  *Act*.  To make this decision the *Kleffman* Court relied on the legislative record:

11          [A] State law requiring some or all commercial e-mail to carry specific types of labels, or
            to follow a certain format or contain specified content, would be preempted. By contrast,
12          a State law prohibiting fraudulent or deceptive headers, subject lines, or content in
            commercial e-mail would not be preempted.... [I]n contrast to telephone numbers, e-mail
13          addresses do not reveal the State where the holder is located. As a result, a sender of e-
            mail has no easy way to determine with which State law to comply. Statutes that prohibit
14          fraud and deception in e-mail do not raise the same concern, because they target behavior
            that a legitimate business trying to comply with relevant laws would not be engaging in
15          anyway.  **S.Rep. No. 108-102**, at 21-22; *Kleffman v. Vonage Holdings Corp.*, Not
            Reported in F.Supp.2d, 2007 WL 1518650 at 3 (C.D.Cal.,2007) (emphasis added)
16

17          The language of the California act bases a violation on:  "falsified, misrepresented, or forged

18  header information" (*California Business & Professions Code* §17529.5(a)(2)); and "e-mail

19  advertisement has a subject line that a person knows would be likely to mislead a recipient" (*California

20  Business & Professions Code* §17529.5(a)(3)).

21          Clearly Plaintiff is bringing this action based on violations of *California Business & Professions

22  Code* §17529.5 against an advertiser, who advertised in emails containing fraudulent and deceptive

23  headers and subject lines.  See Plaintiff's discussion of false headers and misleading subject lines in

24  Plaintiff's Motion for Summary Adjudication P22–24, also see Plaintiff's Second Amended Complaint

25  ¶42 (Docket 117).

26          Defendant has attempted to create a constitutional issue and its papers fall extremely short of a

27  convincing argument.

28          Therefore, neither the *California Business & Professions Code* §17529.5 nor the Plaintiff's

1  actions are specifically preempted by the *CAN SPAM Act*.

2  **5.    Plaintiff has neither consented to receive the subject emails nor has it shown bad faith (unclean hands) in bringing this action against a known SPAMMER.**

On requesting summary judgment based on an affirmative defense a moving party must prove every essential element of that defense. *Rose v. A.C. & S., Inc.*, 796 F.2d 294 at 298 (9th Cir.,1986); also see *Fontenot v. Upjohn Co.*, 780 F2d 1190 at 1194 (5th Cir. 1986).

**a.    Plaintiff did not consent to receive the emails from Defendant or anyone else.**

Defendant argues that Plaintiff has through its actions consented to receive the emails. This argument is ridiculous on its face. Defendant relies on the convoluted arguments of its expert that there are only 175 emails. Plaintiff has demonstrated that there were in excess of twelve thousand emails sent to Plaintiff's and Plaintiff's customer email accounts. Defendant is required to present facts, not opinions to win at summary judgment. Defendant has failed to present any facts to support its assertion.

Plaintiff has presented the emails to the court and to Defendant. See Docket 318-4, Nella Dec., Exhibit E. The base file contains 1,421 emails, each containing multiple "To:" and "CC:" intended recipients. Plaintiff has provided exhaustive investigative reports analyzing the emails and demonstrating that there are in fact 12,756 subject emails in this case. Declaration of Josh Mohland ¶5, Exhibit S to JS. Contrary to Defendant's expert opinion, Plaintiff's expert came to the same conclusion as Plaintiff's investigator's that there are 12,756 emails at issue. Exhibit W to Docket 318-3, Posluns P5–10.

Therefore, Defendant has done nothing more than create a contested issue of fact, and its only basis for those facts are the opinions of its expert. This hardly makes it a settled matter.

Defendant provides no facts to support its conclusion that the emails were somehow fabricated by Plaintiff. Again Defendant relies on the speculation and convoluted logic of its expert. An expert who when faced with a direct question replied that he had no evidence of fabrication by Plaintiff. Exhibit T to JS, Cohen Depo P89-90.

Defendant asserts that because the emails were received in alphabetical order, Plaintiff must have been making those emails available to someone to cause that to happen. The nature of directory harvests, the use of bot-nets on the internet by spammers, the evidence of how these emails were

1  transmitted, and the fact that over a thousand email accounts were stolen to send these emails provides

2  fairly clear proof that Defendant is merely trying to create a speculative argument unsupported by any

3  facts.

