Jason K. Singleton, State Bar #166170
jason@singletonlawgroup.com
Richard E. Grabowski, State Bar #236207
rgrabowski@mckinleyville.net
SINGLETON LAW GROUP
611 "L" Street, Suite A
Eureka, CA 95501
(707) 441-1177
FAX  441-1533

Attorneys for Plaintiff, ASIS INTERNET SERVICES
and JOEL HOUSEHOLTER

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASIS INTERNET SERVICES, a California corporation, and JOEL HOUSEHOLTER, dba KNEELAND ENGINEERING, dba FOGGY.NET<br><br>　　　Plaintiffs,<br>vs.<br><br>ACTIVE RESPONSE GROUP, INC., a Delaware corporation, et al.<br><br>　　　Defendants. | Case No. C-07-6211 TEH<br><br>**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>DATE :　July 21, 2008<br>TIME :　　10:00 a.m.<br>CTRM :　　12, 9th Floor |

# TABLE OF CONTENTS

INTRODUCTION.... .......... .......... .......... .......... ................... .......... .......... .......... .......... ........1

BACKGROUND ..... .......... .......... .......... .......... ................... .......... .......... .......... .......... .........2

DISCUSSION .......... .......... .......... .......... .......... ................... .......... .......... .......... ........... .........2

    a.    The definition of "adverse affect" used by the *Optin Global* court is not supported by the plain language of 15 USC ¶7706(g) or the legislative history. ....... .......... .......... .......... ................... .......... .......... .......... .......... ........3

    b.    The distinction between active and inactive email accounts at ASIS and FOGGY is immaterial. ..... .......... ................... .......... .......... .......... ........... ......13

CONCLUSION ....... .......... .......... .......... .......... ................... .......... .......... .......... ........... ......16

## TABLE OF AUTHORITIES

**Cases**

*ASIS Internet Services v. Optin Global, Inc.*, Slip Copy, 2008 WL 1902217
(N.D.Cal., 2008) .............................................................................................. passim
*Christiansburg Garment Co. v. Equal Employment Opportunity Commission*,
434 U.S. 412 at 412 (1978) ............................................................................................6
*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242 246-247
(9th Cir. 1990) ................................................................................................................1
*Gordon v. Virtumondo, Inc.*, 2007 WL 1459395 (W.D.Wash., 2007) ........................... passim
*Hypertouch, Inc. v. Kennedy-Western University*, 2006 WL 648688 at 4
(N.D.Cal., 2006) ............................................................................................................8
*Lujan v. Defenders of Wildlife*, 504 U.S. 555 at 580 (1992) ...............................................4, 5, 6
*Massachusetts v. E.P.A.*, 127 S.Ct. 1438 at 1453 (2007) ......................................................4, 5
*Newman v. Piggie Park Enterprises*, 390 U.S. 400, 402 (1968) .........................................6
*Phillips v. Netblue, Inc.*, Slip Copy, 2006 WL 3647116 at 4 and 5 (N.D.Cal., 2006) ...........16
*Tcherepnin v. Knight*, 389 U.S. 332 at 336 (1967) ............................................................3, 12
*Warth v. Seldin*, 422 U.S. 490 at 500 (1975) .......................................................................6

**Statutes**

**15** *USC* **§7701** .......................................................................................................................3
**15** *USC* **§7701(6)** .............................................................................................................6, 8
**15** *USC* **§7702(11)** ...........................................................................................................5, 13
**15** USC §7704 .....................................................................................................................4
**15** *USC* **§7706(g)** ..........................................................................................................4, 7, 14
**15** *USC* **§7706(g)(1)** .....................................................................................................4, 5, 6
**15** *USC* **§7706(g)(3)(A)** .................................................................................................6, 8, 18
**47** *USC* **§231(e)(4)** .............................................................................................................14
*California Business & Professions Code §* 17529.5 .............................................................5
*CAN SPAM Act* ................................................................................................................ passim

**Other Authorities**

"Anti-Spam Market Growing at a Rate of 50%" The Radicati Group ....................................2
"Barracuda Networks Releases Annual Spam Report", Barracuda Networks......................1
FTC Staff Report: *Spam Summit: The Next Generation of Threats and Solutions*,
November 2007, P A-1 ..........................................................................................11, 15
Ironport Systems, Inc.: INTERNET SECURITY TRENDS FOR 2007, A REPORT
ON SPAM, VIRUSES AND SPYWARE, by Tom Gillis, 2007 P 3 ........................1, 11, 15
Prepared Witness Testimony: Betty, Charles (Garry) .........................................................2
S. REP. NO. 108-102, at 22 (2003) (Comm. Rep. on *CAN-SPAM Act of
2003* (S.877)) .........................................................................................................7, 8, 11

## INTRODUCTION

Plaintiffs concede the Complaint does not set forth any allegation of adverse effect. Plaintiffs seek leave to amend, and submit a proposed First Amended Complaint (hereafter "FAC") herewith. ***Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.,*** 911 F.2d 242 246-247 (9th Cir. 1990)

Defendant will argue that the new and additional allegations Plaintiffs intend to include in the FAC regarding adverse effect, still do not amount to "significant adverse effect from the subject emails at issue" to satiate the rule on adverse effect that came out of the Optin Global court. Ergo, that amendment is futile.

