IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ASIS INTERNET SERVICES, et al.

Plaintiffs,

v.

ACTIVE RESPONSE GROUP et al.,

Defendants.

NO. C07 6211 TEH

ORDER DENYING MOTION TO DISMISS

This matter came before the Court on July 21, 2008 on Defendant Active Response Group's Motion to Dismiss. After considering the briefs and argument of the parties, the Court DENIES the motion.

**INTRODUCTION AND BACKGROUND**

Plaintiffs ASIS Internet Services and Foggy provide internet access services to individual customers. Defendant Active Response Group is an internet marketer that hires subcontractors to send bulk commercial emails and thereby generate visitors for its customers' websites. Plaintiffs allege that Defendant and related entities (collectively "ARG") sent thousands of unsolicited and misleading spam email messages to Plaintiffs' servers, in violation of the Controlling the Assault of Non-Solicited Pornography and Marketing ("CAN-SPAM") Act of 2003, 15 U.S.C. § 7704, and California Bus. & Prof. Code § 17529.5 (unlawful activities relating to commercial email advertisements). First Amended Complaint ("FAC").[1] Each of the emails allegedly had false or misleading header information that concealed the true identity of the sender, in violation of 15 U.S.C.

---

[1] In response to Defendant's motion, Plaintiffs sought leave to file a proposed First Amended Complaint ("FAC"). Defendant addressed the FAC in Reply, contending the amendment would be futile because it suffers from the same legal defects. This Order therefore analyzes the sufficiency of the FAC rather than the original Complaint.

§ 7704(a)(1). FAC ¶ 28. Many also allegedly had subject lines that "would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents and subject matter of the message," in violation of 15 U.S.C. § 7704(a)(2). FAC ¶ 29. Moreover, the FAC alleges that the emails were sent to addresses acquired as the result of a directory harvest and by the use of automated tools or scripts, in violation of 15 U.S.C. § 7704(b)(1) and (2). FAC ¶ 32-33.

Plaintiffs bring this suit under 15 U.S.C. § 7706(g)(1), which provides a private right of action to any "provider of Internet access service adversely affected by a violation" of sections 7704(a)(1), (b), or (d) of the CAN-SPAM Act. With the FAC, they allege that they suffered various adverse effects from the sending and receipt of the subject emails, including having to process the emails over their servers, having to investigate the emails, and incurring expenses related to management of spam in general. FAC ¶¶ 25-27.

Defendant moves to dismiss on the grounds that these allegations are insufficient to establish standing because Plaintiffs failed to allege some "significant effect, monetary or technological" that was *caused by* the emails at issue. Defendant urges the Court to follow several recent decisions construing § 7706(g)(1), and hold that an IAP must allege it suffered discrete economic loss directly attributable to the deceptive emails alleged in the complaint in order to be "adversely affected by a violation" of the Act. The Court declines to do so. In an effort to place practical limits on the private right of action, those courts imposed additional standing requirements that are neither grounded in the language of the statute itself nor warranted by the legislative history. Their progressively more restrictive interpretations of the Act create a virtually insurmountable barrier to standing that is inconsistent with the statutory structure and purpose. Instead, this Court finds that a provider of Internet access services[2] has standing if it can show that it suffered spam-related harm or costs of the type typically experienced by ISPs rather than consumers, and carried the allegedly unlawful deceptive email over its facilities.

---

[2] This Order uses the terms "provider of internet access services," "IAP," and Internet service provider or "ISP" interchangeably.

2

## LEGAL STANDARD

Although Defendant moves to dismiss both under Fed. R. Civ. Pro. 12(b)(1) and 12(b)(6), this Court resolves such questions of statutory standing under Rule 12(b)(6). *Canyon County v. Syngenta Seeds, Inc.,* 519 F.3d 969, 975 n. 7 (9th Cir. 2008), *citing Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1175 (9th Cir. 2004) ("If a plaintiff has suffered sufficient injury to satisfy the jurisdictional requirement of Article III but Congress has not granted statutory standing, that plaintiff cannot state a claim upon which relief can be granted"). Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(6) when a plaintiff's allegations fail "to state a claim upon which relief can be granted." In evaluating the sufficiency of a complaint's allegations, a court must assume the facts alleged in the complaint to be true unless the allegations are controverted by exhibits attached to the complaint, matters subject to judicial notice, or documents necessarily relied on by the complaint and whose authenticity no party questions. *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). In addition, a court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on other grounds by* 275 F.3d 1187 (9th Cir. 2001). A court should not grant dismissal unless the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). Moreover, dismissal should be with leave to amend unless it is clear that amendment could not possibly cure the complaint's deficiencies. *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).

