1

**Jason K. Singleton,** State Bar #166170
jason@singletonlawgroup.com
**Richard E. Grabowski,** State Bar #236207
rgrabowski@mckinleyville.net

2

**SINGLETON LAW GROUP**
**611 "L" Street, Suite A**

3

**Eureka, CA 95501**
**(707) 441-1177**

4

**FAX  441-1533**

5

6

**Attorneys for Plaintiff, ASIS INTERNET SERVICES**
**and JOEL HOUSEHOLTER, dba FOGGY.NET**

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

ASIS INTERNET SERVICES, a California ) Case No. C-07-6211 TEH
11
corporation, and JOEL HOUSEHOLTER, dba )
KNEELAND ENGINEERING, dba FOGGY.NET ) **OPPOSITION TO DEFENDANT'S**
12
) **MOTION FOR CERTIFICATION, STAY,**
) **AND BOND**
     Plaintiffs, )
13
)
vs. )
14
) **DATE :   September 22, 2008**
) **TIME  :    10:00 am**
ACTIVE RESPONSE GROUP, INC., a Delaware ) **CTRM :    12, 9th Floor**
15
corporation, et al. )
)
16
     Defendants. )
)
17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION... .......... .......... .......... .......... .......... .......... .......... .......... .......... .......... 1

STATEMENT OF FACTS . .......... .......... .......... .......... .......... .......... .......... .......... 3

ARGUMENT .......... .......... .......... .......... .......... .......... .......... .......... .......... .......... 6

I.    Defendant's Motion for Certification is flawed.... .......... .......... .......... ....... 6

    A.    Defendant has provided no reason for the Court to reconsider its
        Order Denying Defendant's Motion to Dismiss. .. .......... .......... .......... ....... 6

    B.    Defendant's analysis of factors for certification is flawed in that it
        relies on the basis that the Court has erred because prior
        opposing decisions exist. ..... .......... .......... .......... .......... .......... .......... ....... 8

II.   Defendant's Motion for Stay is flawed. ..... .......... .......... .......... .......... ...... 10

    A.    Standard for a Motion to Stay. ...... .......... .......... .......... .......... .......... ...... 10

    B.    Defendant's discussion of related cases is flawed. .......... .......... .......... ....... 11

    C.    Defendant has made no credible showing of success on the merits
        and there is strong evidence that Plaintiffs will succeed on the merits. . .......... ....... 12

        1.    Defendant's arguments:...... .......... .......... .......... .......... .......... ...... 12

        2.    Plaintiffs' case:......... .......... .......... .......... .......... .......... .......... ....... 13

            a.    STANDING:  ASIS and Foggy are the type of person
                intended by the statute and were adversely affected
                based on the clear language of the statute and the
                legislative history..... .......... .......... .......... .......... .......... ....... 14

            b.    The emails all contain false headers and misleading
                subject lines. .......... .......... .......... .......... .......... .......... ....... 17

                False Headers.......... .......... .......... .......... .......... ....... 17

                Misleading Subject Lines.... .......... .......... .......... ....... 18

            c.    The unsolicited emails were sent on ARG's behalf and
                ARG knew or consciously avoided knowing its affiliates
                were violating the *CSA*........ .......... .......... .......... .......... ....... 19

    D.    Balance of Hardships .......... .......... .......... .......... .......... .......... .......... ....... 20

        1.    Defendant's Hardships: ...... .......... .......... .......... .......... .......... ....... 20

        2.    Plaintiffs' Hardships: .......... .......... .......... .......... .......... .......... ....... 20

            a.    Loss of evidence:...... .......... .......... .......... .......... .......... ....... 20

    E.    Plaintiffs' action is in the public interest and a delay will impact
        the public's interest. .......... .......... .......... .......... .......... .......... .......... ....... 21

III.  Defendant's Motion for Security Fails to Provide a Basis for Bond ...... .......... .......... ....... 23

# TABLE OF AUTHORITIES

**Cases**

*ASIS Internet Services v. Active Response Group*, Slip Copy, 2008 WL 2952809
(N.D.Cal., 2008) .................................................................................................... 12, 13, 17

*ASIS Internet Services v. Optin Global, Inc.*, Slip Copy, 2008 WL 1902217
(N.D.Cal., 2008) ................................................................................................................ passim

*Bennett v. Spear*, 520 U.S. 154, 161 (U.S., 1997) ............................................................. 8

*Cardona v. General Motors Corp.*, 939 F.Supp. 351, 353 (D.N.J., 1996) ........................ 9

*Christiansburg Garment Co. v. Equal Employment Opportunity Commission*,
434 U.S. 412 (U.S., 1978) .............................................................................................. 24

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882
(9th Cir.,2001) .................................................................................................................... 6

*Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (U.S., 1978) ...................................... 8

*DHL Corp. and Subsidiaries v. C.I.R.*, 285 F.3d 1210, 1219 (9th Cir., 2002) ................. 7

*Golden Gate Restaurant Ass'n v. City and County of San Francisco*,
512 F.3d 1112, 1115 (9th Cir., 2008) ....................................................... 10, 11, 12, 13

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) ......................................................... 10, 11

*In re Merrill Lynch Relocation Mgmt., Inc.*, 812 F.2d 1116, 1121 (9th Cir. 1987) .......... 24

*Landis v. North American Co.*, 299 U.S. 248 (U.S. 1936) ............................................... 11

*Lopez v. Heckler*, 713 F.2d 1432 at 1435 – 1436 (9th Cir.,1983) .............................. 11, 12

*RLS Assocs., LLC v. United Bank of Kuwait PLC*, 464 F. Supp.2d 206, 220
(S.D.N.Y. 2006) .............................................................................................................. 24

*School Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.*, 5 F.3d 1255 (9th Cir.,1993) ..... 6

*Simulnet East Associates v. Ramada Hotel Operating Co.*, 37 F.3d 573 at 576
(9th Cir., 1994) ................................................................................................................ 24

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 at 94 (U.S., 1998) ............... 8

*United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 265 (1982) ............................. 9

**Statutes**

16 *CFR* part 251 ......................................................................................................... 18, 19

15 *USC* §45 ....................................................................................................................... 18

15 *USC* §45(d) .................................................................................................................. 18

15 *USC* §7701 .................................................................................................................. 22

15 *USC* §7701(6) .............................................................................................................. 16

15 *USC* §7702(12) ............................................................................................................ 14

15 *USC* §7702(9) .............................................................................................................. 14

15 *USC* §7704(a)(1) ................................................................................................... 13, 14

15 *USC* §7704(a)(1) and (2) ...................................................................................... 4, 14

15 *USC* §7704(a)(1)(A) .............................................................................................. 17, 18

15 *USC* §7704(a)(2) .................................................................................................... 14, 18

15 *USC* §7704(a)(2)(1) ..................................................................................................... 18

15 *USC* §7704(a)(6) .......................................................................................................... 16

15 *USC* §7706(g)(1) .................................................................................................. 11, 14, 16

15 *USC* §7706(g)(2) .................................................................................................. 11, 14, 19

15 *USC* §7706(g)(3)(A) .................................................................................................... 16

15 *USC* §7706(g)(4) .......................................................................................................... 23

28 *USC* §1292(b) .......................................................................................................... 6, 8

*California Business and Professions Code* §17529.5 ...................................................... 20

*CAN SPAM ACT* ......................................................................................................... passim

1

**Other Authorities**
*The Radicati Group, Inc.,* **Anti-Spam Market Growing at a Rate of 50%"** .................................22, 23
*Barracuda Networks Releases Annual Spam Report,* **Barracuda Networks**........................................21
*Internet Security Trends for 2007,* **IronPort Security** ..........................................................................21
**Prepared Witness Testimony: Betty, Charles (Garry)** ........................................................................22

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiffs, **ASIS INTERNET SERVICES** (hereafter "ASIS") and **JOEL HOUSEHOLTER, dba KNEELAND ENGINEERING, dba FOGGY.NET** (hereafter "FOGGY"), herein oppose Defendant's Motion for Certification, motion for stay, and motion for bond.

