THOMAS R. BURKE (CA State Bar No. 141930)
RONALD G. LONDON (admitted *pro hac vice*)
AMBIKA K. DORAN (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California  94111
Telephone:   (415) 276-6500
Facsimile:    (415) 276-6599
Email:          thomasburke@dwt.com, ronaldlondon@dwt.com, ambikadoran@dwt.com

Attorneys for Defendant ACTIVE RESPONSE GROUP, INC.

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ASIS INTERNET SERVICES, a California corporation, and JOEL HOUSEHOLTER, d/b/a KNEELAND ENGINEERING, d/b/a FOGGY.NET,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>ACTIVE RESPONSE GROUP, INC. et al.,<br><br>　　　　　Defendants. | Case No. CV 07-6211 TEH<br><br>DEFENDANT ACTIVE RESPONSE GROUP, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR CERTIFICATION UNDER 28 U.S.C. § 1292(B), A STAY IN THE PROCEEDINGS, OR A SECURITY<br><br>Date: September 22, 2008<br>Time: 10 a.m.<br>Place: Courtroom 12, 19th Floor |

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................................1

II. ARGUMENT ........................................................................................................................2

    A. ARG Asks the Court To *Certify*, Not *Reconsider*, Its July 30, 2008 Order. ...........................................................................................................................2

    B. Plaintiffs Cite the Wrong Standard For a Motion To Stay, And In Doing So, Proffer a Glut of Irrelevant Analysis And Evidence. ............................4

        1. The damage of a stay would be minimal, if any. ........................................5

        2. The hardship ARG would suffer if forced to move forward is high. ..................................................................................................................7

        3. A stay would simplify the case. ...................................................................9

        4. Plaintiffs' arguments on likelihood of success are irrelevant to the certification and stay, and illustrate why this case should be stayed. ...................................................................................10

    C. If the Court Declines To Stay the Proceedings, It Should Require Plaintiffs To Post a Bond. .................................................................................13

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*AsIs Internet Servs. v. Member Source Media LLC*,
    08-C-01321-EMC ....................................................................................................1, 6, 7

*Brosnan v. Alki Mortgage, LLC*,
    2008 WL 413732 (N.D. Cal. Feb. 13, 2008) .........................................................3, 9

*Cardona v. Gen. Motors Corp.*,
    939 F. Supp. 351 (D.N.J. 1996) ............................................................................3, 4

*CBS, Inc. v. FCC*,
    535 F.3d 167 (3d Cir. 2008) ....................................................................................10

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*,
    254 F.3d 882 (9th Cir. 2001) .....................................................................................2

*CMAX, Inc. v. Hall*,
    300 F.2d 265 (9th Cir. 1962) .................................................................................5, 6

*Dodd v. United States*,
    545 U.S. 353 (2005) ................................................................................................10

*Ferguson v. Quinstreet, Inc.*,
    2008 WL 3166307 (W.D. Wash. Aug. 5, 2008) ..................................................9, 14

*In re Cement Antitrust Litig.*,
    673 F.2d 1020 (9th Cir. 1981) ...................................................................................3

*Landis v. North Am. Co.*,
    299 U.S. 248 (1936)...................................................................................................5

*Mediterranean Enters., Inc. v. Ssanyong Corp.*,
    708 F.2d 1458 (9th Cir. 1983) ...................................................................................5

*Moore v. Lafayette Life Ins. Co.*,
    458 F.3d 416 (6th Cir. 2006) .....................................................................................3

*AsIs Internet Servs. v. Optin Global et al.*,
    3:05-cv-05124-JCS ...........................................................................................*passim*

*RLS Assocs., LLC v. United Bank of Kuwait PLC*,
    464 F. Supp.2d 206 (S.D.N.Y. 2006) ......................................................................13

*Rohan ex rel. Gates v. Woodford*,
    334 F.3d 803 (9th Cir. 2003) .....................................................................................5

DAVIS WRIGHT TREMAINE LLP

Case 3:07-cv-06211-TEH   Document 62   Filed 09/08/2008   Page 4 of 18

*Silver v. Sony Pictures Entertain., Inc.*,
   2001 WL 36127626 (C.D. Cal. Mar. 29, 2001) ........................................................................3

*White Buffalo Ventures, LLC v. Univ. of Tex.*,
   420 F.3d 366 (5th Cir. 2005) ...............................................................................................10

**FEDERAL STATUTES**

15 U.S.C. § 7703 ............................................................................................................................10

15 U.S.C. § 7704 ............................................................................................................................12

28 U.S.C. § 1292 ........................................................................................................................2, 5

15 U.S.C. § 7701 ..............................................................................................................................1

**RULES**

Fed R. Civ. P. 1 ...............................................................................................................................7

Fed. R. Civ. P. 62 .............................................................................................................................5