4         The defense of consent applies to tort laws such as battery. ***Judicial Council Of California Civil***

5  ***Jury Instruction*** 1302; also see ***Rains v. Superior Court***, (1984) 150 Cal.App.3d 933, 938 [198

6  Cal.Rptr. 249]). It is unlikely that there is any application to statutory violations, where the purpose of

7  the statue is intended to deter the action. There is also no evidence, even by Plaintiff's actions, that a

8  reasonable observer would consider an invitation to send SPAM. Plaintiff has warnings on its servers

9  that misuse of its resources to send SPAM are unacceptable. Plaintiff contacted the original Mortgage

10 Brokers in this case within days of receiving the initial emails and informed them of possible litigation.

11 Defendant Azoogle was apprised of this almost immediately, on November 2, 2005, as demonstrated by

12 the emails between Ragi Mahil and Chris Meerschaert. QL-084-085, Exhibit G to JS. Obviously,

13 threatening litigation is not a form of implied consent.

14        Plaintiff did not consent to receive these emails and plaintiff's customers did not consent to

15 receive these emails. Defendant has admitted that they have no evidence of solicitation or affirmative

16 consent by any of the intended recipients. See Court Ordered Stipulation by Defendant, Docket 249.

17        Therefore, Defendant lacks any factual support for their speculation regarding consent.

18        **b.    Plaintiff does not have unclean hands.**

19        Defendant argues that Plaintiff has bad intent because they gathered and preserved evidence in

20 this case in violation of ***Electronic Communications Privacy Act***. Defendant is incorrect in both their

21 reading of the ***Privacy Act*** and the ***CAN SPAM Act***. Defendant has made another frivolous claim with

22 no basis in law.

23        The ***Electronic Communications Privacy Act*** clearly states at 18 ***USC*** § 2511(2)(a)(i):

24        It shall not be unlawful under this chapter for an operator of a switchboard, or an officer,
25        employee, or agent of a provider of wire or electronic communication service, whose
          facilities are used in the transmission of a wire or electronic communication, to intercept,
26        disclose, or use that communication in the normal course of his employment while
          engaged in any activity which is a necessary incident to the rendition of his service or to
27        the protection of the rights or property of the provider of that service

28        Plaintiff is obviously trying to protect its service and its customers by first intercepting SPAM

1   emails and then using evidence gathered to prosecute SPAMMERS.

2       Further the *CAN SPAM Act* provides in 15 *USC* 7707(c) that nothing in the *CAN SPAM Act* or

3   any other law shall be construed regarding the lawfulness or unlawfulness of an ISP's actions in actions

4   relating to the Act.

5       In addition, Defendant fails to bring up any facts to support this defense. Plaintiff has provided

6   both facts and argument to dispute any claim of bad faith, the requisite showing for a defense of unclean

7   hands. See Plaintiff's Motion for Summary Adjudication, Docket 318, P16–17.

8       Defendant has attempted to bring up another ridiculous defense based on no facts and a faulty

9   reading of the law. Defendant has failed to even state the essential elements of its affirmative defenses,

10  mush less actually prove them.

11      The defense of unclean hands requires a showing of bad intent. *Dollar Systems, Inc., v Avcar*

12  *Leasing Systems, Inc.*, 890 F.2nd 165, 173 (9th Cir. 1989). As discussed above, the use of evidence in

13  this case does not somehow prove bad intent. Gathering and preserving evidence is not a showing of

14  bad intent. A finding that gathering, preserving and disclosure of evidence in litigation somehow creates

15  bad intent would eviscerate not just the *CAN SPAM Act*, but a majority of Federal and State statutes.

16      Defendant has failed to present any facts for either consent or unclean hands and has

17  misrepresented the law regarding these defenses.

18                              **III.    CONCLUSION**

19      Defendant Azoogle's Motion for Summary Judgment\Adjudication of issues, should be denied.

20

21                                      **SINGLETON LAW GROUP**

22

23  Dated:  January 31, 2008              /s/ Jason K. Singleton
                                          Jason K. Singleton,
24                                        Richard E. Grabowski, Attorneys for Plaintiff,
                                          **ASIS INTERNET SERVICES**
25

26

27

28