The question of what constitutes "adverse effect" for **CAN SPAM Act** standing is the legal question both Plaintiffs and Defendant seek to have clarified by Defendant's Motion and Plaintiffs' Opposition. Plaintiffs thoroughly explain below that under the correct interpretation of adverse effect, the allegations of the FAC set forth what is necessary to state a claim.

## BACKGROUND

In 2001, spam accounted for 5-7% of all email sent on the Internet.[1] At the time the **CAN-SPAM Act** was written in 2003, that number had risen to 50%.[2] In 2004, spam accounted for 70% of all email sent on the Internet.[3] By 2007, 90-95% of all email was spam.[4] Between October 2005 and October 2006, the size of spam messages increased threefold.[5]

Today, spammers are using illegal tactics to avoid detection and send more spam, such as infecting computers with viruses and falsifying domain name registrations.[6] As the amount of spam increases, spammers continually develop sophisticated tools and new techniques to send email past spam filters. According to Dean Drako, president and CEO of Barracuda Networks, "The spam war is a continuous battle between spammers and security vendors. Security vendors now require 24-by-7 defense operations to continuously monitor the Internet

---

[1] CAN-SPAM Act of 2003, §2(a)(2)
[2] Ibid.
[3] "Barracuda Networks Releases Annual Spam Report", Barracuda Networks, http://www.barracudanetworks.com/ns/news_and_events/index.php?nid=232 (Courtesy copy attached)
[4] Ibid.
[5] Internet Security Trends for 2007, IronPort Security, http://www.ironport.com/pdf/ironport_trend_report.pdf (Courtesy copy attached)
[6] Ibid.

1  for new spam trends and distribute new defensive solutions immediately."[7]

2  The rapid growth of spam has resulted in a thriving anti-spam industry, with vendors
3  such as Postini, Barracuda Networks, and IronPort offering solutions for email service
4  providers. A report published by The Radicati Group in 2004 expected the anti-spam market
5  would surpass $1.7 billion in 2008.[8]

6  In 2003, Charles (Garry) Betty, then CEO of Earthlink, testified before the House
7  Subcommittee on Telecommunications and the Internet on this subject: "Spam costs Internet
8  providers real money.  Excess server capacity, an "abuse team" working full time to ferret out
9  and close down sources of spam on the internet, internal and external legal fees are all costs
10  we incur because of spam. While we don't publish exact figures on this, it is fair to say that
11  they are in excess of $10 million a year for EarthLink alone."[9]

12  Furthermore, the continued increase in spam threatens the viability of email as a
13  communications platform.  According to Betty's testimony:

14  "What was at first an occasional inconvenience grew to be an annoyance and now threatens to overwhelm online
15  communications. E-mail is often described as the Internet's 'killer app.' (killer application=primary use) Left unchecked, spam
16  threatens to kill the killer app."[10]

17  The federal courts now rely almost entirely upon PACER and email for filings, and to
18  provide legal notice to parties and attorneys.  If it were not for the spam filters operated by the
19  courts, and the large IAP's, that system would cease to function.   Even the District Courts are
20  being used by spammers.  In a recent Notice from the Clerk of the Central District, spammers
21  were telling recipients they had been subpoenaed to appear before a grand jury in the U.S.D.C
22  in San Diego. The official looking email contained a link on which to click to obtain more
23  information.  If the consumer clicked the link, it downloaded malicious software onto their
24  computer. See Exhibits "A" and "B" to the Declaration of Jason K. Singleton (hereafter JKS).

25  A review of the Congressional Findings and Policy set forth in 15 *USC* §7701 (*CAN-*

---

26  [7] "Barracuda Networks Releases Annual Spam Report", ³Above
27  [8] "Anti-Spam Market Growing at a Rate of 50%" http://www.radicati.com/uploaded_files/news/04%20Anti-Spam%20Press%20Release.pdf (Courtesy Copy attached)
28  [9] Prepared Witness Testimony: Betty, Charles (Garry) (Courtesy copy attatched)
http://republicans.energycommerce.house.gov/108/Hearings/07092003hearing1008/Betty1568.htm
[10] Ibid.