## DISCUSSION

The CAN-SPAM Act makes it unlawful to "initiate the transmission" of a commercial email message that has false or misleading header information, or a deceptive subject line. 15 U.S.C. § 7704. The Act is enforced by the Federal Trade Commission, other federal agencies, and state attorneys general. 15 U.S.C. § 7706(a), (b), (f). It also creates a limited

3

right of action for injunctive relief or damages by any "provider of Internet access service adversely affected by a violation" of sections 7704(a)(1), 7704(b), or 7704(d) of the Act. 15 U.S.C. § 7706(g)(1).

Defendant argues this Court should follow the few others that have construed the standing provision. The first court to do so found, without much exegesis or ado, that the plaintiff had raised a triable issue of fact about whether it was "adversely affected" with a declaration that "high spam loads have caused decreased server response and crashes, led to higher bandwidth utilization, and forced expensive hardware and software upgrades" and a showing that it received "thousands of spam messages" on its servers. *Hypertouch Inc. v. Kennedy-Western University*, 2006 WL 648688, \*4 (N.D. Cal. March 8, 2006).

Analysis in the second case to construe § 7706(g)(1), *Gordon v. Virtumundo, Inc.* 2007 WL 1459395 (W.D. Wash. May 15, 2007), was largely driven by the question of whether the plaintiff was even a *bona fide* internet service provider. The *Gordon* plaintiff asserted he had standing as an IAP even though it provided email service to only six customers, most of whom were family members, and none of whom paid for the service. *Id.* at \*3, \*9. Although plaintiff alleged that "the sheer volume of spam sent by Defendants" had cost him substantial time and resources to manage, plaintiff had "not hired any staff" to deal with spam, and had not specified what "resources" he had spent. *Id.* at \*4. No customer had actually received spam messages because plaintiff used effective spam filters. *Id.* Plaintiff had not "come close" to using the bandwidth he leased from his server host, nor had his server costs gone up due to spam. *Id.*

Considering both the definition of an internet service provider and the requisite adverse effect, the *Gordon* court looked to the legislative history of the CAN-SPAM Act. It noted that Congress focused on harm specific to ISPs, going beyond the "burden of sorting through an inbox of spam" borne by the ordinary consumer. *Id.* at \*7. The Report of the Senate Committee on Commerce, Science and Transportation found that spam "imposes significant economic burdens on ISPs" by clogging computer networks, slowing service, and forcing ISPs to invest in new equipment to increase capacity and hire customer service

4

1 personnel to deal with subscriber complaints. *Id.* at *6, *quoting* S. REP. NO. 108-102, at 6
2 (2003)(Comm. Rep. on CAN-SPAM Act of 2003 (S. 877)) (hereafter "Senate Report").   The
3 court therefore concluded that the "adverse effect" to the plaintiff must be "real" and the type
4 uniquely experienced by ISPs, rather than consumers, *id.* at *7, and must rise beyond the
5 mere "annoyance of spam." *Id.* at *8.  Moreover, the court concluded that the required harm
6 must be "significant" "[i]f Congress's 'limited' right of action is to have any traction at all"
7 because without such a requirement, the right of action would be available to almost anyone.
8 *Id.* at *8.

9 Applying those standards, the *Gordon* court found that the plaintiff did not have
10 standing.  Plaintiff undisputably suffered "no harm related to bandwidth, hardware, Internet
11 connectivity, network integrity, overhead costs, fees, staffing, or equipment costs," and
12 alleged "no financial hardship or expense due to emails they received from Defendants," *id.*
13 at *8, and in fact had admitted to *benefitting* from spam by way of his "research" on spam
14 and "prolific litigation and settlements." *Id.* at *9.  Plaintiff was "not the type of entity that
15 Congress intended to possess the limited private right of action it conferred on adversely
16 affected bona fide Internet access service providers," and so lacked standing to sue under §
17 7706(g)(1). *Id.*

18 The *Gordon* decision, then, added two conditions for standing: the adverse effect must
19 be of a type unique to ISPs, rather than consumers, and it must be "significant."  Although
20 the court argued that plaintiff had shown no expense "*due to emails* they received from
21 Defendants," *id.* at *8, it did not explicitly require a causal relationship between the various
22 harms it listed and the subject emails.