Defendant brings this motion in an attempt to overturn's this Court's ruling and further the spamming community's aim of decapitating the **CAN SPAM Act of 2003** (hereafter "**CSA**"). Spammers such as Active Response Group (hereafter "ARG") significantly benefit from the SPAM they send and hire others to send. Typical successful internet direct marketing spam operations have grown from nothing to companies with revenues of hundreds of millions of dollars just in the last ten years. They are becoming rich on the backs of Internet Service Providers, who must constantly increase their costs to protect their customers from the spammers.

Spamming operations do not care that the resources they use to send their garbage is paid for by the ISPs and consumers. That is the point. Make money with virtually no investment. Defending themselves is seen as a cost of business, a cost they want to eliminate by any means. The **CSA** was passed with the specific purpose of stopping the spammers from misusing the resources of the internet. To a great extent the **CSA** is a weak law. The penalties are not high enough to deter criminals away from the SPAM business and the standards for proof are very rigorous. Even a decision of $10 million will not deter a spammer who can make several hundred million dollars a year. Recent settlements by the FTC with spamming companies have been criticized by the FTC commissioners as too low because they do not represent a realistic deterrence.

SPAM has been increasing by 200 to 300% per year since 2005. Many of the larger ISPs have simply given up trying to enforce the anti-spam laws in court because the costs are too high and courts too supportive of the spammers. Many of the smaller ISPs are going out of business as they can no longer keep up with the costs involved with filtering and processing SPAM. To add insult to injury, the courts are now allowing defendants to demand bonds from plaintiff ISPs, mostly in cases that are never heard on the merits. This will close the doors of the courthouse to the ISPs and the only deterrence to spamming will be lost.

Many state legislatures, seeing that the federal courts do not support the **CSA**, are reacting by

1    creating new and stronger anti-spamming laws.  The states are not going to give up.  The costs to their

2    consumers and the business serving those consumers are too great.  SPAM currently uses up more than

3    half of the infrastructure used to provide the internet.  Some estimates put the amount of SPAM as 90%

4    plus of all email traffic.  It has been estimated that the actual cost of SPAM worldwide is $198 billion

5    per year.  This cost is borne by the consumers and ISPs so that a handful of spamming operations can

6    make a couple of billion dollars a year in profit.  The states understand that they cannot allow this type

7    of productivity loss to continue.

8         Compared to every other problem on the internet, SPAM is king.  Congress has heard testimony

9    concerning net neutrality, privacy issues, loss from hacking, etc.  None of these problems represents the

10   complexity and shear magnitude of the loss in productivity caused by allowing SPAM to continue to be

11   sent on the Internet.  If SPAM were eliminated, bandwidth problems and infrastructure restrictions

12   would instantly be eliminated as over half of the current infrastructure would be freed.

13        Into this environment comes ARG with an attempt to overthrow the decision of the Court, delay

14   any attempt at prosecution, and punish ASIS and FOGGY for attempting to defend themselves.  This

15   defense is typical of the tactics used by SPAMMERS to delay litigation and burden the plaintiff with

16   costs they cannot possibly bear, forcing them to withdraw.  Defendant argues that they are worried about

17   significant litigation costs, primarily from expensive discovery.  But the facts of this case, not already

18   presented by Plaintiff, are all within the control of Defendant.  Defendant has only to look at its own

19   contracts, inquire of its own employees, and review its own files to find out the truth of the issues.

20   Defendant is not worried about these costs as they are relatively insignificant.  Defendant is instead

21   worried about what it will be forced to reveal.

22        On the other hand Plaintiffs' costs are very high.  Plaintiffs must travel to Defendant's site for

23   every deposition.  It is likely that Plaintiffs will have to travel to Defendant's site to copy and collect

24   data held by Defendant.  Plaintiffs must pay for every subpoena to a third party.  Plaintiffs have already

25   incurred significant costs in subpoenas to privacy domain name registration companies who view the

26   spamming operations as their bread and butter customers.  There is no significant market for privacy and

27   proxy services outside of the spamming community.  Most consumers do not buy their own domains.

28   Only a very few of those who buy domains want to hide their identities behind privacy services.  Real

1   businesses want their name to be prominently displayed at every opportunity.  However, spammers are

2   willing to pay an additional $10 to $20 per domain for thousands of domains to avoid using their own

3   names on the SPAM.  The domain name companies want this business and resist any action that might

4   reduce their new found revenue stream.  As a result domain name companies are charging very high fees

5   for research and production of information relating to domain names using privacy or proxy services.

6   See Declaration of Jason K. Singleton (hereafter Dec JKS) ¶2 and Exhibit A as an example of Plaintiffs

7   costs.

8            Finally, in a request for a stay or a bond the moving party must show a likelihood of success on

9   the merits or at least a legal issue that is likely to be resolved in their favor.  Defendant points only to the

10  issue of standing already decided by this Court.  Based on the Court's own review and analysis of the

11  issue of standing it is very likely that the 9th Circuit will overturn the decision in ***ASIS vs. Optin Global***.

12  Both the language of the statute and the legislative history support the decision of this Court as to the

13  issue of standing.  Therefore, Defendant has provided no legal issue on which to base a ruling in favor of

14  a stay or a bond.

15                                    **STATEMENT OF FACTS**

16            ASIS and FOGGY brought this suit after receiving some 9121 (**6269** to ASIS and **2852** to

17  FOGGY)  emails advertising the various brand web sites of Defendant ARG.  See the First Amended

18  Complaint (hereafter "FAC") ¶¶13 and 14.  Each of the emails states it is an advertisement for one of the

19  ARG brand names.  (See the emails in Declaration of Nella White (hereafter "Dec of NW") ¶8 and

20  Exhibit E filed under seal as confidential (with instructions for viewing); Declaration of Householter

21  (hereafter "Dec of JH") ¶8 and Exhibit D filed under seal as confidential (with instructions for viewing);

22  also see the terms and conditions for each of the brand web sites in Declaration of Josh Mohland

23  (hereafter "Dec of JM") ¶2 and Exhibit A indicating the brands are owned by ARG.  Those brand names

24  and web sites are:  **BRANDARAMA (aka BRANDARAMA.COM), also dba FREE GIFT PARADE**

25  **(aka    FREEGIFTPARADE.COM),    also    dba    HOUSEHOLD    SAVINGS    CLUB    (aka**

26  **HOUSEHOLDSAVINGSCLUB.COM),        also        dba        POLL        PRIZE        USA        (aka**

27  **POLLPRIZEUSA.COM), also dba REWARDS PARADE (aka REWARDSPARADE.COM), also**

28  **dba TOP CONSUMER REWARDS (aka TOPCONSUMER REWARDS.COM), also dba USA**

1   **SURVEY GROUP (aka USASURVEYGROUP.COM), also dba VIEWPOINT REWARDS (aka**

2   **VIEWPOINTREWARDS.COM),        also    dba    WHOLESOME    REWARDS    (aka**

3   **WHOLESOMEREWARDS.COM),        also    dba    YOUR    PRODUCT    SAMPLES    (aka**

4   **YOURPRODUCTSAMPLES.COM),       also    dba    YOUR    TOP    BRANDS    (aka**

5   **YOURTOPBRANDS.COM)**.  ARG and all of its brand names/websites were named in the FAC ¶8.

6       ASIS and FOGGY have alleged that all of these emails contained false header information and

7   some of the emails contain misleading subject lines in violation of 15 *USC* §7704(a)(1) and (2).  ASIS

8   and FOGGY also alleged that ARG sent or had sent the emails and that they contain advertisements for

9   ARG's brands/websites.  See Complaint ¶13-15.  Also see the emails Dec of NW ¶8 and Exhibit E and

10  Dec of JH ¶7 and Exhibit D.

11      ASIS received these emails between October 31, 2005, through September 4, 2007, in the

12  following manner:  ASIS received the emails first on its filtering service operated by Postini; then

13  transferred, processed, and stored the emails on its email server; and then transferred the emails to it's

14  attorney where they were stored on a special SPAM storage and investigation server.  See Dec of NW

15  ¶11.