**OTHER AUTHORITIES**

S. REP. 108-102, 2004 U.S.C.C.A.N. 2348 (July 16, 2003) .........................................................10

DAVIS WRIGHT TREMAINE LLP

## I. INTRODUCTION

Plaintiffs' Opposition is itself "Exhibit A" for why the Court should grant Defendant Active Response Group, Inc. ("ARG") the relief it seeks. ARG filed a brief motion noting that certification of the standing issue in this case and pausing to await Ninth Circuit guidance on the same issue in other cases would be appropriate, as there is now a difference of opinion among the district courts—including different courts within this District—regarding what constitutes adverse effect sufficient to confer standing under the CAN-SPAM Act, 15 U.S.C. § 7701. This Court openly acknowledged the split its order created. Dkt. 48 at 2. ARG noted that neither this Court nor ARG should be required to expend substantial resources if the Ninth Circuit should hold that Plaintiffs lacked standing, and consequently all the discovery, motions practice, and any potential trial (and related efforts) that came between would have been for naught. In response, Plaintiffs filed an over-the-page-limit diatribe, plus another 100 pages of declarations and exhibits, that extend well beyond the issue presented by the Motion. The Opposition reveals Plaintiffs' *modus operandi* toward eradicating commercial email, and bludgeoning CAN-SPAM defendants into submission with expensive discovery and litigation tactics.

In the final analysis, the Court's July 30, 2008 order clearly is ripe for certification, and this case is an appropriate one to stay. To certify the order, the Court need only find that it involves a controlling issue of law, upon which reasonable minds may differ, and the reversal of which would materially advance termination of this litigation. The Court need not, as Plaintiffs suggest, reconsider the order itself. To stay the case, the Court need only weigh the damage from a stay (minimal here, where Plaintiffs seek money for receiving emails that admittedly cost them less than $92), the potential hardship to ARG (high, given the likely litigation costs), and the potential simplification of the case (again, high, given the pending appeal of three cases deciding the *same issue*, and a stay by another court of a nearly identical lawsuit). The Court need not, as Plaintiffs suggest, decide whether Plaintiffs are likely to succeed on the merits, making Plaintiffs' arguments on the merits utterly irrelevant to the Motion. Finally, the same court that issued a stay in *AsIs Internet Servs. v. Member Source Media LLC*, 08-C-01321-EMC, another case

brought by Plaintiff AsIs Internet Services ("AsIs"), required it to post a bond, the minimum this Court should require of Plaintiffs if the Court does not issue a stay.

## II. ARGUMENT

### A. ARG Asks the Court To *Certify*, Not *Reconsider*, Its July 30, 2008 Order.

ARG seeks certification to the Ninth Circuit Court of Appeals of this Court's July 30, 2008, order holding that Plaintiffs have standing, accompanied by a stay, as 28 U.S.C. § 1292(b) specifically contemplates. Although it would welcome this Court's change of heart, by this Motion, ARG is not asking this Court to "overthrow" or "overturn" its ruling, Opp. at 1-2, nor is "a motion for certification for appeal… in effect a motion to reconsider a prior order" as Plaintiffs claim. *Id.* at 6. The Court, in certifying an already-issued order, *may* reconsider its order, Opp. at 6, but it is not *required* to do so, *see* 28 U.S.C. § 1292(b), as Plaintiffs admit in reciting that "[t]he Court *may* reconsider its order… on a motion… or *sua sponte*," Opp. at 6.[1]

The question at this juncture is not whether the Court should reconsider its Order, but only whether it should certify it to the Court of Appeals to allow a definitive ruling on the threshold issue of standing since, if the Ninth Circuit finds all the other courts with which this Court parted company were correct, it would effectively end this case. Plaintiffs do not otherwise dispute that certification requires that (1) there be a controlling issue of law; (2) there be "substantial ground for difference of opinion" as to the controlling question of law; and that (3) immediate appeal from the order may "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).[2] Plaintiffs, however, mischaracterize the nature of these requirements in applying them.

---

[1] The single case Plaintiffs cite, *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882 (9th Cir. 2001), if anything, confirms that a district court can certify an order without reconsidering it. There, the Ninth Circuit, finding a district court could rescind its certification order, noted that the moving party had sought certification, not reconsideration, although the court had *mistakenly* assumed the latter. *Id.* at 884.

[2] Section 1292(b) requires an order not be "otherwise appealable." Plaintiffs suggest this means the order need be not appealable *ever*. Opp. at 9. Section 1292(b) was enacted precisely to allow interlocutory review of orders not "*otherwise* appealable." Plaintiffs do not and cannot show the order is appealable now, citing to two cases involving Section 1291, not Section 1292. *See* Opp. at 8-9 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463 (1978); *United States v. Hollywood Motor Car Co.*, 458 U.S. 263 (1982)).