1  **SPAM Act**) reveals that Congress found unsolicited commercial emails to be a serious
2  problem that "*imposes significant monetary costs on providers of Internet access services,*
3  *businesses, and educational and nonprofit institutions..*"   Internet service providers spend
4  billions of dollars a year for spam filtering.  *WIkepedia the Free Encyclopedia* under **E-mail**
5  **spam**, estimates that world wide 2007 IT costs for dealing with SPAM is **$198 billion** – based
6  on a study by *The Radacati Group, Inc.*

7  It is clear the **CAN SPAM Act** is a remedial statute, and "*remedial legislation should be*
8  *construed broadly to effectuate its purposes.*"   **Tcherepnin v. Knight**, 389 U.S. 332 at 336
9  (1967).

### DISCUSSION

11  Defendant's Motion is premised upon the rulings of the **ASIS Internet Services v.**
12  **Optin Global, Inc.**, Slip Copy, 2008 WL 1902217 (N.D.Cal., 2008)  and **Gordon v.**
13  **Virtumundo, Inc.**, 2007 WL 1459395 (W.D.Wash., 2007) (courtesy copies attached) courts
14  that an Internet Service provider must show discreet, individualized, significant economic loss
15  from the emails at issue in litigation, to have standing to sue under the **CAN SPAM Act**.  As is
16  set forth in detail below, Plaintiff argues that the **Optin Global** and **Gordon** Courts are
17  mistaken.  Such a rule will eviscerate the **CAN SPAM Act** *of 2003*, as few, if any, Internet
18  Access providers will ever be able to show such a loss.  For example, the large internet service
19  providers, such as AOL and Earthlink, receive several million spam emails each day.  They will
20  never be able to point to a group of five or ten, or even a hundred thousand spam emails, and
21  show a discreet, individualized <u>significant</u> economic loss.

22  **ASIS Internet Services v. Optin Global, Inc.**, Slip Copy, 2008 WL 1902217 at 17
23  (N.D.Cal., 2008) held that ASIS did not have standing as and IAP under 15 **USC** §7706(g)
24  because ASIS had not demonstrated adverse affect.  To reach this conclusion, the court
25  created a definition of adverse affect that includes significant harm <u>specifically caused by the</u>
26  <u>subject emails and peculiar</u> to IAPs.  The court's definition of adverse affect is not supported
27  by the language of the statute or the legislative history.  The court could only reach its decision
28  concerning standing by narrowly defining the type of adverse affect in 15 **USC** §7706(g)(1).

### a. The definition of "adverse affect" used by the *Optin Global* court is not supported by the plain language of 15 *USC* §7706(g) or the legislative history.

Congress has authorized "[a] provider of Internet access service adversely affected by a violation…" of various sections of 15 **USC** §7704 with standing to bring an action. 15 **USC** §7706(g)(1). The Congress has the authority to enact legislation that confers standing on a plaintiff based on harm as defined in that statute. "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before…" ***Massachusetts v. E.P.A.***, 127 S.Ct. 1438 at 1453 (2007); citing ***Lujan v. Defenders of Wildlife***, 504 U.S. 555 at 580 (1992).

The issues in this matter turn on the proper construction of the language of the statute of 15 **USC** §7706(g)(1) and is "a question eminently suitable to resolution in federal court." ***Massachusetts v. E.P.A.***, 127 S.Ct. 1438 at 1453 (2007).

To establish standing the party bringing suit "must show that the action injures him in a concrete and personal way… assuring both that the parties before the court have an actual, as opposed to professed, stake in the outcome…" ***Massachusetts v. E.P.A.***, 127 S.Ct. 1438 at 1453 (2007); citing ***Lujan v. Defenders of Wildlife***, 504 U.S. 555 at 580 (1992).

ASIS and FOGGY have alleged that all of the emails were sent to and received by Plaintiffs' servers. See Complaint at ¶¶13 and 14, and FAC at ¶¶13 and 14. Samples of the emails were attached to the Complaint as Exhibit E. Plaintiff's have provided all of the emails to Defendant as a supplemental disclosure.

The Congress has identified the class of persons as providers of Internet access services. 15 **USC** §7706(g)(1). FOGGY and ASIS have alleged they are providers of Internet services within the meaning of 15 **USC** §7702(11) and email service within the meaning of ***California Business & Professions Code*** § 17529.5. See Complaint ¶¶11 and 12, and FAC ¶¶11 and 12.

15 **USC** §7706(g)(1) defines the requisite injury as "adversely affected." In exercising its power to define standing by statute the Congress must "at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit."

*Massachusetts v. E.P.A.*, 127 S.Ct. 1438 at 1453 (2007); citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 at 580 (1992).

Congress defined the type of harm that the **CAN SPAM Act** was intended to vindicate:

> (6)    The growth in unsolicited commercial electronic mail imposes significant monetary costs on providers of Internet access services, businesses, and educational and nonprofit institutions that carry and receive such mail, as there is a finite volume of mail that such providers, businesses, and institutions can handle without further investment in infrastructure.  15 **USC** §7701(6).