23 The third decision to interpret the standing provision held that, even at the pleading
24 stage, a plaintiff must allege "the adverse effects that the ISP suffered from Defendant's
25 alleged spam." *Brosnan v. Alki Mortgage, L.L.C.*, 2008 WL 413732, *2 (Feb. 13, 2008).
26 The court intoned that the adverse effects must be "more than the time and money spent
27 dealing with spam," and
28

5

must rise to a significant level of harm unique to an IAS. These harms include a substantial decreased bandwidth, expenditures of resources to manage the spam (hired staff, purchased equipment, increased server costs) and compromised network integrity.

*Id.* at *3. (citation omitted). The *Brosnan* court relied solely on *Gordon* and *Hypertouch*, stating that "[a]ccording to the Act and *Gordon*, the plaintiff must have suffered actual adverse effects *as a result of Defendant's actions*, not merely pray for monetary damages to be established at some later point." *Id.* at *2 (emphasis added). Like the *Gordon* court, it gave no explanation of how or why an ISP was required to show a causal connection between the "significant" harms (such as decreased bandwidth, expenditures of resources or compromised network integrity) and the subject emails.

The most recent case to interpret the standing provision, *ASIS Internet Services v. Optin Global, Inc.*, 2008 WL 1902217 (N.D. Cal. April 29, 2008), was brought by Plaintiff in this action ASIS Internet Services, and was nearly identical to this one. After reviewing the holdings and reasoning of *Hypertouch* and *Gordon*, the court observed that it found "the reasoning of *Gordon* to be sound." *Id.* at *17. The court's analysis was as follows:

> Further, having carefully reviewed the evidence, the Court concludes that no reasonable jury could find, based on the undisputed evidence, that the Emails that are the subject of this action caused any significant adverse effect to ASIS. While there is some evidence that spam generally has imposed costs on ASIS over the years, there is no evidence that the Emails at issue in this action resulted in adverse effects to ASIS: there is no evidence in the record that any of the Emails either reached any active ASIS users (rather than being filtered by Postini) or were the subject of complaints to ASIS; there is no evidence in the record that ASIS had to increase its server capacity or experienced crashes as a result of the Emails; and there is no evidence in the record that ASIS experienced higher costs for filtering by Postini as a result of the Emails. Indeed, the monthly charge for filtering that Postini charged ASIS was somewhat lower in the second half of 2005. when the Emails were sent, than in the first half of 2005. In short, ASIS suffered no meaningful adverse effect as a result of the Emails of any kind. As a result, it does not have standing to assert its claims under the CAN-SPAM Act.

*Id.* at *17. Building upon the analysis of *Gordon*, the *Optin Global* court extended the *Gordon* court's finding that a plaintiff who had not shown harm "due to emails" received from the defendant had not shown standing, 2007 WL 1459395 at *8, to an affirmative requirement that plaintiff show the allegedly deceptive email caused the adverse effects listed.

6

1    This requirement appears to have evolved as an artifact of courts' paraphrasing each
2 other, without an explicit analysis of what, in reality, would be required to show causation.
3 All courts that have construed the statute agree that the "adverse effects" on which standing
4 can be predicated include network crashes, higher bandwidth utilization, and increased costs
5 for hardware and software upgrades, network expansion and additional personnel. *See, e.g.,*
6 *Hypertouch* at *4, *Gordon* at *6, *8, *Brosnan* at *3, and *Optin Global* at *17; *see also* 15
7 U.S.C. § 7701(6)(pointing to the "significant monetary costs on providers of Internet access
8 services ... that carry and receive such mail" as one of the harms the Act is intended to
9 redress).  Yet, as Plaintiff argued and Defendant conceded at the hearing in this matter, *none*
10 of these adverse effects can, as a practical matter, be traced or causally linked to a particular
11 email or batch of emails.  At the hearing, Defendant was unable to identify *any kind* of
12 adverse effect or economic loss that an ISP could show was the "result of" an allegedly
13 deceptive email.