16      FOGGY received these emails between May 25, 2007, through September 22, 2007, in the

17  following manner:  FOGGY received the emails first on its Barracuda filtering; then transferred,

18  processed, and stored the emails on its email server; and then transferred the emails to it's attorney

19  where they were stored on a special SPAM storage and investigation server.  See Dec of JH ¶10.

20      ASIS has been in business of providing dial-up and DSL internet and email services to Humboldt

21  County, California, since 1995, primarily in the isolated community of Garberville, California.  In

22  January of 2007 ASIS had 950 customers for both internet access and 1,500 email services.  ASIS

23  provides these services through: its own equipment, service agreements with Postini, Falcon Knight,

24  AT&T and other vendors; and its team of 4 employees.  See Dec of NW ¶12 and ¶5 and Exhibit C

25  (vendor invoices), and ¶6 and Exhibit D (Customer invoices [customer names redacted]).  ASIS owns

26  various domain names used to provide internet and email services.  See Dec. of NW ¶13 and Exhibit F

27  for printouts of WHOIS reports indicating ownership of six domain names used in the provision of

28  access to the Internet and email services.  ASIS is incorporated and licensed to do business in

1  Garberville, California.  See Dec. of NW ¶3 and Exhibit A (Articles of Incorporation) and ¶4 and

2  Exhibit B (Business Licenses).

3      FOGGY has been in business of providing dial-up internet and email services to Humboldt

4  County, California, since 1998.  In 2007 FOGGY had 75 customers for internet access and 180 email

5  service customers.  FOGGY provides these services through: its own equipment, AT&T and other

6  vendors; and its team of 2 employees.  See Dec of JH ¶11 and ¶4 and Exhibit B (vendor invoices), and

7  ¶5 and Exhibit C (Customer invoices [customer names redacted]).  FOGGY owns various domain names

8  used to provide internet and email services.  See Dec. of JH ¶12 and Exhibit E for printouts of WHOIS

9  reports indicating ownership of 4 domain names used in the provision of access to the Internet and email

10  services.  In addition FOGGY is the Administrative Contact for and/or hosts 7 additional domains.

11  FOGGY is licensed to do business in Humboldt County.  See Dec. of JH ¶3 and Exhibit A for business

12  license.

13      ASIS estimates that its cost of processing SPAM emails, including employee costs, is

14  approximately $3,000 per month.  See Dec of NW ¶9.  ASIS estimates that it receives 200,000 SPAM

15  emails per day or approximately 6,000,000 emails in an average month.  See Dec of NW ¶10.  Therefore

16  the average cost of processing and carrying a SPAM email is less than $.01 per email.  Specific emails

17  may have a higher cost if they contain viruses or hacker software, or if they result in customer SPAM

18  complaints.  See Dec of NW ¶14.

19      FOGGY estimates that its cost of processing SPAM emails, including employee costs, is

20  approximately $1,221 per month.  See Dec of JH ¶8.  FOGGY estimates that it receives 33,273 SPAM

21  emails per day or approximately 1,011,165 SPAM emails in an average month.  See Dec of JH ¶9.

22  Therefore the average cost of processing and carrying a SPAM email is less than $.01 per email.

23  Specific emails may have a higher cost if they contain viruses or hacker software, or if they result in

24  customer SPAM complaints.  See Dec of JH ¶13.

25      ASIS does not collect, for use in SPAM suits, SPAM emails directed to active consumers, it does

26  collect and use SPAM sent to inactive accounts and internal administrative accounts.  See Dec of NW

27  ¶15.  Because the SPAM going to active customers must be set aside and stored for retrieval by

28  customers to resolve false positive identification by the filtering software, those emails are not available

1    for SPAM litigation.  Therefore any offending SPAM sent by ARG to active customers is not available
2    and the SPAM emails produced are only to inactive accounts and ASIS internal business accounts.

3        FOGGY collects all SPAM emails sent to its servers.  Among those are emails sent to active,
4    inactive, and administrative accounts.  See Dec of JH ¶14.

5        ASIS occasionally suffers network and server slow downs based on daily receipt of SPAM
6    emails.  See Dec of NW ¶16.

7        FOGGY occasionally suffers network and server slow downs based on daily receipt of SPAM
8    emails.  See Dec of JH ¶15.

9        ASIS' contract with its service providers allows for spikes in its network bandwidth beyond its
10   normal contracted bandwidth at no additional costs as the costs are built into the overall contract rate.
11   See Dec of NW ¶17.  This allows for spikes in the amount of bandwidth received beyond the average
12   load and prevents outages caused by unusually large SPAM attacks.

13                                         **ARGUMENT**

14   **I.    Defendant's Motion for Certification is flawed.**

15        **A.    Defendant has provided no reason for the Court to reconsider its Order Denying
16               Defendant's Motion to Dismiss.**

17        A Motion for Certification for Appeal is in effect a motion to reconsider a prior order.
18   Defendant has provided no sound basis for the Court to reconsider its order.

19        A statement certifying an interlocutory order for appeal must be made in writing at the time of
20   the order.  28 *USC* §1292(b).  The Court may reconsider its order adding a statement certifying on a
21   motion to reconsider or sua sponte.  *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254
22   F.3d 882 (9th Cir.,2001).

23        Therefore, the moving party must first present a valid reason why the court should reconsider its
24   order prior to discussing reasons for certification.  Defendant has presented no valid reason for
25   reconsideration and did not even discuss the issue.

26        However, Defendant's motion must be taken as a motion for reconsideration.  "Reconsideration
27   is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear
28   error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling

1    law." **School Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.,** 5 F.3d 1255 (9th Cir.,1993).

2         Defendant does not suggest and presents no new evidence that would justify reconsideration.

3         There are no new controlling cases that Plaintiffs are aware of or that Defendant has cited.

4         Here, Defendant argues that the Court is in error because it has disagreed with "precedent" cases.

5    Defendant's Motion Docket 54, P4, L3.  Binding precedent is defined in *Black's Law Dictionary* as "a

6    precedent that a court must follow.  For example, a lower court is bound by an applicable holding of a

7    higher court in the same jurisdiction."  *Black's Law Dictionary*, Second Pocket Edition, P 544.  This is a

8    problem as the cases cited by Defendant are not binding precedent; they are decisions by Magistrate

9    Judges that are not controlling.  What is more, the Court was presented with copies of all these prior

10   cases, reviewed them, and commented on the prior cases in its Order.

11        The only conclusion that can be reached is that Defendant is arguing clear error or that the

12   decision was manifestly unjust.  As was stated above the Court has already reviewed the other cases on

13   the standing issue and found that the statutory language, the legislative history, and the analysis by those

14   courts did not support those court's rulings.  The Court based its ruling on the plain language of the

15   statute and the clear statements made in the legislative history.  The facts as to standing were not in

16   dispute.  The court provided its reasoning as to how its interpretation of the law was applied to the facts

17   provided.  ***DHL Corp. and Subsidiaries v. C.I.R.,*** 285 F.3d 1210, 1219 (9th Cir., 2002).  Therefore there

18   is no indication that there is clear error.

19        As to whether the decision was manifestly unjust, Defendant offers that their litigation costs are

20   high and they will incur additional high costs if they are forced to litigate the case prior to a 9th Circuit

21   ruling in the ***ASIS vs. Optin Global*** case.  This does not represent a manifestly unjust decision as it is the

22   normal course of any litigation for a Defendant and Plaintiff to incur their costs to defend a position.  In

23   addition, a contrary ruling by this Court would likely result in an additional appeal that would add

24   significantly to Defendant's legal costs.  The only way that Defendant's suffer any additional

25   burdensome costs is if the 9th Circuit rules that ASIS has no jurisdictional standing to bring cases under

26   the **CSA**.  Based on this Court's own analysis that is not likely to be the outcome of the current appeal.