Page 2

1    As to the first and third requirements, whether Plaintiffs have standing is a controlling
2 issue of law because "resolution of the issue on appeal could materially affect the outcome of the
3 litigation in the district court," *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1981),
4 *i.e.*, the order might materially advance the ultimate termination of the litigation.  Plaintiffs' own
5 authority states that "a question is 'controlling' if its incorrect disposition would require reversal
6 of the final judgment." *Cardona v. Gen. Motors Corp.*, 939 F. Supp. 351, 353 (D.N.J. 1996)
7 (cited in Opp. at 9).  Where, as here, standing to bring suit under a federal statutory scheme is
8 unsettled, the issue of whether a plaintiff may even bring its action clearly is a "controlling
9 question" under Section 1292.  *See*, *e.g.*, *Silver v. Sony Pictures Entertain., Inc.*, 2001 WL
10 36127626 (C.D. Cal. Mar. 29, 2001), and cases cited therein, *appeal accepted and aff'd*, 330 F.3d
11 1204 (9th Cir. 2003), *reh'g granted*, 370 F.3d 1252 (9th Cir. 2004), *rev'd on reh'g*, 402 F.3d 881
12 (9th Cir. 2005) (assignee who holds accrued claim for copyright infringement, but who has no
13 legal or beneficial interest in underlying copyright, lacks standing under the Copyright Act).
14    Plaintiffs' assertion that standing is not a controlling issue of law because the Ninth
15 Circuit may resolve the *Optin Global* case on grounds other than standing is not only incorrect,
16 but misplaced.  The standard for certification does not depend on rulings in other cases.  Even if
17 there were no *Optin Global* for the Ninth Circuit decide, the fact that the Ninth Circuit could find
18 Plaintiffs lack standing on appeal (and thus require a final judgment against Plaintiffs) means a
19 controlling issue of law exists.  Further, the inquiry is not whether resolution of the issue in the
20 instant case *would* materially affect the outcome of the case—but rather whether it *could* do so.
21 Here, an order from the Ninth Circuit *could* end the litigation altogether.  Moreover, the Ninth
22 Circuit could not decide *Optin Global* without deciding the standing issue, as lack of standing
23 moots the need to decide any other issue, and proceeding to other issues would require holding
24 that plaintiffs were properly in court to begin with.  *E.g.*, *Brosnan v. Alki Mortgage, LLC*, 2008
25 WL 413732, at *2-*3 (N.D. Cal. Feb. 13, 2008) (dismissing CAN-SPAM claim *sua sponte* where
26 plaintiff failed to allege adverse effect and court thus lacked subject matter jurisdiction); *see also*
27 *Moore v. Lafayette Life Ins. Co.,* 458 F.3d 416, 450 (6th Cir. 2006) ("Statutory standing—the
28 issue of whether a statute authorizes a plaintiff to sue—is a jurisdictional matter deserving of

Page 3

threshold judicial inquiry.") (internal quotation marks and citation omitted).

As to the second requirement, that there be substantial ground for difference of opinion as to the controlling issue of law—here, the meaning of "adverse effect" for internet access or service providers ("IAPs" and "ISPs," respectively) to bring suit under the CAN-SPAM Act—the Court itself has noted disagreement with prior decisions, within this District, and within other district courts in the Ninth Circuit. *E.g.*, Dkt. 48 at 2. There is a "clear dispute as to the legal issues" in these cases, Opp. at 8, and Plaintiffs provide no analysis for their contrary claim, *id*. Nor could they, given their admission that "there is a difference of opinion within the Northern District" on the standing issue. Opp. at 12. The Court itself stated:

> *Defendant urges the Court to follow several recent decisions construing § 7706(g)(1)*, and hold that an IAP must allege it suffered discrete economic loss directly attributable to the deceptive emails alleged in the complaint in order to be "adversely affected by a violation" of the Act. *The Court declines to do so*.

Dkt. 48 at 2 (emphasis added). This is not, therefore, merely a case of ARG's "disagreement with the district court's ruling." *See* Opp. at 9 (block-quoting *Cardona*, 939 F.Supp. at 353).

The intra-district and intra-circuit split on this issue make this a prototypical case that involves an issue on which substantial ground for difference of opinion exists. *See* ARG Motion for Certification at 11-12 (citing numerous cases certifying question where split of authority existed). Plaintiffs' citation to *Cardona* only supports this claim. The court did *not* reach its decision declining certification "in the light of clearly contrary rulings in the same jurisdiction." Opp. at 9. Rather, the court, in a far simpler case, distinguished the case at bar from a case the moving party had cited "because there were 'two conflicting district court opinions' [in that case]" and "*no such conflict in this district*." 939 F. Supp. at 354 (emphasis added).