Congress related the injury to IAPs in a broad manner as "adversely affected."  15 **USC** §7706(g)(1).  The legislature further expanded on this definition in the penalties section:

> For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is the amount calculated by multiplying the number of violations (with each separately addressed unlawful message that is transmitted or attempted to be transmitted <u>over the facilities of the provider of Internet access service</u>… 15 **USC** §7706(g)(3)(A).  (emphasis added)

The text of the **CAN SPAM Act** clearly points to the harm as the cost of carrying SPAM emails over the IAP's facilities.  *ASIS Internet Services v. Optin Global, Inc.*, Slip Copy, 2008 WL 1902217 at 15 - 17 (N.D.Cal., 2008) did not agree with this definition of harm and created a new definition that in effect makes it impossible for any IAP to bring an action under the **CAN SPAM Act**.

This case is not an attempt to create statutory standing with no real harm for a segment of the population thus evading the requirement for concrete harm as required for **Article III** standing.  There is no dispute that some harm has occurred.  At the very least ASIS and FOGGY had to carry the emails over its servers.  A portion of the expenses that ASIS ad FOGGY have expended over time to prevent spamming was used to filter, process and store the emails.  ASIS and FOGGY conducted investigations specific to these emails.  The question before the Court is if that harm is sufficient to meet the requirements of **Article III** standing.

Further it is likely that even this level of harm is not necessary as **Article III** standing can be created by Congress by creating a right and the invasion of that right.  The Court in *Lujan* stated: "Nothing in this contradicts the principle that '[t]he ... injury required by Art. III

may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.' ' " ***Lujan v. Defenders of Wildlife***, 504 U.S. 555 at 578 (1992); citing ***Warth v. Seldin***, 422 U.S. 490 at 500 (1975).  As examples the Court cited:  "individual's personal interest in living in a racially integrated community,… and injury to a company's interest in marketing its product free from competition." ***Lujan v. Defenders of Wildlife***, 504 U.S. 555 at 578 (1992).   In the ***CAN SPAM Act of 2003*** (15 ***USC*** §7706(g)) the Congress intended to create a legal right for IAPs not to be spammed and empowered IAPs to enforce that right. Invasion of that right therefore creates standing.  Congress not only intended to create a legal right it intended that right as a deterrent to SPAM.  Congress empowered plaintiff Internet access providers as private attorney generals to prosecute spammers in the war on SPAM.  15 ***USC*** §7706(g).  It is clear that plaintiff Internet access providers are one of the chosen vindicators of a policy considered highly important by the Congress.  In similar cases, with similar statutes, the Court has warned against punishing the Congresses "chosen instrument to vindicate a policy that Congress considered of the highest priority." ***Christiansburg Garment Co. v. Equal Employment Opportunity Commission***, 434 U.S. 412 at 412 (1978); citing ***Newman v. Piggie Park Enterprises***, 390 U.S. 400, 402 (1968).

     The ***Optin Global*** court relied heavily on the legislative history as discussed below. However, even though the court cites portions of the Senate Report text, it did not give credence to the clear language concerning enforcement of the act in **S. REP. NO. 108-102**, at 22 (2003) (Comm. Rep. on ***CAN-SPAM Act of 2003*** (S.877)) (courtesy copy attached):

> Section 7(f) would allow a provider of Internet access service adversely affected by a violation of section 5 to bring a civil action in Federal district court or other court of competent jurisdiction. <u>This could include a service provider who carried unlawful spam over its facilities</u>, or who operated a website or online service from which recipient e-mail addresses were harvested in connection with a violation of section 5(b)(1)(A)(i). (Emphasis added).[11]

     This portion of the legislative record clearly indicates that the type of harm contemplated for enforcement is "carrying the unlawful spam over" the IAP's facilities.  This correlates exactly

---

[11] It should be noted that Plaintiffs have alleged a directory harvest related to this matter.  Which, is adverse effect. See FAC at ¶32.

with the language in the statute at 15 *USC* §7706(g)(3)(A) and 15 *USC* §7701(6). This portion of the legislative history appears in the section labeled "Section 7. Enforcement by the Federal Trade Commission."[12]

ASIS and FOGGY have pled in the FAC that they carried the unlawful SPAM over its filtering service and its other facilities. ASIS and FOGGY also propose to plead that they processed the SPAM, and stored the SPAM on their facilities. This definition takes into account the ongoing harm that every legitimate IAP incurs on a daily basis. IAPs incur ongoing costs for filtering, network bandwidth, processing, storage, and customer service.

ASIS and FOGGY have alleged in the FAC following types of harm:

A) ASIS received the emails at issue in this suit, processed those emails through its SPAM filtering service Postini; processed the emails through its email server; preserved the emails on its servers, and transferred the emails to its attorneys as evidence in this case.

B) ASIS estimates that a third of its' employees' time is spent on customer spam complaints and technical issues, such as modifications to individual customer account filtering to reduce SPAM and avoid false positives. ASIS spends a considerable amount of time in sender authentication, a process where ASIS stops its users or users who have been taken over as zombies, from sending SPAM to other sites. This is an industry wide problem as any IAP that is discovered allowing their customers to send SPAM will be blocked by the other IAPs. As the level of SPAM has increased since 2005 the sender authentication process has become increasingly burdensome to avoid email blockage by the networks.