14    Imposing a requirement that the plaintiff show a particular email caused the "adverse
15 effects," therefore, makes a standard for ISP standing that no ISP can realistically meet.  It
16 defines the private right of action set out in § 7706(g)(1) out of existence.  However, the
17 Court must choose a construction that gives meaning to each provision of the statute, *United*
18 *States v. Trident Seafoods Corp.*, 92 F.3d 855, 860 (9th Cir.1996)*, Beisler v. Commissioner*,
19 814 F.2d 1304, 1307 (9th Cir. 1987), including the private right of action.

20    Moreover, the legislative history of the CAN-SPAM Act appears to contradict *Optin*
21 *Global*'s restrictive interpretation of the standing requirement.  *See Tahara v. Matson*
22 *Terminals, Inc.,*  511 F.3d 950, 953 (9th Cir. 2007)(court may look to legislative history for
23 guidance where statute is ambiguous).  The Senate Report on the CAN-SPAM act provides,
24 *in the section on enforcement*, that:

25    Section 7(f) would allow a provider of Internet access service adversely affected by a
   violation of section 5 to bring a civil action in Federal district court or other court of
26    competent jurisdiction. *This could include a service provider who carried unlawful
   spam over its facilities*, or who operated a website or online service from which
27    recipient email addresses were harvested in connection with a violation of section
   5(b)(1)(A)(I).
28

7

1  S. REP. NO. 108-102 at 21 (2003)(Comm. Rep. on CAN-SPAM Act of 2003 (S.
2  877))(emphasis added).  This language equates "carrying unlawful spam" with adverse
3  effects caused by the violation, and makes no mention of an additional requirement that the
4  plaintiff link the cost of carrying spam to specific emails.  Moreover, the portion of the Act
5  governing statutory damages for the private right of action makes them dependent on the
6  number of unlawful email messages "transmitted or attempted to be transmitted over the
7  facilities of the provider of Internet access service." 15 U.S.C. § 7706(g)(3)(A).  While this
8  language does not define adverse effect for the purposes of standing, it further suggests that
9  an ISP is wronged when it is forced to carry, filter, or investigate deceptive email.

10         The Court therefore holds that a provider of internet access services is "adversely
11 affected by a violation" of the CAN-SPAM Act within the meaning of § 7706(g)(1) if it has
12 suffered ISP-specific harms, such as the network problems or increased costs discussed
13 above, and has carried the unlawful spam over its facilities.  As Judge Samuel Conti
14 observed in a case analyzing the damages provisions of the Act, the structure and legislative
15 history of the CAN-SPAM Act show that its primary purpose is to punish spammers, not to
16 compensate its victims. *Phillips v. Netblue, Inc.*, 2006 WL 3647116, *3-*4 and n.3 (N.D.
17 Cal. December 12, 2006), citing the "Purpose of the Bill" portion of the Senate Report,
18 *supra*.  Providers of internet access service can seek an injunction and collect damages of up
19 to a hundred dollars per email for each violation or actual damages, together with attorney's
20 fees. § 7706(g)(1), (3) and (4).  States enforcing the Act can obtain injunctive relief, fees, and
21 damages of up to $250.00 per email.  § 7706(f)(1), (3) and (4).  The Act even orders the
22 Federal Trade Commission to create a bounty payable to those who track down spammers
23 and provide information leading to the FTC's collection of a civil penalty, *id.* at *5, *citing* 15
24 U.S.C. § 7710 – further proof that punishment and deterrence, rather than compensating
25 harm, are the Act's primary goals.  A broad interpretation of the standing provision which
26 allows ISPs to join in enforcing the Act is consonant with this statutory purpose, and more
27 fully effectuates the purpose of the private right of action than the restrictive *Optin Global*
28 construction.  *See Resident Councils of Washington v. Leavitt,* 500 F.3d 1025, 1032 (9th Cir.

8

1 2007), *quoting Tcherepnin v. Knight,* 389 U.S. 332, 336 (1967)(court should construe
2 remedial legislation broadly to effectuate its purposes).