27        In addition, there are several other decisions that the Court of Appeal could reach that will not

28   result in termination of this litigation.  The decision in the ***ASIS vs. Optin Global*** case does not indicate

1    if the court was finding a lack of jurisdictional standing or a lack of prudential standing. The court in

2    *Optin Global* went on to make two additional rulings in that case. *ASIS Internet Services v. Optin*

3    *Global, Inc.*, Slip Copy, 2008 WL 1902217, 27-30 (N.D.Cal., 2008). If the *Optin Global* court was in

4    fact finding a lack of jurisdictional standing, then the court lacked subject matter jurisdiction to make

5    subsequent rulings and therefore the additional rulings were improper. *Steel Co. v. Citizens for a Better*

6    *Environment*, 523 U.S. 83 at 94 (U.S., 1998). Therefore, the assumption must be that the *Optin Global*

7    court based its ruling on prudential issues. If so, a finding that ASIS lacked prudential standing may

8    have no effect on the current litigation before the Court as prudential standing is based on the merits of

9    the prior case and may not represent a binding ruling based on the current case. *Bennett v. Spear*, 520

10   U.S. 154, 161 (U.S., 1997). It will have absolutely no effect on the case brought by Plaintiff FOGGY.

11   Viewing these issues in the light of the various decisions the Appeals Court could possibly reach

12   indicates there is no manifest unfairness in the Court's ruling.

13       Therefore, Defendant has provided no bases for reconsideration of the Court's Order and the

14   Court should deny Defendant's motion for certification on that basis.

15   **B.    Defendant's analysis of factors for certification is flawed in that it relies on the basis that the Court has erred because prior opposing decisions exist.**

16       In arguing for certification Defendant relies on decisions where there is a clear dispute as to the

17   legal issues in those cases. Defendant has failed to show there is a clear dispute as to the issue of

18   standing in this matter. Rather Defendant appears to do little more than reassert its original position and

19   rely on the prior cases already reviewed and considered by the Court in its Order.

20       The Supreme Court has defined only a small class of cases that are appealable prior to final

21   judgment:

22           To come within the "small class" of decisions excepted from the final-
23           judgment rule by *Cohen*, the order must conclusively determine the
             disputed question, resolve an important issue completely separate from the
24           merits of the action, and be effectively unreviewable on appeal from a
             final judgment. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (U.S.,
25           1978).

26       28 *USC* §1292(b) requires a moving party to point to: (1) a controlling question of law, (2) about

27   which there is substantial ground for difference of opinion, the immediate resolution of which by the

28   appeals court will (3) materially advance the ultimate termination of the litigation.

If the **ASIS vs. Optin Global** rule was based on prudential standing then this is likely not a controlling issue of law. If the **ASIS vs. Optin Global** rule was based on prudential standing and the Appellate Court supported that ruling, then that would be a ruling on the merits and would be completely separate from the merits of this action. Therefore, a stay would be improper.

Defendant has made no showing that this Court's ruling would be unreviewable on appeal from a final judgment. The issue of standing has already been brought up by Defendant's Motion to Dismiss and ruled on by the Court. Therefore the ruling will be reviewable after a final decision.

Further, the Supreme Court has stated that:

> Any appeal under this section is necessarily a deviation from the ordinary policy of avoiding "piecemeal appellate review of trial court decisions which do not terminate the litigation." **United States v. Hollywood Motor Car Co.,** 458 U.S. 263, 265 (1982).

While it is possible that this case may be resolved by a decision of the Appellate Court in **ASIS vs. Optin Global**, it is by no means a certainty. As discussed above a decision in ASIS' favor will not terminate the current case. In addition, several possible negative decisions, to ASIS, may have no direct impact on the current litigation. In addition to the prudential decision discussed above, the Appellate Court could create a definition of adverse affect different from that formulated in this case or the **ASIS vs. Optin Global** case. This would result in a necessary reassessment of the facts to see if the Appellate Court's legal dicta might or might not result in dismissal for lack of standing.

In addition, Defendant appears to have completely ignored the fact that there are two Plaintiffs in this case. Plaintiff FOGGY was not involved in the **ASIS vs. Optin Global** matter and must be assessed on every issue based on the facts in this case. Therefore, even if ASIS is eliminated as a Plaintiff by an unfavorable Appellate Court decision, it will not necessarily eliminate FOGGY.

In similar cases district courts have refused to certify issues for appeal. In **Cardona v. General Motors Corp.**, 939 F.Supp. 351, 353 (D.N.J., 1996), the district court cautioned that:

> a party's mere disagreement with the district court's ruling does not constitute a "substantial ground for difference of opinion" within the meaning of §1292(b). Rather, the "difference of opinion" must arise out of genuine doubt as to the correct legal standard.

The **Cardona** court reached its decision, not to certify, in the light of clearly contrary rulings in the same jurisdiction from other district courts. Further, the **Cardona** court put significant weight on the

1    fact that the appellate court would likely agree with its ruling and a stay would significantly delay

2    litigation for no appropriate reason. ***Ibid.***

3            It is clear that Defendant has nothing new to offer beyond its original Motion to Dismiss. The

4    Court's ruling is based on the plain language of the statutes and the legislative record. There is little

5    chance the Appellate Court will rule in a manner that will result in a termination of this case. Therefore,

6    the Court should deny Defendant's Motion for Certification on that basis.

7    **II.        Defendant's Motion for Stay is flawed.**

8            Defendant argues that the Court should stay this matter whether or not it rules to issue a

9    certification. Defendant's arguments are flawed and do not rely on the current standard factors for

10   granting a stay. Defendant offers only that a stay favors judicial economy, that Defendant will be

11   burdened with legal expenses, and that Plaintiffs will not be burdened. Defendant's analysis does not

12   even consider the merits of the case. Defendant ignores that there are potential significant judicial costs

13   in delaying the litigation. Defendant ignores that judicial economy must ultimately be weighed against

14   the interests of the public in stopping spamming. Defendant ignores that FOGGY, the second Plaintiff,

15   was not involved in the prior case and that their fate cannot be decided simply on the basis of an

16   unfavorable appellate decision. Defendant's litigation costs are a normal part of any case and do not

17   represent a hardship considered in a motion for stay. Defendant's analysis ignores the potential loss of

18   evidence that will occur if this case is stayed for possibly an entire year creating a significant hardship

19   for Plaintiffs. Finally, because this case is also for injunction and statutory penalties, Defendant ignores

20   the significant deterrence and benefit to the public by a resolution that may reduce or stop Defendant's

21   spamming to the public.

22   **A.        Standard for a Motion to Stay.**

23           The Supreme Court in ***Hilton v. Braunskill***, 481 U.S. 770, 776 (1987) articulated the standard

24   for a motion to stay on an issue on appeal. The 9th Circuit Court recently restated and explained the

25   standard in ***Golden Gate Restaurant Ass'n v. City and County of San Francisco***, 512 F.3d 1112, 1115

26   (9th Cir., 2008):

27                    1.        whether the stay applicant has made a strong showing that he is
                               likely to succeed on the merits;

28                    2.        whether the applicant will be irreparably injured absent a stay;

OPPOSITION TO MOTION FOR CERTIFICATION            10                              C-07-6211 TEH

3.    whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

4.    where the public interest lies.

The ***Golden Gate*** Court stated that the decision method for analyzing the issue of whether sufficient grounds exist for the stay was based on a continuum:

> At one end of the continuum, the moving party is required to show both a probability of success on the merits and the possibility of irreparable injury. We have recently applied, as an alternative test at this end of the continuum, a test originally formulated for granting a preliminary injunction: (1) a strong likelihood of success on the merits, [and] (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted[.]  At the other end of the continuum, the moving party must demonstrate that serious legal questions are raised and that the balance of hardships tips sharply in its favor.  These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.    (Quotations and citations omitted).  ***Golden Gate Restaurant Ass'n v. City and County of San Francisco***, 512 F.3d 1112, 1115 (9th Cir., 2008).