**B.   Plaintiffs Cite the Wrong Standard For a Motion To Stay, And In Doing So, Proffer a Glut of Irrelevant Analysis And Evidence.**

In opposing ARG's request for a stay pending Ninth Circuit resolution of adverse effect for ISP-plaintiffs under the CAN-SPAM Act, Plaintiffs mistakenly rely on the test for whether to stay enforcement of a judgment pending disposition of an appeal of that judgment, a question largely governed by Fed. R. Civ. P. 62, Opp. at 10-11 (citing cases). Unlike the request here,

Page 4

Defendant's Reply in Support of Motion For Certification Under 28 U.S.C. § 1292(b), a Stay, Or a Security

264782.1

stays of that sort require a showing of irreparable injury, a likelihood of success or serious questions as to the merits, and a balancing of harms. The test is inapplicable here, where ARG seeks a stay under Section 1292(b), and alternatively under the Court's inherent authority, that simply would bring this case to a standstill while the Ninth Circuit resolves the unsettled threshold issue of adverse effect under the CAN-SPAM Act.

The district court has sole discretion to grant a stay under Section 1292(b). 28 U.S.C. § 1292(b). The Court also has inherent authority to grant a stay pending disposition of another appeal under *Landis v. North Am. Co.*, 299 U.S. 248 (1936), and its progeny. Although, as Plaintiffs note, the Supreme Court decided *Landis* in 1936, the Ninth Circuit routinely relies on it to decide whether to stay a case pending the appeal of another proceeding. *See, e.g., Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir. 2003); *Mediterranean Enters., Inc. v. Ssanyong Corp.,* 708 F.2d 1458, 1465 (9th Cir. 1983); *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962). To determine whether this type of stay is appropriate, rather than the test above that Plaintiffs applied, courts look to "[1] the possible damage which may result from the granting of a stay, [2] the hardship or inequity which a party may suffer in being required to go forward, [3] and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *CMAX, Inc.*, 300 F.2d at 268. Notably, a sister court, after reviewing this Court's July 30, 2008 order and prior decisions, granted the defendant a stay in a spam case brought by AsIs.[3]

### 1. The damage of a stay would be minimal, if any.

In its opinion, the Court rejected ARG's argument that a broad standing requirement would "untether[] real harm from damages," finding that the "primary purpose" of the Act is to "punish spammers, not compensate its victims." Dkt. 48 at 9. Thus, the Court reasoned, Congress designed the Act to allow IAS providers to enforce the statute, even if the receipt of

---

[3] *See* Declaration of Henry M. Burgoyne, III, ¶ 2. Plaintiffs' counsel declined to agree to a stipulation to this effect, noting the Court could take judicial notice of the order. ARG respectfully requests the Court do so. Once the order is entered, ARG will have a copy delivered to the Court. In the interim, however, ARG submits the Declaration of Henry M. Burgoyne, III, an attorney for Member Source Media LLC.

emails has not significantly harmed them, and found that Plaintiffs sought to do just that. *See id.* at 9-10. The delay will cause little, if *any*, harm to Plaintiffs, who may simply have to wait a little bit to recover the statutory damages designed not to compensate them, but rather to punish ARG, assuming ARG has even acted unlawfully.

Moreover, despite rhetoric to the contrary that seems overwhelming (and is misplaced, as shown below), Plaintiffs actually suffer very little harm from spam, indeed, less than 1 cent per email. Opp. at 5. They allege ARG sent them 9,121 unlawful emails; even assuming ARG was responsible for each unlawful email (which it was not), Plaintiffs' damages would amount to less than $91.21, less than one-third of the cost of filing this lawsuit. Plaintiffs also suggest they must maintain spam filters, *id.* at 16, but Congress contemplated, and ISPs have recognized, this is simply a cost of doing business. Such filtering is something ISPs undertake to deal not only with emails that violate the CAN-SPAM Act, but also lawful emails sent within the parameters of the Act. Plaintiffs can hardly blame these costs on ARG, who they allege sent them these 9,121 emails over a period of nearly two years, when Plaintiffs purportedly receive more than 1 *million* emails *each month,* Opp. at 15. This averages to receipt of 24 million spam emails over two years, meaning that again, even assuming ARG acted unlawfully, it is responsible for *less than .1 percent* of Plaintiffs' purported harm.

Plaintiffs' claim that important evidence will be lost if the Court issues a stay, Opp. at 20-21, is a red herring. ARG already has produced the vast majority of discovery that Plaintiffs have requested, including identifying the affiliates responsible for the emails. In addition, ARG long ago issued a litigation hold in this matter, meaning it will preserve any evidence it has. ARG has no intention of disappearing into the night, as Plaintiffs strain to suggest. Opp. at 20. Further, the Court may enter a preservation order to this effect, ensuring that no evidence is destroyed, as Judge Chen did in *Member Source Media LLC*, 08-C-01321-EMC. Burgoyne Decl. ¶ 2.[4]

---

[4] AsIs's position on this point also is inconsistent with its representations in at least one other case. In a joint letter to Judge Chen, Member Source Media LLC noted that AsIs had dismissed another lawsuit against a different defendant, after Judge Spero stated his intention to stay the lawsuit pending the Ninth Circuit's decision in *Optin Global*, purportedly because the data would become stale. 08-C-01321-EMC, Dkt. 28 (July 13, 2008). AsIs responded that the date range of the allegedly unlawful emails at issue in *Member Source* was more recent than those in the other