C) ASIS's customers with older computers now have to buy newer computers to use the service because of the changes ASIS has had to make to reduce SPAM.

D) ASIS estimates that the prevention of SPAM costs about $3000 per month in SPAM filtering costs and employee time.

E) ASIS increased its computer server capacity and network capacity as a result of the spam emails generally. In 2007, ASIS changed its email server from SENDMAIL to Postfix to upgrade its services to process and

---

[12] Even though labeled under the FTC this section also includes enforcement by State Attorney Generals and IAPs. See **S. REP. NO. 108-102**, at 22 (2003) (Comm. Rep. on *CAN-SPAM Act of 2003* (S.877)).

| | | |
|---|---|---|
| | | capture SPAM email that was evading the Postini filtering service and going directly to customers. |
| | F) | ASIS incurs network slow downs occasionally as a result of constantly increasing SPAM loads. |
| | G) | ASIS has not incurred any server or network crashes directly attributable to SPAM in the last three years. |

Facts alleged in the FAC showing adverse affect for the emails received by FOGGY:

H) FOGGY received the emails at issue in this suit, processed those emails through its SPAM filtering servers DSPAM and Barracuda; processed the emails through its email server; preserved the emails on its servers, and transferred the emails to its attorneys as evidence in this case.

I) FOGGY currently has 72 active paying customers; in 2007 FOGGY had approximately 180 customers. FOGGY provides only dial up services to its retail customers.

J) FOGGY purchased and installed a Barracuda spam filtering system (server and software) in July of 2007. Prior to acquiring the Barracuda system, FOGGY only used DSPAM, which it still runs. Both SPAM filters are required to eliminate most of the SPAM.

K) Joel Householter spends about an hour each day, seven days a week, working with customers fixing problems where SPAM evades the filters. The system administrator spends 2 hours per week working on upgrades and problems with the filters.

O) FOGGY incurs network slow downs occasionally as a result of constantly increasing SPAM loads.

P) FOGGY has not incurred any server crashes or network crashes directly attributable to SPAM in the last two years.

See FAC ¶¶26 and 27.

Defendant relies heavily on ***Gordon v. Virtumundo, Inc.***, 2007 WL 1459395 (W.D. Wash. May 15, 2007) in its decision. The ***Optin Global*** court and the ***Gordon*** court also cite ***Hypertouch, Inc. v. Kennedy-Western University***, 2006 WL 648688 at 4 (N.D.Cal., 2006) citing the text: "Hypertouch has submitted a declaration indicating that high spam loads have caused decreased server response and crashes, led to higher bandwidth utilization, and forced

expensive hardware and software upgrades." ***ASIS Internet Services v. Optin Global, Inc.***, Slip Copy, 2008 WL 1902217 at 15 (N.D.Cal., 2008).

The ***Optin Global*** court defined "adversely affected" as "a particular type of harm and that harm is 'significant'." ***ASIS Internet Services v. Optin Global, Inc.***, Slip Copy, 2008 WL 1902217 at 17 (N.D.Cal., 2008).

Both the ***Optin Global*** and the ***Gordon*** Court noted that the Congress described the harm caused by SPAM as:

> "[s]pam imposes significant economic burdens on ISPs, consumers and businesses" because "[m]assive volumes of spam can clog a computer network, slowing Internet service for those who share that network. ISPs must respond to rising volumes of spam by investing in new equipment to increase capacity and customer service personnel to deal with increased subscriber complaints." ***ASIS Internet Services v. Optin Global, Inc.***, Slip Copy, 2008 WL 1902217 at 15 (N.D.Cal., 2008).; ***Gordon v. Virtumundo, Inc.***, 2007 WL 1459395 at 6 (W.D. Wash. May 15, 2007); citing **S. REP. NO. 108-102**, at 6 (2003) (Comm. Rep. on ***CAN-SPAM Act of 2003*** (S.877)).

This section of text appears under the title "Costs to ISPs, Consumers, and Businesses". **S. REP. NO. 108-102**, at 6 (2003) (Comm. Rep. on ***CAN-SPAM Act of 2003*** (S.877)). It does not appear in the section of the report labeled "Section 7. Enforcement by the Federal Trade Commission". *ibid.* at 22.

This citation to the Senate Report also represents the state of technology and investment by IAPs in 2003. They do not represent the environment today.