3 Defendant intimates a broad interpretation of the standing requirement will make
4 damages untethered to any real harm suffered by the ISP,[3] and will create a flood of suits by
5 "spam litigation mills" – ISPs who have suffered no discrete harm and who, with modern
6 technology, can successfully filter spam before it reaches their customers. But again, the
7 focus of the Act is not to compensate ISPs for the burdens of filtering spam, but to penalize
8 and deter those who would send false, deceptive, and misleading email. There is no reason
9 to hold that ISPs that block deceptive email (and incur costs doing so) cannot enforce the
10 CAN-SPAM Act's prohibitions. On the contrary, a holding that an ISP which successfully
11 protects its consumers with filters and other spam management has no standing to bring suit
12 would emasculate the private right of action, undercut the deterrent purposes of the Act, and
13 inappropriately "shift[] to the victim the responsibility to avoid spam." *See Netblue,* 2006
14 WL 3647116, *4.

15 Plaintiffs have alleged facts sufficient to show they were "adversely affected by a
16 violation" of the Act. The FAC alleges Plaintiff ASIS was adversely affected because it
17 received, processed, and stored the spam emails at issue in this suit; because it spends
18 significant employee time dealing with spam, including approximately $3,000 per month in
19 spam filtering costs and employee time; has been forced to expand its server and network
20 capacity because of spam; and has experienced network slow downs because of spam. FAC
21 ¶ 26. The FAC alleges Plaintiff Foggy was forced to purchase a new filtering system
22 because of spam, in part because of the emails at issue in this case, and that Plaintiff Joel
23 Housholter and his system administrator collectively spend about nine hours a week working
24 on problems caused by spam. FAC ¶ 27. Plaintiffs therefore adequately allege that they
25 suffered ISP-specific harm because they incurred spam-related expenses for filtering

---

27 [3] This argument echoes *Gordon* court's reasoning that if the plaintiff ISP were not required
to show "substantial actual harm," the per-email statutory damages under § 7706(g)(3) would
28 effectively impose strict liability on spammers for any email any ISP received. 2007 WL 1459395
at *8.

9

1 systems, expanded server and network capacity, and personnel time. Plaintiffs also allege
2 that they carried the allegedly unlawful emails over their facilities. FAC ¶¶ ¶¶ 13-16, 23-24.
3 These allegations, taken as true, are sufficient to allege standing under 15 U.S.C.
4 § 7706(g)(1).[4]

**CONCLUSION**

Defendant's Motion to Dismiss is DENIED, and Plaintiff's request for leave to file the First Amended Complaint is GRANTED. The stay of discovery the Court ordered at the hearing on this matter is vacated, and the parties are to proceed with limited discovery as discussed at the hearing. A Case Management Conference is hereby set for 1:30 p.m. on October 20, 2008. The parties are to submit a Joint Case Management Conference Statement no later than October 13, 2008.

**IT IS SO ORDERED.**

Dated: July 30, 2008

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

---

[4] Because the FAC alleges solely that unassigned and inactive email accounts received the spam emails, FAC ¶ 17, Defendant also contends Plaintiffs were not acting as "providers of internet access services" within the meaning of § 7706(g)(1) when they administered these unassigned an inactive email accounts. The argument has no merit. For the purposes of the Act, "internet access service" is

> a service that enables users to access content, information, electronic mail, or other services offered over the internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers.

47 U.S.C. § 231(e)(4); 15 U.S.C. § 7702(11) ("internet access service" has meaning given in 47 U.S.C. § 231(e)(4)). Providing that service to consumers entails more than simply administering the email accounts of those active consumers; other components of the business, from administering payroll to filtering spam to managing closed accounts, are part of the integral process of running a business. Administrative accounts "are used by internet access providers for testing, configuring, and maintenance of email computer servers." Plaintiffs' Memorandum of Points and Authorities in Support of Imposition of a Protective Order, filed April 21, 2008. Emails sent to inactive and closed accounts consume server and filtering resources. Both mechanically and conceptually, administering closed and inactive accounts is part of providing internet access service. Defendant offers no principled reason or precedent to suggest that the Court should treat an entity differently depending upon which of the components of running such a business is at issue.

United States District Court
For the Northern District of California