The analysis of where the public's interest lie is performed separately and in addition to the analysis of the moving parties interests and merits.  ***Id.***

Defendant bases its argument on the revered case of ***Landis v. North American Co.***, 299 U.S. 248 (U.S. 1936).  However, ***Landis***  is 72 years old and both the Supreme Court and the 9th Circuit have refined the specific factors regulating the issuance of a stay on appeal in ***Hilton v. Braunskill***, 481 U.S. 770, 776 (1987), ***Lopez v. Heckler***, 713 F.2d 1432 at 1435 – 1436 (9th Cir.,1983), and most recently in ***Golden Gate Restaurant Ass'n v. City and County of San Francisco***, 512 F.3d 1112, 1115 (9th Cir., 2008).  In addition, the language of  ***Landis*** supports the factors defined in the more recent cases.

Therefore, Defendant's standard for legal analysis is flawed and does not follow current Supreme Court and 9th Circuit instruction.

**B.    Defendant's discussion of related cases is flawed.**

The issues of standing and conscious avoidance are on appeal to the 9th Circuit as a result of an unfavorable ruling for ASIS in the case of ***ASIS Internet Services v. Optin Global, Inc.***, Slip Copy, 2008 WL 1902217 (N.D.Cal., 2008).  The appeal is filed in the 9th Circuit as case number:  08-15979. The appeal is concerned primarily with the legal definition of: adverse affect as it relates to standing (15 *USC* §7706(g)(1)); and conscious avoidance of knowledge as it relates to inducing or hiring affiliates to

send emails that may be in violation of the **CAN SPAM ACT** (15 **USC** §7706(g)(2)). While these are important issues in any **CSA** case, there has been no dictum established as to how to interpret the statutes as regarding these issues and there is a difference of opinion within the Northern District on these issues. See **ASIS Internet Services v. Optin Global, Inc.**, Slip Copy, 2008 WL 1902217 (N.D.Cal., 2008), and **ASIS Internet Services v. Active Response Group**, Slip Copy, 2008 WL 2952809 (N.D.Cal., 2008).

  **C.**  **Defendant has made no credible showing of success on the merits and there is strong evidence that Plaintiffs will succeed on the merits.**

  Defendant's initial argument that Plaintiffs lacked standing to bring this action is weak and has little chance of success. Defendant's argument is based primarily on rulings in several District courts that is currently disputed by more recent rulings in the Northern District. The unfavorable decisions are on appeal to the 9th Circuit. In addition, the Defendant, facts, timeframe and transactions in this case are different from those of the prior ASIS cases making those decisions less relevant. Finally, Plaintiffs have already produced significant evidence of Defendant's liability and in support of its case prior to the start of discovery.

  **1.**  **Defendant's arguments:**

  Defendant's have presented no evidence nor have they made any supportable legal arguments that they will succeed on the merits. Defendant relies on three basic arguments: 1) Defendant will incur significant unnecessary litigation costs if the case on appeal is decided against ASIS; 2) Plaintiffs will bear no hardship; and 3) judicial economy. As to judicial economy, this is a factor considered under where the public interest lies and must be weighed against other important public interests as discussed below.

  As to Defendant's litigation costs, these costs are not generally considered in balancing the hardships of the parties, and are not even mentioned in the modern cases of **Lopez v. Heckler**, 713 F.2d 1432 (9th Cir.,1983), and **Golden Gate Restaurant Ass'n v. City and County of San Francisco**, 512 F.3d 1112 (9th Cir., 2008).

  Further, Defendant argues that its hardship is based on the expensive discovery it will have to undertake while admitting it has already performed part of that discovery. In Defendant's Motion for

1  Stay, Defendant represents "ARG has agreed to provide voluminous amounts of material information to

2  Plaintiffs prior to the hearing of this motion."  Def Mot P12, L5 - 6.  Therefore, Defendant's argument

3  that it will incur significant litigation costs is not supported by its own actions in pursuing pre-discovery

4  investigations.

5       The information offered by Defendant may identify other possible defendants in this matter.

6  Plaintiffs desire to add such entities as named defendants in the within suit.  If a stay is effected,

7  Plaintiffs will be unable to bring such parties to the table.  Moreover, a stay would preclude discovery

8  into the relationship between such new parties and Defendant which is relevant to Defendant's liability.

9       Defendant does not argue the merits of its case, relying instead on a potentially favorable

10  decision in the 9th Circuit appeal that may relieve them of liability.  This hardly meets the requirement

11  that: "the moving party must demonstrate that serious legal questions are raised and that the balance of

12  hardships tips sharply in its favor. "  *Golden Gate Restaurant Ass'n v. City and County of San*

13  *Francisco*, 512 F.3d 1112, 1115 (9th Cir., 2008).  While it is possible that the appeal will favor

14  Defendant, it is much more likely that the 9th Circuit will render a decision similar to that entered in the

15  Court's order within: *ASIS Internet Services v. Active Response Group*, Slip Copy, 2008 WL 2952809

16  (N.D.Cal., 2008).

17       Therefore, Defendant has described no valid hardship to be considered by the Court and there is

18  currently no legal dicta regarding the legal issues.  As discussed below Plaintiffs can demonstrate

19  serious hardships and has produced evidence of likely success on the merits.

20             **2.      Plaintiffs' case:**

21       Based on the clear language of the *CAN SPAM Act of 2003*, Plaintiffs have standing to bring an

22  action and can demonstrate that Defendant sent or procured the sending of unlawful emails in violation

23  of the *CSA*.  Plaintiffs have produced significant evidence that the emails are in violation of the *CSA*.

24  Plaintiffs have demonstrated the emails were not solicited.  Evidence concerning whether ARG knew or

25  consciously avoided knowing they were inducing spamming is entirely in the control of Defendant and

26  its affiliates.

27       The *CSA* states that it is unlawful for a party to "initiate" transmission of emails in violation of

28  the Act.  15 *USC* §7704(a)(1).  The *CSA* grants standing to a provider of Internet access service who has

1   been adversely affected by violation of: "section 7704(a)(1) of this title, 7704(b) of this title, or 7704(d)

2   of this title, or a pattern or practice that violates paragraph (2), (3), (4), or (5) of section 7704(a)".  15

3   *USC* §7706(g)(1).  Plaintiffs have complained of violation of 15 *USC* §7704(a)(1) and (2).  15 *USC*

4   §7704(a)(1) states that it is a violation to send any email with false header information (this includes

5   commercial, transactional or relationship emails). 15 *USC* §7704(a)(2) states that it is a violation to send

6   commercial emails with deceptive subject lines.

7           15 *USC* §7702(9) defines "Initiate" as to transmit or procure the transmission of an unlawful

8   commercial electronic mail message.  15 *USC* §7702(12) defines "Procure" in regard to unlawful emails

9   to mean "intentionally to pay or provide other consideration to, or induce, another person to initiate such

10  a message on one's behalf."   15 *USC* §7706(g)(2) states "after 'behalf' insert the words 'with actual

11  knowledge, or by consciously avoiding knowing, whether such person is engaging, or will engage, in a

12  pattern or practice that violates this chapter'."

13          Therefore a person who procures or induces another to send unlawful emails with actual

14  knowledge or consciously avoiding knowing that person is engaging or will engage in violations is

15  liable under the *CSA*.  Likewise a person who transmits emails in violation of the *CSA* is liable under

16  the *CSA*.  An IAP adversely affected by those actions has been granted standing to bring a civil action in

17  federal court.