Plaintiffs' claims that the public will be harmed because this Court will not have the chance to sanction ARG, Opp. at 21, are nonsensical. Not only do they presume Plaintiffs will prevail on the merits, and that ARG acted unlawfully (and does so on a large-scale basis), more importantly, they ignore the very first Federal Rule of Civil Procedure calling for "*just*, speedy, and *inexpensive* determination of *every* action and proceeding," *see* Fed R. Civ. P. 1 (emphases added), not to mention the public interest in promoting civility in the legal system. Plaintiffs' vexatious litigation is a much more serious public concern than the relatively miniscule amount of spam Plaintiffs allege is at issue. It is certainly not in the public interest to allow professional spam plaintiffs to bring numerous lawsuits to recover millions of dollars in damages to leverage settlements by imposing costly discovery, motions practice, and trials, when they may not even have standing to be in court in the first place. Even though AsIs has suffered virtually no harm, it has brought ten separate CAN-SPAM lawsuits against more than thirty defendants. Although ARG disputes that AsIs has standing to bring these lawsuits, it nevertheless managed to force settlements in many of these cases. The Court should not allow AsIs to strong-arm defendants into settling while AsIs's very ability to bring cases is in doubt. On this record, the public policy arguments weigh strongly in favor of a stay.

**2.   The hardship ARG would suffer if forced to move forward is high.**

Plaintiffs' suggestion that the Court ought not weigh ARG's potential fees and other costs is erroneously based on cases deciding whether to stay enforcement of judgments pending appeal. *See* Opp. at 12. Indeed, ARG's legal fees and costs—and the Court's time—are front and center in the serial litigation brought by these professional anti-spam plaintiffs. Plaintiffs suggest this is

---

lawsuit, which were sent between December 12, 2005 and March 30, 2007. *Id.* The date range at issue in this case is nearly identical to that of the lawsuit in which AsIs claimed the emails were too old to pursue—October 31, 2005 to September 22, 2007. Either AsIs believes discovery for emails sent during this time period is futile, and should dismiss its Complaint, or it should stipulate to a stay. Plaintiffs' concerns that they will be unable to add defendants, Opp. at 13, or collect information from third parties, *id.* at 21, are likewise irrelevant. The Court could craft its stay in a manner that will allow Plaintiffs to do both, and ARG would not object to such a stay.

DAVIS WRIGHT TREMAINE LLP

merely the "cost of litigation," Opp. at 2, 7, 20, while at the same time mischaracterizing their own litigation costs.[5]

Plaintiffs are notorious for unnecessarily driving up litigation costs. In this case alone, Plaintiffs forced discovery briefing over two issues, and have either improperly contacted or threatened to contact the Special Master prior to completion of meet-and-confer processes numerous times. This occurred despite ARG's expenditure of thousands of dollars—some of it during the Court-imposed stay—to respond to just two discovery requests. In the only case to reach the merits, the defendant incurred $1 million in litigation costs. *AsIs Internet Servs. v. Optin Global et al.*, 3:05-cv-05124-JCS, Dkt. 412 at 2. The *Optin Global* docket itself contains nearly 500 documents. Plaintiffs contend that if ARG has produced the costly discovery, it should not fear costs, but labor-intensive discovery is ongoing, with more to follow once the parties implement the Special Master's resolution of discovery of ARG's correspondence with its affiliates, and Plaintiffs have already stated they will take further discovery before taking additional depositions. Plaintiffs have scheduled two depositions—including one just before this Court's hearing of the motion to stay. To ARG's knowledge, Plaintiffs are not nearly finished with discovery, but this discovery can easily take place if and when a stay is lifted.

Perhaps the best evidence of the costs ARG is likely to incur is Plaintiffs' oversized response to ARG's certification motion. ARG spent hours examining this case law and dispelling the myths Plaintiffs have put forth in opposing this motion. Plaintiffs are likely to continue these tactics, as its other cases are either on appeal or stayed pending appeal, and Plaintiffs have more time on their hands.

---

[5] Plaintiffs do not have to travel to ARG for every deposition, Opp. at 2—ARG's CEO, Brad Powers, who lives in New York, traveled to San Francisco for his deposition. Plaintiffs will not have to travel to ARG to copy or collect data, because ARG has already produced most data. Moreover, Plaintiffs' suggestion that ARG's litigation costs are low because it has in its possession the material Plaintiffs seek is ludicrous—responsive material still must be located, culled from nonresponsive material with which it may reside, be reproduced and reviewed by counsel, and ARG personnel must devote—and have devoted—dozens of productivity-interrupting hours to responding to Plaintiffs' discovery.