The Federal Trade Commission reports that SPAM filters used by ISPs effectively block the vast majority of SPAM sent to harvested email accounts. **FTC Staff Report:** *Spam Summit: The Next Generation of Threats and Solutions*, November 2007, P A-1. (courtesy copy attached) Because IAPs have improved their networks, increased bandwidth and server capacity, and installed SPAM filtering processes, they no longer experience server crashes based on spam attacks. *Id.*

The amount of SPAM has not decreased, it has increased at astronomical rates. Ironport Systems Inc., an Internet security firm, reports that in 2005 SPAM volumes increased

1  by 200%, that volumes more than tripled in 2006, and that SPAM volumes would more than
2  double in 2007.  This required a 300 percent increase in email gateway capacity in 2006 over
3  2005.  **Ironport Systems, Inc.**: INTERNET SECURITY TRENDS FOR 2007, *A REPORT ON*
4  *SPAM, VIRUSES AND SPYWARE*, by Tom Gillis, 2007 P 3 (courtesy copy attached).

5      Under the **Optin Global** Court's definition of "adverse affect" it is unlikely that any
6  provider of Internet access services will ever have standing to bring a suit under the **CAN**
7  **SPAM Act**.  IAPs, including ASIS and FOGGY, have put into place filtering systems, better
8  networks, more processing capacity and staff to handle complaints.  Servers and networks no
9  longer crash.  Customers do not see the great majority of SPAM.  Businesses manage their
10 expenses so that there are minimal surprise increases in cost.  Even so, IAPs must continue to
11 spend resources, at a growing rate, in order to stop the increasing onslaught of SPAM.  This is
12 exactly what the legislature predicted and exactly what they intended to prevent by the **CAN**
13 **SPAM Act of 2003**.

14     If this Court finds that the **Optin Global** court's definition of adverse affect is correct,
15 then the intent of the legislature to protect the IAPs will have been thwarted.

16     In addition, in agreeing with the court in **Gordon v. Virtumundo, Inc.**, 2007 WL
17 1459395 (W.D. Wash. May 15, 2007), the **Optin Global** court made no attempt to analyze the
18 distinguishing facts between the two cases.  In **Gordon** the plaintiff was found not to be acting
19 like an IAP at least in part because of the characteristics of his business.  **Gordon v.**
20 **Virtumundo, Inc.**, 2007 WL 1459395 at 8 (W.D. Wash. May 15, 2007).

21     The plaintiff in **Gordon** did not argue that he had suffered any adverse affect beyond
22 the receipt of the emails.  This led the Court to determine that the plaintiff was suffering no
23 affect other than that of an average consumer.  **Gordon v. Virtumundo, Inc.**, 2007 WL
24 1459395 at 8 (W.D. Wash. May 15, 2007).  If the affect was no greater than that felt by a
25 consumer, then plaintiff was not among those intended by the legislature to bring an action,
26 otherwise the legislature would have given standing to consumers.   *Id.* at 8 and 9.  The
27 plaintiff in **Gordon** had no paying customers.  *Id.* at 7.  The plaintiff in **Gordon** had only six
28 customers, most of them were family members.  *Id.* at 3.  The plaintiff in **Gordon** did not own

his own equipment, bandwidth, nor have employees.  The plaintiff in *Gordon* did not charge for his services and all of his revenue came from SPAM "settlements and disputes." *id.* at 3 and 4.  This led the Court to believe that the plaintiff was really in the business of conducting spam suits.

ASIS and FOGGY have alleged adverse affect well beyond what any consumer can experience.  ASIS had almost a thousand paying Internet and email customers in 2005.  These customers pay for this service.  FOGGY currently has 72 active paying customers; in 2007 FOGGY had approximately 180 customers.  Plaintiff's both own and lease hardware and network bandwidth in providing their separate services.  ASIS runs an Internet Access service in the isolated community of Garberville, California, providing, dial-up and broadband, internet and email service to most of the population of Garberville.  FOGGY is one of the last remaining internet access providers offering only dial-up services.  ASIS and FOGGY are going concerns based on profits from its internet and email services.  Both Plaintiffs were in business for several years prior to implementation of the **CAN SPAM Act** of 2003.

These facts significantly distinguish ASIS and FOGGY from the plaintiff in *Gordon*.  The facts indicate that the court in *Gordon* felt that the plaintiff was not really in the business of providing Internet access service but in the business of suing spammers.  The *Gordon* Court was attempting to distinguish a person who sets up an IAP to sue spammers from an IAP whose main business was providing consumers access to the Internet.  Instead of making this holding the *Gordon* Court tried to create a definition of harm inconsistent with the statutory language of the *CAN SPAM Act of 2003*.

The *Gordon* court argues that without the "significant harm" definition that any consumer could bring an action and that is not what the legislature intended.  *Gordon v. Virtumundo, Inc.*, Slip Copy, 2007 WL 1459395 at 8 (W.D.Wash., 2007).  This argument is fallacious because the legislature specifically defined what it meant by an IAP.  An Internet Access Service is:  "The term 'Internet access service' has the meaning given that term in section 231(e)(4) of Title 47."  15 **USC** §7702(11).