18              **a.     STANDING:  ASIS and Foggy are the type of person intended**
                        **by the statute and were adversely affected based on the clear**
19                      **language of the statute and the legislative history.**

20          Plaintiff discussed the legal issues and basis for standing under the CAN SPAM Act in its

21  opposition to Defendant's Motion to dismiss and will not burden the Court with that discussion here.

22  Rather Plaintiff will present the evidence alleged in the prior papers.

23          The Congress has identified the class of persons with standing as providers of Internet access

24  services.  15 *USC* §7706(g)(1).

25          ASIS is a provider of Internet access services within the definition provided in the *CSA*.

26          ASIS has declared that it is an Internet Access service, in operation since 1995, in the isolated

27  community of Garberville, California, providing dial-up and broadband, internet and email service to

28  much of the population of Garberville.  Dec of NW ¶2.  ASIS currently has just under 1,000 Internet

access and email customers.  Dec of NW ¶2.  Plaintiff ASIS both owns and leases hardware and network bandwidth in providing its services.  (See Dec of NW ¶7).  Therefore ASIS is a provider of Internet access within the meaning of the *CSA*.

FOGGY has declared that it is an Internet Access service, in operation since 1998, in Humboldt County, California, providing dial-up internet and email.  Dec of JH ¶2.  FOGGY had 75 Internet access and 180 email customers in 2007.  Dec of JH ¶11.

Both ASIS and FOGGY have produced documents demonstrating their relations to vendors and copies of customer invoices.

Therefore ASIS and FOGGY are providers of Internet access within the meaning of the *CSA*.

To establish standing the party bringing suit "must show that the action injures him in a concrete and personal way… assuring both that the parties before the court have an actual, as opposed to professed, stake in the outcome…" ***Massachusetts v. E.P.A.***, 127 S.Ct. 1438 at 1453 (2007); citing ***Lujan v. Defenders of Wildlife***, 504 U.S. 555 at 580 (1992).

ASIS and FOGGY have declared that they received all of the emails at issue in this case and carried/processed those emails over its servers and network.  See Dec of NW ¶¶8 and 11, also see the emails in Exhibit E, and Dec of JH ¶¶7 and 10, also see the emails in Exhibit D.

ASIS has declared that it costs approximately $3,000 per month to process SPAM emails in both processing and employee costs.  Dec of NW ¶9.  ASIS receives approximately 200,000 SPAM emails per day to all of its and its customers email accounts (both active and inactive).  Dec of NW ¶10.  This is roughly 6,000,000 emails per month, therefore ASIS' SPAM processing costs are less than $.01 per email.  These costs fluctuate based on how much employee time is spent on any set of emails.  Consequently, the actual costs are likely higher.

FOGGY has declared that it costs approximately $1,221 per month to process SPAM emails in both processing and employee costs.  Dec of JH ¶8.  FOGGY estimates that it receives 33,273 SPAM emails per day or approximately 1,011,165 SPAM emails in an average month.  See Dec of JH ¶9.  Therefore the average cost of processing and carrying a SPAM email is less than $.01 per email.  These costs fluctuate based on how much employee time is spent on any set of emails.  Consequently, the actual costs are likely higher.  Foggy purchased and installed a Barracuda spam filtering system (server

and software) in July of 2007.  Prior to acquiring the  Barracuda system, Foggy only used DSPAM, which it still runs as both SPAM filters are required to eliminate most of the SPAM.  This upgrade in spam filtering was caused in part by the emails at issue in this case.  Dec of JH ¶16.  Joel Householter spends about an hour each day, seven days a week, working with customers fixing problems where SPAM evades the filters.  The system administrator spends 2 hours per week working on upgrades and problems with the filters.  Dec of JH ¶17.

Although the cost per email is small, it is real.  If ASIS or FOGGY stopped filtering and processing the emails, they would flood their servers and end up in their customers' email inboxes.  This would put ASIS and FOGGY out of business in a very short time.  Therefore, Plaintiffs have an actual stake in reducing their costs by preventing, through injunction and statutory penalties, spamming operations from sending SPAM to their servers.  If Plaintiffs can stop or reduce the SPAM being sent, they can reduce their overall costs.  Therefore Plaintiffs have suffered concrete and personal harm and assures the Court that Plaintiffs have an actual stake in the outcome of this suit.

15 *USC* §7706(g)(1) defines the requisite injury as "adversely affected."  In exercising its power to define standing by statute the Congress must "at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit."  *Massachusetts v. E.P.A.*, 127 S.Ct. 1438 at 1453 (2007); citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 at 580 (1992).

Congress defined the type of harm that the *CAN SPAM Act* was intended to vindicate in 15 *USC* §7701(6) and 15 *USC* §7706(g)(1).   The legislature further expanded on this definition in the penalties section 15 *USC* §7706(g)(3)(A).

As discussed above, Plaintiffs ASIS and FOGGY have provided evidence that they carried the emails over their facilities and have shown harm from the emails that is typical of and IAP (i.e. employee costs, server and network costs, and filtering costs).

The legislative record further confirms the meaning of adverse affect in **SEN. REP. 108-102** at 21 (2003).

This portion of the legislative record clearly indicates that the type of harm contemplated for enforcement is "carrying the unlawful spam over" the IAP's facilities.

This Court agreed with this argument in its ruling and held that: "a provider of Internet access

services has standing if it can show that it suffered spam-related harm or costs of the type typically experienced by ISPs rather than consumers, and carried the allegedly unlawful deceptive email over its facilities."  ***ASIS Internet Services v. Active Response Group***, Slip Copy, 2008 WL 2952809 at 1 (N.D.Cal., 2008).  Further on the basis of its ruling this Court vacated its stay on discovery. *Id.* at 7.

### b.    The emails all contain false headers and misleading subject lines.

### False Headers

Each of the 9,121 messages indicated that they were from email accounts with some 2588 separate domain names.  See Dec of JM ¶3 and Exhibit B, for a complete list of the sending domain names at issue in this action.  See the emails in Exhibit E to the Dec of NW and Exhibit D to the Dec of JH (submitted under seal).  A WHOIS check of the domain name registrations for the senders of all of the emails indicates that the domain names were registered using a privacy or proxy service. See Dec of JM ¶4 and Exhibit C for WHOIS reports on all of the sending domain names.  The true registrant for the sender of all of the emails cannot be determined without a subpoena.  Plaintiffs have reviewed the Domain Name registrations for all of the sending Domain Names and determined that all of the emails were sent using email accounts registered to domain names that are registered under services that conceal the true identity of the domain name registrant through a proxy service or privacy service.  Also see the domain name privacy/proxy service registration agreements in Dec of JM ¶5 and Exhibit E.

15 *USC* §7704(a)(1)(A) states:

> "(A) header information that is technically accurate but includes an originating electronic mail address, domain name, or Internet Protocol address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations shall be considered materially misleading."

15 *USC* §7704(a)(6) states:

> "the term "materially" when used with respect to false or misleading header information, includes the alteration or concealment of header information in a manner that would impair the ability of an Internet access service processing the message on behalf of a recipient, a person alleging a violation of this section, or a law enforcement agency to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation…"

The registration agreements for the proxy/privacy services prohibit the use of domain names

registered in this manner to send bulk commercial emails. Therefore, since false information was used to generate the domain names and/or domain names were concealed from investigation through proxy/privacy services the electronic mail messages violated 15 *USC* §7704(a)(1)(A).

### Misleading Subject Lines

Plaintiffs further argue that the Defendant sent or had sent **1501 (1082** to **ASIS** and **419** to **FOGGY)** separate items of electronic mail to Plaintiffs' computers that include advertisements with a subject line that a person would know would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents and subject matter of the message. 15 *USC* §7704(a)(2)(1) defines two methods for determining if a subject line is misleading: "1) if such person has actual knowledge," or 2) "knowledge fairly implied on the basis of objective circumstances."