DAVIS WRIGHT TREMAINE LLP

### 3.    A stay would simplify the case.

This Court acknowledged that it went against the weight of authority when it found that Plaintiffs were "adversely affected" within the meaning of the CAN-SPAM Act.  And, since the Court issued its ruling, another court followed the majority test in dismissing another lawsuit. *Ferguson v. Quinstreet, Inc.*, 2008 WL 3166307, at *6-*7 (W.D. Wash. Aug. 5, 2008).  The plaintiff has appealed this decision.  C07-5378 RJB, Dkt. 81 (Aug. 27, 2008).  Thus, there are now *three* cases on appeal to the Ninth Circuit that will necessitate decision of the meaning of "adverse affect."  If the Ninth Circuit agrees that the majority view is the correct one, this Court would have to dismiss this case, making the legal issues quite simple.  Even if, as Plaintiffs hope, the Ninth Circuit reverses *Optin Global, Gordon,* and *Ferguson*, the standard it announces as to what constitutes "adverse effect" is likely to significantly change the tone of the litigation here, and may require revisiting the Court's decision on standing.  Moreover, the second issue that the Ninth Circuit might review in *Optin Global*—whether the defendant "procured" the emails within the meaning of the CAN-SPAM Act—will almost certainly be at issue here.  The potential guidance offered on this issue also would be highly instructive if and when this case resumes.

Any notion that the Ninth Circuit could dispose of these three cases on grounds other than standing, without reversing on the standing issue, is myopic.  Plaintiffs appear to have neglected ARG's request that the Court issue a stay pending not only the *Optin Global* appeal, but also the appeal in *Gordon v. Virtumundo,* where lack of adverse effect was the *sole* basis for dismissal of the CAN-SPAM claim.  *See* 2007 WL 1459395, at *8 (W.D. Wash. May 15, 2007).  ARG also now requests the Court await the outcome of the new third case, *Ferguson v. Quinstreet, Inc.*, which also relied for dismissal on lack of adverse effect.  2008 WL 3166307, at *6-*7.  Even considering only *Optin Global,* the Ninth Circuit will decide standing, because standing is a threshold matter that federal courts must find exists before proceeding to any other issue.  *E.g.*, *Brosnan,* 2008 WL 413732, at *2-*3.  The dismissal in these three cases, just as in the case at bar, go to the fundamental question of whether ISPs can show adverse affect sufficiently to prove standing, if they cannot prove the adverse affect came from the emails they are suing over, as Plaintiffs, including Plaintiff Joel Householter, admit is the case.  It does not matter that the facts

Page 9

Defendant's Reply in Support of Motion For Certification Under 28 U.S.C. § 1292(b), a Stay, Or a Security

264782.1

along the periphery may differ.  ARG should not be forced to continue to spend tens of thousands of dollars a month while the Ninth Circuit reviews these virtually identical lawsuits.

**4.    Plaintiffs' arguments on likelihood of success are irrelevant to the certification and stay, and illustrate why this case should be stayed.**

Given the standards ARG has identified, Plaintiffs' arguments that they are likely to prevail on the merits—and their attempt to try their case here—are entirely irrelevant and wholly inappropriate.  Yet Plaintiffs' Opposition makes clear they have locked their sights on not only unlawful spam, but lawful spam as well.  Notwithstanding this, it is critical not to lose sight of one important point as this case continues to unfold:  ***The CAN-SPAM Act—the statute under which Plaintiffs have brought this suit—does not make all unsolicited commercial email unlawful.***  Rather, it prohibits only email sent in violation of a prior opt-out request to a sender, email that is false or misleading, email that lacks utilitarian information such as a postal address for the sender and an online opt-out mechanism, and harvest attacks.  15 U.S.C. §§ 7703, 7704.  Commercial email is not illegal.  It has a role in the marketplace, S. REP. 108-102, 2004 U.S.C.C.A.N. 2348, 2349 (July 16, 2003), and it is constitutionally protected.[6]  And, if sent within the bounds of the CAN-SPAM Act, it is *lawful*.  Plaintiffs may wish the Act prohibited more, but this is simply not the case.[7]  The Courts are not open to parties to simply strike a blow by obtaining, in Plaintiffs' own words, "[a] decision against spammers," Opp. at 23, which in many cases include entities engaged in perfectly lawful pursuits.

This point appears lost on Plaintiffs.  The Opposition repeatedly speaks of "SPAM" generally, in terms of how much email traffic it constitutes, Opp. at 2, how much it increases each

---

[6] *See, e.g., White Buffalo Ventures, LLC v. Univ. of Tex.*, 420 F.3d 366, 374-77 (5th Cir. 2005). In this regard, the CAN-SPAM Act does not "make[ ] the advertiser *strictly liable*," Opp. at 20, nor could it.  *See*, *e.g.*, *CBS, Inc. v. FCC*, 535 F.3d 167, 199-203 (3d Cir. 2008).