> The term "Internet access service" means a service that enables users to access content, information, electronic mail, or other

>   services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers… 47 **USC** §231(e)(4).

The **Gordon** court discusses this issue and then creates a definition for adverse affect that no IAP can meet and that is not supported by the statutory language. ***Gordon v. Virtumundo, Inc.***, 2007 WL 1459395 at 8 (W.D. Wash. May 15, 2007).

The key is that there is a package of services offered to consumers. This is a definition of a business offering services. A consumer not offering those services to other consumers does not qualify. Any business or individual offering those services does qualify. The District Courts have tried to change this definition by their addition of "significant harm" unique to those types of businesses. However, no IAP currently suffers from the type of "significant harm" narrowly defined by the **Optin Global** and **Gordon** Courts. IAPs do not suffer server and network crashes <u>*from specific spam*</u> because they have added personnel and upgraded software, hardware and networks.

In creating a definition of adverse affect the **Optin Global** Court ignored the familiar canon of statutory construction: "remedial legislation should be construed broadly to effectuate its purposes." ***Tcherepnin v. Knight***, 389 U.S. 332 at 336 (1967). The **Optin Global** Court has created a definition for adverse affect that is narrow and has the effect of eviscerating 15 **USC** §7706(g) the IAP portion of the **CAN SPAM Act**.

The **Optin Global** Court defined significant harm as:

>   "the Emails either reached any active ASIS users (rather than being filtered by Postini) or were the subject of complaints to ASIS… that ASIS had to increase its server capacity or experienced crashes as a result of the Emails… that ASIS experienced higher costs for filtering by Postini as a result of the Emails." ***ASIS Internet Services v. Optin Global, Inc.***, Slip Copy, 2008 WL 1902217 at 17 (N.D.Cal., 2008).

This definition turns the purpose of the **CAN SPAM Act** on its head. This definition places the responsibility on the IAP to perform badly as an IAP so that it can suffer the specific harm cited by the **Optin Global** Court. No real IAP is going to run their business so badly that large amounts of spam reach their customers. No real IAP is going to run their business in

such a way that their servers crash. No real IAP is going to manage their costs, such that they constantly go up in an uncontrollable manner. Good businesses do not operate in this manner. The intent of the *CAN SPAM Act* was to stop spamming, not to cause IAP's to operate their businesses poorly so they can have standing to enforce the *CAN SPAM Act*.

Both the *Optin Global* Court and the *Gordon* Court have attempted to create a definition for an entity that does not exist and that is at odds with the purpose of the *CAN SPAM Act*. That is, an Internet access provider that does not have an effective filter and has not upgraded its facilities and staff to deal with the growing onslaught of SPAM. By doing so they have defeated the purpose of the *CAN SPAM Act* to stop SPAM by allowing IAPs to bring actions in court.

As discussed above, because IAPs have undertaken efforts to deal with SPAM, IAPs no longer suffer server or network crashes because of SPAM. **FTC Staff Report:** *Spam Summit: The Next Generation of Threats and Solutions*, November 2007, P A-1. Making the single issue of server crashes determinant means all IAPs will be excluded from enforcing the *CAN SPAM Act*.

Plaintiffs contend that this is a burden no IAP can ever completely meet nor should an IAP be forced to meet. The narrow definition used by the *Optin Global* Court for adverse affect ignores the remedial nature of the *CAN SPAM Act*. IAPs were receiving over 60 billion spam emails per day at the end of 2006. *IronPort Internet Security Trends for 2007 – a Report on SPAM, Viruses and Spyware*, by Tom Gillis, P 7. At this volume no IAP will ever be able to show a significant direct result from 10,000 or even a million spam emails. Even a million emails are insignificant when an IAP is receiving a billion emails per day.

Plaintiffs request that the Court establish the definition of adverse affect as carrying the emails over the IAPs facilities and accept Plaintiffs' proposed FAC.

    **b.    The distinction between active and inactive email accounts at ASIS and FOGGY is immaterial.**

Defendant's Motion states:
> "No court, however has decided whether an IAS provider, acting as Plaintiffs allege in their Complaint, may assert a claim when they

    perform activities outside the scope of their role as an IAS provider. Here, Plaintiffs allege that the email accounts to which ARG allegedly sent the email were either unassigned or inactive. Thus, Plaintiffs were apparently providing internet services to none of the account holders when the emails arrived at these allegedly affected email accounts." Def. Motion P7 L12-20

  When a spammer sends spam to an internet service providers closed email accounts, it still consumes resources sought to be preserved by the **CAN SPAM Act**. First, *if any* email addressed to the ASIS domain is sent, the server still has to process it. For example, if we were to make up an address, such as 123456@asis.com, and send an email to that address, ASIS' email server would still have to look to see whether such address exists, and if none, "bounce" the message. Consequently, even if ASIS "bounced" the spam emails, sent to its inactive email address accounts, it still consumes bandwidth and server processing resources.