Defendant advertises and markets its offers through email and Web-based ads. **1501** of the emails received by Plaintiffs contain the word "free" (or other similar words such as "gift," "without paying," and "no charge") in the subject line. The email subject lines received by Plaintiffs were clearly intended to get someone to open the email by enticing them with free gifts such as: "Claim your Free Apple iPhone," "Your Top Brands is giving you $1000 FREE to shop Circuit City!," "Get a Harry Potter Movie Pack - for FREE!," "Claim your new John Deere Lawn Tractor - Free!," "[QUAR] Don't Miss out on a FREE High School Musical Gift Pack inluding Ice Tour Tickts, DVDs, CDs and More!," and "QUAR] Can't Get Enough of High School Musical 2? You Can Go See the Ice Tour FREE!"

15 *USC* §7704(a)(2) states that a violation is proper if consistent with 15 *USC* §45. 15 *USC* §45 is titled "Unfair methods of competition unlawful; prevention by Commission," and enables the Federal Trade Commission to issue orders regarding unfair trade practices. 15 *USC* §45(d) provides that the orders of the Commission are exclusive unless overturned by the United States Court of Appeals. The FTC has issued 16 *CFR* part 251, "Guide concerning use of the word 'free' and similar representations." 16 *CFR* Part 251 states that the terms of the offer should be set out clearly and conspicuously at the outset of the offer so that no misunderstanding can occur. **1501** of the emails' subject lines represent that the recipient has received a free gift. Samples of the emails with subject lines and printouts of the website Terms and Conditions are contained in Dec of JM ¶9 and Exhibit F. The web sites that the email recipient is directed to contain extensive terms and conditions that require the recipient to provide

1  personal information and their agreement to take several "sponsor offers."  Only by going to

2  Defendant's web sites can the recipient find out what the terms and conditions are for the supposedly

3  free gifts.  This evidence indicates that the subject lines and advertisements contained in the emails are

4  in violation of 16 **CFR** Part 251 and therefore also in violation of 15 **USC** §7704(a)(2).

5       **c.    The unsolicited emails were sent on ARG's behalf and ARG**
             **knew or consciously avoided knowing its affiliates were**
6            **violating the CSA.**

7       The fact that the emails all contain statements indicating that they are advertisements for ARG's

8  brands and that those email links that were still live went to ARG websites, indicates that the emails

9  were sent on Defendant's behalf.

10       Evidence of contracts with affiliates determining the terms of how ARG induced the sending of

11 the emails is totally in the control of Defendant and its affiliates and will not be available until discovery

12 is allowed.  Likewise, the identity of Defendant's affiliates and other discussions and dealings Defendant

13 had with those affiliates will not be available until discovery is allowed.

14       As discussed above, Plaintiff ASIS has produced only emails sent to inactive and administrative

15 accounts.  ASIS does not use its administrative accounts for any purpose other than to conduct its

16 business.  That business does not include soliciting email advertisements. See Dec of NW ¶18.  This

17 creates an inference that the emails were not solicited on the part of the inactive accounts and a fact that

18 they were not solicited for the administrative accounts.  Dec of NW ¶9.  Some of the emails received by

19 FOGGY were sent to inactive or administrative accounts.  Therefore, without a showing of actual

20 solicitation, this will not represent a defense for Defendant.

21       Plaintiffs **CAN SPAM Act** causes of action are dependent on a showing of actual knowledge or

22 consciously avoiding knowing Defendant's affiliates were violating the **CAN SPAM Act** (15 **USC**

23 §7706(g)(2)).  As discussed above, this information is within the control of Defendant.  However,

24 persons familiar with the bulk internet direct marketing business (email marketing) know that bulk

25 advertisements rarely penetrate SPAM filters and reach consumers without violating the CAN SPAM

26 Act.  Therefore, it is likely that ARG, an experienced internet marketing company, understood that they

27 were inducing its affiliates or sub-affiliates to send SPAM.   In addition, Defendant ARG's IP addresses

28 are now listed on the SPAMHAUS BLOCK LIST of blocked IP addresses as the payloads used by

1    spammers worldwide.  See Dec of JM, Exhibit G.

2        In addition, Plaintiffs *California Business and Professions Code* §17529.5 does not require a

3    showing of knowledge.  A showing that Defendant's email advertisements were sent in emails with

4    fraudulent header information or fraudulent subject lines makes the advertiser strictly liable.  Plaintiffs

5    have demonstrated the emails contain unsolicited advertisements for Defendants.  Plaintiffs have also

6    demonstrated that the emails contain fraudulent subject lines intended to deceive the recipients.

7    Therefore, Plaintiffs will likely succeed on the merits of their *California Business and Professions*

8    *Code* §17529.5 cause of action.

9        Therefore, it is likely that Plaintiffs will succeed on the merits.

10   **D.    Balance of Hardships**

11       If the Court should stay the case during the appeal for *ASIS vs. Azoogle* then discovery will be

12   stayed for at least one year and possibly longer as the appellant's brief was just filed on August 4, 2008.

13   Therefore the Court should take into consideration a time frame of possibly one year in its analysis of

14   the hardships to the parties.

15       **1.    Defendant's Hardships:**

16       Defendant has indicated no hardships beyond the costs of litigating this matter.  These are not

17   valid hardships as every defendant and plaintiff in a lawsuit are generally required to bear their costs of

18   litigation.  What is more Defendant's costs are likely significantly less than Plaintiff's costs of litigation.

19       **2.    Plaintiffs' Hardships:**

20       Plaintiffs' hardships are primarily of two types:  1) the potential loss of evidence from a delay in

21   discovery; 2) ongoing harm to Plaintiffs from ARG's spam.

22       **a.    Loss of evidence:**

23       Because of the nature of *CSA* suits, evidence becomes lost as web sites are taken down and

24   digital data is lost or becomes intermingled with other data.  In addition, the SPAM industry consist of

25   entities, generally the affiliates who actually send the emails, who are constantly changing their

26   identities and locations.  The typical SPAMMER starts a company, uses it for a short time until the

27   industry identifies them, and then abandons that corporate identity for a new corporate name.  This

28   allows the SPAMMER to avoid detection and prevents actions by both the FTC and IAPs.  The longer

discovery is stayed in this case the less likely any trace of the actual SPAMMERS will exist.

Evidence has already been lost or destroyed. The URL links in the emails are no longer active. It is unclear if these links were destroyed by Defendant and its affiliates or merely disconnected as part of their normal business operations. The intermediary web sites created by the affiliates are no longer in operation. It is unclear if the websites were taken down as part of a normal business operation or intentionally destroyed to hide evidence.

The domain name registration companies do not keep registration information indefinitely. Some of the vendors keep information for as little as six months after a domain becomes inactive. Therefore, Plaintiffs' ability to trace affiliates and sub-affiliates using proxy and privacy services may already have been compromised.

**E.    Plaintiffs' action is in the public interest and a delay will impact the public's interest.**

In 2001, spam accounted for 5-7% of all email sent on the Internet.[1] At the time the ***CAN-SPAM Act*** was written in 2003, that number had risen to 50%.[2] In 2004, spam accounted for 70% of all email sent on the Internet.[3] By 2007, 90-95% of all email was spam.[4] Between October 2005 and October 2006, the size of spam messages increased threefold.[5]

Today, spammers are using illegal tactics to avoid detection and send more spam, such as infecting computers with viruses and falsifying domain name registrations.[6] As the amount of spam increases, spammers continually develop sophisticated tools and new techniques to send email past spam filters. According to Dean Drako, president and CEO of Barracuda Networks, "The spam war is a continuous battle between spammers and security vendors. Security vendors now require 24-by-7 defense operations to continuously monitor the Internet for new spam trends and distribute new defensive solutions immediately."[7]

---

[1]   ***CAN-SPAM Act of 2003***, §2(a)(2)
[2]   Ibid.
[3]   *Barracuda Networks Releases Annual Spam Report*, Barracuda Networks,
      http://www.barracudanetworks.com/ns/news_and_events/index.php?nid=232 (courtesy copy attached)
[4]   Ibid.
[5]   *Internet Security Trends for 2007*, IronPort Security, http://www.ironport.com/pdf/ironport_trend_report.pdf   (courtesy copy attached)
[6]   Ibid.
[7]   *Barracuda Networks Releases Annual Spam Report*, Above