[7] Plaintiff-ISPs should not look to courts to address this.  *Dodd v. United States,* 545 U.S. 353, 359-60 (2005) (Congress, not the courts, must amend statutes that may be observed to lead to undesirable consequences). Still, ARG does not believe that if standing is denied in lawsuits like this, Section 7701 *et seq.* is rendered a nullity. Dkt. 48 at 2.  ISPs will be able to allege harm from specific emails they sue over in certain cases, e.g., where the sheer volume of them causes adverse effects, cases of harvest attacks, viruses, or other malfeasance that disable or impede ISP servers, or similar harms.

DAVIS WRIGHT TREMAINE LLP

year, *id*. at 1, its alleged estimated annual cost, *id*. at 2, and how ISPs take steps to "protect customers from spammers," *id*. at 1, while offering various quantifying data about the spam that Plaintiffs encounter. *See id*. at 5, 15-16. But all of this by definition includes both lawfully sent commercial emails and unlawful transmissions the CAN-SPAM Act prohibits, and by necessity incorporates efforts ISPs take to help subscribers avoid even lawfully sent emails, which ISPs do as a service to customers and/or as a way to distinguish themselves in the market.[8] Elsewhere, Plaintiffs equate all spam with "garbage," Opp. at 1, and laud efforts of outfits like Spamhaus, *see id*. at 19, who define "spam" as *all* unsolicited bulk email—whether commercial or not, and whether an opt-out request was made or not—and who seek to combat email that is inconsistent with their vision of how it should be regulated, including "pursu[ing] spammers worldwide." *See* www.spamhaus.org; www.spamhaus.org/definition.html (visited Aug. 9, 2008). Plaintiffs confirm their indiscriminate view of all unsolicited commercial email, whether lawful or not, via statements to the effect that, "compared to every other problem on the internet, SPAM is king," Opp. at 2, surpassing even, taking just a few examples, child pornography, children's access to sexually explicit materials, and identity theft.

      Again, the CAN-SPAM Act does not prohibit unsolicited commercial email. Plaintiffs' mission is clearly not preventing *unlawful* spam, but eradicating <u>*all*</u> spam. To be sure, Plaintiffs throw in a few aversions to the types of mass volume spam that can cause harm—such as those that bear viruses, or that are so monstrously voluminous as to affect ISPs' systems by themselves —but, significantly, Plaintiffs do not allege those harms here. Here, Plaintiffs allege nothing

---

[8] *See*, *e.g.*, www.comcast.com/Customers/Faq/FaqDetails.ashx?Id=3609 (FAQ answering "What is Comcast doing about spam?"). *Cf*. Opp. at 16 ("If ASIS or FOGGY stopped filtering…emails, they would flood their service and end up in their customers' email inboxes [and thus] put ASIS and FOGGY out of business in a very short time"). *See also id*. at 6 ("ASIS' contract with its service providers allows for spikes in its network bandwidth beyond … at no additional costs"). In this regard, the extent to which ISPs like Plaintiffs engage in anti-*spam* mechanisms is *not* an adverse affect within the meaning of the statute—that is why it is vital that, to have standing, ISPs must show adverse affect from emails that they allege to be unlawful. Any other interpretation means that, if ISPs receive solely lawful spam, and incur costs taking anti-spam measures, they would have standing to bring suit, and to drag entities acting lawfully into expensive litigation. That is why it is critical that, as a threshold matter, plaintiff ISPs at least make a proffer that the specific email over which they are suing caused adverse affects.

more than run-of-the-mill spam, and admit they cannot show harm from specific emails, Opp. to Motion to Dismiss at 12, while offering no allegations whatsoever involving viruses, or emails in volumes that have any significant impact on Plaintiffs' systems.  Even if Plaintiffs are right about everything they say about spam generally—how much people dislike it, and how taxing the steps are that ISPs must take to combat it, etc.—none of that has anything to do with a CAN-SPAM cause of action, which lies only in certain limited circumstances.  What gets lost in Plaintiffs' rhetoric is an implicit admission: Consumers have mechanisms to avoid lawful, unwanted spam, and ISPs often assume this burden for them, a burden that, as Plaintiffs admit, has become relatively low-cost, standard business practice.  Opp. at 15-16.  Accordingly, short of fraud, wholesale refusal to facilitate or honor opt-ours, harvest attacks, or other malfeasance having a direct, identifiable adverse affect on an ISP's network separate from that caused by marketplace reactions to lawful spam, the CAN-SPAM Act does not provide a remedy.