  Next, "bouncing" spam email messages sent to inactive accounts at an IAP, *is not* industry friendly. "Bounced" email messages actually go somewhere. When an IAP "bounces" an email message, it sends a message back saying "no user found." That "no user found" message is sent to whatever email address was put in the "sent from" field in the email originally sent to the IAP. Spammers do not put their own email address in the "sent from" field of spam emails. Spammers use other people's email addresses to put in the "sent from" field. Consequently, when an IAP bounces spam emails, the bounced message is sent to some innocent person who generally has no idea why they are receiving a message saying the mail they attempted to send did not get through.

  There is another very valid reason why IAP's and ASIS/FOGGY should not, and do not "bounce" spam email messages sent to inactive email accounts. If the closed accounts are bounced, then a spammer can perform a directory harvest, by simply sending emails alphabetically to each possible combination. E.g. a@asis.com, b@asis.com, etc. Those combinations that do not bounce, are active accounts. Plaintiffs do not bounce emails sent to inactive accounts, simply because they do not wish to educate spammers as to which accounts are inactive and active.

  Next, spam filtering is a dynamic evolution. The filters are very sophisticated, and the

configuring of same by Plaintiffs is no small task.  Plaintiffs collect the spam sent to their inactive accounts so as to allow analysis of the spam its clients are receiving, and thus better configure its spam filters.  Without this process, the filters are frequently too stiff, filtering out bona fide communication.

Which brings up the next point.  Defendant has stated the emails in this litigation were sent to inactive and administrative accounts at ASIS and FOGGY.  However, that does not mean that spam emails which contained Defendant's advertisements were not sent to Plaintiffs' active clients as well. They likely were.  It is just that such emails were simply not collected.

Now if any IAP intends to effect Congress's purpose in enacting the **CAN SPAM Act**, by filing suit regarding spam emails sent to an IAP's server, there simply must be a method for collecting and sorting such spam.  Further, virtually every IAP uses spam filtering.  If they did not, and let millions of spam messages pass through to their end user clients, the IAP would be out of business within a matter of days.  Consequently, for an IAP to file suit regarding such emails, it must either collect the spam before it hits the spam filter, or after.  In either event, the defendant will argue the IAP did not suffer adverse effect, or did so as a result of their own actions.  Also, in either event, the defendant, like the Defendant here, will make the argument that such plaintiff IAP configured its server; spam filter; closed accounts; etc., in such manner as to "be in the business of filing CAN SPAM suits".  There is no way for any IAP to collect the spam it is sent and file suit over it, without seeing the argument Defendant raises here.

It might be kept in mind, the onus imposed by the **CAN SPAM Act** is for **_sending_** spam. 15 **USC** §7706(g)(3)(A) states:

> For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is the amount calculated by multiplying the number of violations (with each separately addressed unlawful message that is transmitted or <u>attempted</u> to be transmitted over the facilities of the provider of Internet access service, or that is transmitted or <u>attempted</u> to be transmitted to an electronic mail address obtained from the provider of Internet access service in violation of section 7704(b)(1)(A)(i) of this title, treated as a separate

violation)…(emphasis added).[13]

There is nothing in the any of the language of the **CAN SPAM Act** that renders Defendant's argument that Plaintiff is in the "spam lawsuit business" legally significant. Indeed, what Defendant is arguing is that the responsibility for spam is not with the sender, but with the IAP for receiving it. Defendant's argument is similar to that rejected by Judge Conti in the ***Phillips v. Netblue, Inc.***, Slip Copy, 2006 WL 3647116 at 4 and 5 (N.D.Cal., 2006) (Courtesy copy attached). There, defendant **Netblue** moved to amend its answer to allege the defense of failure to mitigate. Judge Conti took some effort to explain why such a defense is irrelevant to statutory claims such as the **CAN SPAM Act**. So too here. Defendant's position that it is Plaintiffs fault they received the spam, or collected it, would turn the **CAN SPAM Act** on its head, making the IAP's responsible for not receiving spam emails.

## CONCLUSION

Plaintiffs request the Court provide clarification of the adverse effect required for standing, that is consonant with the legislative history and the Congressional purpose in enacting the **CAN SPAM Act**, and that takes into account the practical realities of how virtually every internet access provider currently addresses the onslaught of spam emails, and in doing so, grant Plaintiffs leave to amend to file the proposed First Amended Complaint submitted herewith.

**SINGLETON LAW GROUP**

Dated:   June 27, 2008          /s/ Jason K. Singleton
                                Jason K. Singleton
                                Richard E. Grabowski, Attorneys for Plaintiffs,
                                **ASIS INTERNET SERVICES and JOEL
                                HOUSEHOLTER, dba FOGGY.NET**

---

[13] Since the law imposes liability for emails which are only *attempted* to be sent, one might wonder how the IAP can show discreet, individualized, significant, economic loss from emails that are only attempted to be sent, but not actually received.