The rapid growth of spam has resulted in a thriving anti-spam industry, with vendors such as Postini, Barracuda Networks, and IronPort offering solutions for email service providers. A report published by The Radicati Group in 2004 expected the anti-spam market would surpass $1.7 billion in 2008.[8]

In 2003, Charles (Garry) Betty, then CEO of Earthlink, testified before the House Subcommittee on Telecommunications and the Internet on this subject: "Spam costs Internet providers real money. Excess server capacity, an "abuse team" working full time to ferret out and close down sources of spam on the internet, internal and external legal fees are all costs we incur because of spam. While we don't publish exact figures on this, it is fair to say that they are in excess of $10 million a year for EarthLink alone."[9]

Furthermore, the continued increase in spam threatens the viability of email as a communications platform. According to Betty's testimony:

> "What was at first an occasional inconvenience grew to be an annoyance and now threatens to overwhelm online communications. E-mail is often described as the Internet's 'killer app.' (killer application=primary use) Left unchecked, spam threatens to kill the killer app."[10]

The federal courts now rely almost entirely upon PACER and email for filings, and to provide legal notice to parties and attorneys.  If it were not for the spam filters operated by the courts, and the large IAP's, that system would cease to function.   Even the District Courts are being used by spammers. In a recent Notices from the Clerks of the Central District and Eastern District, spammers were telling recipients they had been subpoenaed to appear before a grand jury in the U.S.D.C. in San Diego. The official looking email contained a link on which to click to obtain more information.  If the consumer clicked the link, it downloaded malicious software onto their computer. See ¶ 3 and Exhibit "B" to Dec JKS.

A review of the Congressional Findings and Policy set forth in 15 *USC* §7701 (*CAN-SPAM Act*) reveals that Congress found unsolicited commercial emails to be a serious problem that "*imposes*

---

[8]  "Anti-Spam Market Growing at a Rate of 50%" http://www.radicati.com/uploaded_files/news/04%20Anti-Spam%20Press%20Release.pdf  (courtesy copy attached)

[9]  Prepared Witness Testimony:  Betty, Charles (Garry)   http://republicans.energycommerce.house.gov/108/Hearings/07092003hearing1008/Betty1568.htm  (courtesy copy attached)

[10]  Ibid.

*significant monetary costs on providers of Internet access services, businesses, and educational and nonprofit institutions..*"    Internet service providers spend billions of dollars a year for spam filtering. *Wikipedia the Free Encyclopedia* under ***E-mail spam***, estimates that world wide 2007 IT costs for dealing with SPAM is ***$198 billion*** – based on a study by *The Radicati Group, Inc.*

A decision against spammers, accompanied by injunction and statutory penalties, will have a deterrent affect against both Defendant and other potential spammers.    Therefore, the potential injunctive effect and the deterrent affect on other spammers must be considered in weighing the public interest.

The Court does have an interest in judicial economy.  If, as Defendant suggests, the 9th Circuit rules against ASIS, it is possible that ASIS' case will be dismissed for a lack of standing.  There is strong evidence that the other issues in the appeal will have no affect on this case.  Therefore, a stay would tend to reduce judicial costs.  However, if the decision is in ASIS' favor then judicial costs will have been increased by a stay and justice will be delayed for at least a year.

However, the public interest in stopping SPAM and the associated costs are significantly higher than the potential loss of judicial economy.  Therefore the interests of the public weigh heavily in Plaintiffs' favor.

Therefore the Court should deny Defendant's motion for stay on that basis.

**III.    Defendant's Motion for Security fails to provide a basis for bond.**

A party requesting security must demonstrate that it is likely to succeed on the merits. Defendant has failed to make such a showing and Plaintiffs have provided significant evidence that indicate Plaintiffs will succeed.  In addition, the court must consider whether forcing Plaintiffs to post a security may close the doors to Plaintiffs and allow a justice to be thwarted.

15 ***USC*** §7706(g)(4) of the ***CAN-SPAM Act*** allows the district court, in its discretion, to "require an undertaking for the payment of the costs of such an action [brought by an internet access provider], and assess reasonable costs, including reasonable attorneys' fees, against any party."  In addition, Civil Local Rule 65.1-1 provides, "Upon demand of any party, where authorized by law and for good cause shown, the Court may require any party to furnish security for costs which can be awarded against such party in an amount and on such terms as the Court deems appropriate."  Federal courts also have

1   inherent authority to require plaintiffs to post security for costs. ***In re Merrill Lynch Relocation Mgmt.***,

2   ***Inc.***, 812 F.2d 1116, 1121 (9th Cir. 1987).

3          Clearly if Plaintiffs are the prevailing party, then costs and fees would be allowed for Plaintiffs.

4   Without a showing by Defendant of its likely success, there is no good reason to suggest that costs or

5   fees would be allowed for Defendant.   Therefore, without a showing the Defendant will succeed on the

6   merits there is no reason to grant a security bond for those costs and fees.

7          An important point to remember is that Defendant is generating most of their additional litigation

8   costs.  This is the third issue brought by Defendant in this matter:   1) Defendant's opposition to a

9   protective order; 2) Defendant's Motion to Dismiss; 3) Defendant's Motion for Certification.

10         Defendant does not specify an amount in its request for security, however, it talks about fees and

11  costs of several hundred thousands of dollars.  While Plaintiffs are a going concern, forcing Plaintiffs to

12  post a bond for $300,000 would in effect close the doors of the court to Plaintiffs and every other small

13  to intermediate IAP.    Defendant cites ***RLS Assocs., LLC v. United Bank of Kuwait PLC***, 464 F.

14  Supp.2d 206, 220 (S.D.N.Y. 2006) for the principal that inability to post a bond is good reason to justify

15  imposition.   However, this citation ignores 9th Circuit precedent that holds that it is an abuse of

16  discretion to require a bond that the court knows a plaintiff cannot pay when there is a genuine issue of

17  material fact in the matter.  ***Simulnet East Associates v. Ramada Hotel Operating Co.***, 37 F.3d 573 at

18  576 (9th Cir., 1994).  Here, Plaintiffs have made a showing that it is likely to succeed on the merits,

19  therefore imposition of a bond the court knows Plaintiffs cannot pay would be an abuse of discretion.

20         As to potential fees in the ***ASIS Internet Services v. Optin Global, Inc.***, Defendant Azoogle's

21  request for fees and sanctions has been denied by the court without prejudice until a ruling on the

22  appeal.  See Docket 439, Order Denying Without Prejudice Defendant Azoogle's Motion for Sanctions,

23  attached to Dec JKS as Exhibit C.

24         Finally, because the ***CAN SPAM Act*** is a remedial statute it is likely that ***Christiansburg***

25  ***Garment Co. v. Equal Employment Opportunity Commission***, 434 U.S. 412 (U.S., 1978) will apply to

26  any fee dispute.   The ***Christiansburg*** test requires a showing plaintiff's action was frivolous,

27  unreasonable, or without foundation in order to award fees in Defendant's behalf.  ***Id.*** at 421 and 422.

28  Defendant has not even implied much less demonstrated that Plaintiffs' action is frivolous,

unreasonable, or without foundation, within the definitions defined in **Christiansburg**.    Therefore, Defendant has provided no basis on which it is likely to even be awarded costs and fees.

The Court should deny Defendant's motion for security on that basis.

**SINGLETON LAW GROUP**

Dated:        August 29, 2008         _/s/ Jason K. Singleton_____
Jason K. Singleton
Richard E. Grabowski, Attorneys for Plaintiffs,
**ASIS INTERNET SERVICES and JOEL HOUSEHOLTER, dba FOGGY.NET**