Finally, Plaintiffs speak repeatedly of having not opted into or solicited the emails in question, as if that has any bearing on whether a CAN-SPAM violation exists.  While that may be the state of the law Plaintiffs and their comrades-in-arms might prefer,[9] that is *not* the legal standard for a violation under the Act.  The CAN-SPAM Act prohibits sending emails after the would-be recipient has opted out of further email from the sender.  15 U.S.C. § 7704(a).  It is not an opt-in regime.  Thus, any reference to the special "administrative" accounts Plaintiffs operate for the purpose of harvesting emails so that it can bring suits like this, makes clear that Plaintiffs pointedly do not exercise opt-out rights.  Accordingly, the claims involving Plaintiffs not opting into a given email (or body of emails) is an attempt at misdirection that this Court must ignore.[10]

---

[9] *See*, *e.g.*, www.spamhaus.org/faq/answers.lasso?section=Marketing%20FAQs#17 ("Nobody must ever be required to opt-out of anything they did not opt-in to in the first place.").

[10] The Court also must ignore the Opposition's sundry other irrelevancies and unsupported aspersions.  For example, Plaintiffs suggest certain links in the emails at issue "were destroyed by Defendant and its affiliates or [ ] disconnected as part of [ ] normal business operations" without citing any basis for leveling such an assertion.  Opp. at 21.  Plaintiffs also refer to "illegal tactics to avoid detection and send more spam," the "infecting [of] computers with viruses," and the "falsifying of domain name registrations," *id*., even though Plaintiffs have not alleged such conduct (nor could they) here, making the claims wholly irrelevant.  The same is true of Plaintiffs' unsupported attempt to raise the specters of this Court's website failing, or being hijacked for nefarious purposes, *id*. at 22, which also have nothing whatsoever to do with the

Page 12

### C. If the Court Declines To Stay the Proceedings, It Should Require Plaintiffs To Post a Bond.

Plaintiffs tellingly admit that courts are now allowing defendants to demand bonds from Plaintiff ISPs, "mostly in cases that are never heard on the merits." Opp. at 1. In other words, courts are allowing defendants to obtain security because they are likely to incur significant fees and costs in defending themselves, regardless of whether a lawsuit has merit, and even *then*, are finding it more cost-effective to settle cases. This is not surprising, given the million dollars in fees and costs that one defendant incurred in its lawsuit against AsIs.

Plaintiffs suggest that the Court must find ARG is likely to prevail on the merits to require a security, but that is just one of several factors a court considers. ARG believes it is likely to succeed on the merits but will not waste any more of the court's time explaining why, given the discrete issues here. Most of the remaining factors—namely the plaintiff's financial condition, the extent and scope of discovery, and the legal costs expected to be incurred—favor ARG. *See RLS Assocs., LLC v. United Bank of Kuwait PLC,* 464 F. Supp.2d 206, 220 (S.D.N.Y. 2006). As Judge Chen noted in granting a motion for a bond against AsIs, the company effectively has admitted its insolvency. 08-CV-07321 EMC, Dkt. 24 (July 2, 2008). And, "inability to pay prospective costs is sufficient in and of itself to justify an order requiring the posting of a cost bond." *RLS Assocs.*, 464 F. Supp.2d. at 221 (citation omitted). The extent and scope of discovery is already voluminous, and ARG expects to incur significant additional costs.

Plaintiffs suggest that ARG is to blame for the legal costs already incurred, but nothing could be further from the truth. ARG has spent substantially more money and company resources to respond to Plaintiffs' discovery than it did on filing a motion to dismiss and this motion for certification. And, it only filed the latter two motions given the dearth of authority supporting Plaintiffs' standing to bring a lawsuit. ARG did not "oppose" a protective order; in fact, it sought to reduce discovery costs by pushing for an order allowing its senior officials (rather than a hired expert) to see information critical to determining who sent the allegedly unlawful emails. It was

---

averments in this case.

Plaintiffs who insisted that the recipient email addresses, which were admittedly at inactive and unassigned accounts, were somehow "highly confidential."

Curiously, Plaintiffs suggest that if "they are the prevailing party, then costs and fees would be allowed for Plaintiffs," without citing any authority. Plaintiffs further misstate that the Court denied the defendant's motion for sanctions in *Optin Global*, Opp. at 24, when in truth the *Optin Global* court merely tabled the issue, explicitly stating that it would reconsider it after the appeal. C-05-05124 JCS, Dkt. 438 (August 25, 2008). As Judge Chen stated, "it is evident the ASIS's litigation is brought primarily for the purpose of profiting from litigation and not protecting its underlying business." 08-CV-07321 EMC, Dkt. 24. To decline both a stay (either accompanying certification or pending the outcome of *Optin Global, Gordon,* and *Ferguson*) and a bond would put ARG in an impossible position—it would be forced to incur hundreds of thousands of dollars on litigation that may well be dismissed or moot after a Ninth Circuit decision on the standing question.

DATED:  September 8, 2008

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: _/s/ Thomas R. Burke_
 THOMAS R. BURKE
 RONALD LONDON (*pro hac vice*)
 AMBIKA K. DORAN (*pro hac vice*)
 Attorneys for Defendant ACTIVE RESPONSE GROUP, INC.